Timothy Devlin (*pro hac vice* forthcoming)
tdevlin@devlinlawfirm.com
Lowell D. Jacobson (*pro hac vice* forthcoming)
ljacobson@devlinlawfirm.com
**DEVLIN LAW FIRM, LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010   Fax: (302) 353-4251

Marc J. Gross, Esq.
mgross@foxrothschild.com
Gerard P. Norton, Esq.
gnorton@foxrothschild.com
Jordan B. Kaplan, Esq.
jbkaplan@foxrothschild.com
**FOX ROTHSCHILD LLP**
49 Market Street
Morristown, New Jersey 07960
Tel: 973-992-4800
Fax: 973-992-9125

Tamara D. Fraizer (*pro hac vice* forthcoming)
tamara.fraizer@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
1841 Page Mill Road, Suite 110
Palo Alto, California 94304
Telephone:650 856 6500
Facsimile: 650 454 8777

*Attorneys for Plaintiff Happy Products, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAPPY PRODUCTS, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>ONTEL PRODUCTS CORPORATION; TELEBRANDS CORPORATION; BOSCOV'S DEPARTMENT STORE, LLC; BJ'S WHOLESALE CLUB, INC.; AND UNBEATABLESALE.COM, INC.,<br><br>    Defendants. | Civil Action No.<br><br>**COMPLAINT FOR PATENT INFRINGEMENT, TRADE DRESS INFRINGEMENT, FALSE ADVERTISING, UNFAIR COMPETITION, AND TORTIOUS INTERFERENCE**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Happy Products, Inc. ("Plaintiff" or "HPI"), by and through its undersigned

counsel, files this complaint against Defendants Ontel Products Corporation ("Ontel");

Telebrands Corporation ("Telebrands"); Boscov's Department Store, LLC ("Boscov's"); BJ's

Wholesale Club, Inc. (BJ's"); and Unbeatablesale.com, Inc. ("UBS") (together with Boscov's

and BJ's, "Retailer Defendants," and collectively, "Defendants") and alleges as follows:

### NATURE OF THE ACTION

1.     This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et

seq.*, the federal Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, the New Jersey Unfair Competition

Act, N.J. Stat. Ann. § 56:4-1, and New Jersey common law for acts relating to Ontel's

importation into and sale, offer for sale, distribution, marketing, advertising, and use in the

United States of the Pillow Pad or Pill-O-Pad media support device (hereinafter, "Pillow Pad").

Pillow Pad is a knock-off copy of HPI's visually distinct and patented Flippy® or Flipy® tablet

pillow stand (hereinafter, "Flippy") that has been distributed throughout the United States online

and at virtually all major retailers, and used to sell other and inferior media support products, to

the detriment of consumers and Plaintiff HPI.

2.     Shown below are HPI's Flippy (left) and Ontel's knock-off Pillow Pad product

(right).  As shown in the diagram below them, the Flippy and the Pillow Pad each provide three

different viewing angles for a supported media. Each of the three viewing angles is obtained by

flipping the device to rest upon each of its three sides.

 



3.      By virtue of this action, HPI seeks monetary damages and a preliminary and/or permanent injunction that prohibits Ontel and its principals from importing, making, using, distributing, marketing, advertising, selling and offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) into or in the United States, prohibits each Retailer Defendant and its principals from marketing, advertising, selling and/or offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) in the United States, and further prohibits Ontel, the other Defendants and their principals from assisting any other Entity in importing, making, using, distributing, marketing, advertising, selling or offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) and any product marked as "Pillow Pad" into or in the United States.

### THE PARTIES

4.      Plaintiff Happy Products, Inc. ("HPI") is a small woman-owned business that invented, developed, and continues to market and sell the Flippy.

5.      Happy Products, Inc. is a Delaware corporation located in Portland, Oregon.

6.      On information and belief, Defendant Ontel Products Corporation was founded by Ashok (aka "Chuck") Khubani in 1994, and offers "As Seen on TV" products including the Pillow Pad, which is indicated at www.asseenontvlive.com/best-sellers/ to be a "best seller."

7.      On information and belief, Ontel is a New Jersey corporation with its principal place of business at 21 Law Drive, Fairfield, New Jersey, 07004.

8.      On information and belief, Defendant Telebrands Corporation was founded by Ajit (aka "AJ") Khubani and, having created the "As Seen on TV" brand, offers "As Seen on TV" products.

9.      On information and belief, Telebrands is a New Jersey corporation with its principal place of business at 79 Two Bridges Road, Fairfield, New Jersey, 07004.

10.     Chuck Khubani is the founder, owner, and CEO of Ontel and a resident of New Jersey.

11.     On information and belief, Chuck Khubani was personally and directly involved in all aspects of the business of Ontel during at least the 2018–2019 period and through approximately summer of 2022.

12.     Amar Khubani is the President of Ontel and a resident of New Jersey.

13.     On information and belief, Amar Khubani is personally and directly involved in all aspects of the business of Ontel.

14.     AJ Khubani is the CEO of Telebrands and is a resident of New Jersey.

15.     On information and belief, AJ Khubani is personally and directly involved in all aspects of the business of Telebrands.

16.     Chuck Khubani and AJ Khubani are brothers.

17.     Amar Khubani is Chuck Khubani's son and AJ Khubani's nephew.

18.     On information and belief, defendant Boscov's Department Store, LLC is a Delaware entity with its corporate headquarters located at 4500 Perkiomen Ave., Reading, PA, 19606.

19.     On information and belief, defendant BJ's Wholesale Club, Inc., is a Delaware corporation with its corporate headquarters located at 350 Campus Drive, Marlborough, MA 01752.

20.     On information and belief, defendant Unbeatablesale.com, Inc. is a New Jersey corporation with its corporate headquarters located at 195 Lehigh Ave., Ste. 5, Lakewood, NJ, 08701.

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a)–(b) under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1051, 1121.  This Court also has subject matter over this action pursuant to 28 U.S.C. § 1367(a) for the claims arising under the New Jersey Unfair Competition Act, N.J. Stat. Ann. § 56:4-1, and New Jersey common law.

22.     On information and belief, this Court has personal jurisdiction over Ontel because Ontel is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

23.     On information and belief, this Court has personal jurisdiction over Telebrands because Telebrands is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

24.     On information and belief, defendant Boscov's is subject to the general personal jurisdiction of this Court based its continuous and systematic activities in New Jersey that include but are not limited to the eight Boscov's department stores operating in the state of New Jersey.  See https://locations.boscovs.com/nj/ .

25.     On information and belief, defendant BJ's is subject to the general personal jurisdiction of this Court based its continuous and systematic activities in New Jersey that include but are not limited to the twenty-five BJ's club locations operating in the state of New Jersey.  See https://www.bjs.com/clubLocator .

26.     On information and belief, defendant UBS is subject to the general personal jurisdiction of this Court based its continuous and systematic activities in New Jersey that including its incorporation, business location, and operation in the state of New Jersey. .

27.     On information and belief, this Court has personal jurisdiction over defendant UBS because UBS is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Ontel because Ontel resides in this District, because Ontel has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Ontel occurred in this District.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Telebrands because Telebrands resides in this District, because Telebrands has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Telebrands occurred in this District.

30.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Boscov's because Boscov's has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Boscov's occurred in this District.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to BJ's because BJ's has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against BJ's occurred in this District.

32.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to UBS because UBS resides in this District, because UBS has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against UBS occurred in this District.

**THE BUSINESS AND BUSINESS MODEL OF ONTEL AND TELEBRANDS**

33.    Ontel and Telebrands are each infamous for a pattern of copying successful proprietary products and seeking to piggyback on the innovations of others by selling "knock-off" products (often made in China), which are then imported into the United States.

34.    As alleged in an infringement lawsuit filed against Telebrands by MyPillow, "the principal of Telebrands, AJ Khubani, is known as the infamous 'Knock Off King' of the infomercial industry."

35.    Ontel and Telebrands each promote and offer for sale products online and through national direct response television commercials (aka "infomercials").

36.    Each of Ontel and Telebrands is a big player in the direct response industry and a well-known marketer of "As Seen On TV" products.[1]



37.    On information and belief, "As Seen on TV" is a brand used to identify products that are or were advertised and offered on direct response TV—i.e., via infomercials.

38.    Telebrands further touts itself as the creator of the "As Seen On TV" brand and logo.

---

[1] See https://www.asseenontvlive.com/brands/telebrands and
https://www.asseenontvlive.com/brands/ontel .

39.    Because of their superior size, market penetration, and retail connections, Ontel and Telebrands are able to quickly generate advertising and commercials to aggressively market "knock-off" products.

40.    Because these companies are often trying to determine whether they can generate sufficient sales *before* incurring the expenses of arranging for knock-off products to be manufactured, on information and belief, they typically do not have any products of their own on hand to be featured in their initial commercials and/or website materials.

41.    On information and belief, at least their initial commercials and related advertising and sales materials relating to such knock-off products thus instead typically feature the products that they are seeking to copy.

42.    If justified by the response to their initial commercials and other "test marketing," Ontel and Telebrands are each able to quickly arrange for knock-off products to be manufactured and get those knock-off products placed into "big box" stores and other retail channels.

43.    On information and belief, it is a standard business practice for each of Ontel and Telebrands, with the substantial involvement of their respective CEOs, to intentionally "test the market" to determine whether sufficient sales can be generated to justify the manufacturing and marketing of products.

44.    This was explained in a 2007 article in New York Magazine about Telebrands, which stated:

> The hard part, in fact, is accurately predicting demand, which Khubani's test-launches sometimes fail to do.  To roll out five new items, as Khubani will do this year, he'll film infomercials for at least twenty and try each one out for a week.  Each trial needs to generate double its advertising costs to make it to a full launch, which involves buying millions of dollars in national advertising time and ordering between a half-million and a million pieces.

See https://nymag.com/news/features/31806/ .

45.    Ontel and Telebrands each also markets and sells products at the retail level through well-known retailers.  For Ontel, these retailers have included Amazon, Target Stores, BJ's Wholesale Club, Boscov's, Kroger's (and various other brands operated by Kroger's,

including but not limited to Fred Meyer), Meijer, Big Lots, Ollie's Bargain Outlets, Walmart, Ace Hardware, Rite Aid, the JoAnn Stores, Lowe's, Bed Bath & Beyond, CVS, and Walgreens.

46.    Ontel's business model is straightforward: it typically identifies a successful pioneering product, has knock-off copies manufactured (often in China), and then imports the knock-off products into the United States for sale (both directly and through retail partners) at a substantially lower price than the pioneering product.

47.    On information and belief, Ontel seeks to free-ride on the success of pioneering products by undercutting them in the market, selling them at discounted prices relative to the original pioneering product.

48.    Ontel typically makes little (if any) effort to meaningfully distinguish its knock-off products from the pioneering products being copied.

49.    Rather, on information and belief, Ontel deliberately seeks to blur the lines between its knock-off products and the pioneering products being copied.

50.    The design of such knock-off products is normally substantially similar, if not identical, to the pioneering product being copied.

51.    Ontel's knock-off products are typically of inferior quality to the pioneering product being copied.

52.    Ontel's knock-off products being of inferior quality to the pioneering product being copied is a substantial reason why Ontel is able to offer its knock-off products at a lower price and undercut the pricing of the pioneering product being copied.

53.    Ontel's efforts to blur the lines between its knock-off products and the pioneering products are not just limited to knocking-off the design of the pioneering product being copied.

54.    Ontel also seeks to knock-off the advertising and marketing of the pioneering product being copied, including copying or emulating the messaging, images, and/or terminology used to advertise and market the pioneering product.

55.    Ontel's marketing for its knock-off products is typically substantially similar to that of the pioneering product being copied.

HPI V. ONTEL COMPLAINT

56.    On information and belief, in some instances, Ontel has actually used the product being copied to advertise its knock-off before any knock-off product has been manufactured for Ontel.

57.    Ontel is aware that this business model invites litigation in response.

58.    Many of the pioneering products targeted by Ontel are provided by small companies without substantial resources to litigate.

59.    The lack of resources of the typical companies behind the pioneering products targeted for copying by Ontel reduces the risk that lawsuits will be brought against Ontel for infringement of the targeted companies' intellectual property.

60.    Nevertheless, over the past quarter-century, Ontel has been repeatedly sued in the United States for such conduct, including tens of claims for each of trademark and/or trade dress infringement, patent infringement, and copyright infringement.

61.    The products copied by Ontel in such fashion include (but are not limited to) "the Perfect Push-Up," the "Pocket Hose", the "Pet-Rider," the "Guidelight" and the "SnapPower Charger," the "Sure Clip," the "Cami Secret," the "Firminator," ThinOptics reading glasses and attachable smartphone case, and the "Hair Master"—all of which are products covered by patents, copyrights, and/or trademarks.

62.    Ontel's approach has been described in detail in numerous other lawsuits, including (but not limited to) in paragraphs 48–54 of the complaint (Dkt. 1) in *KNR Indus. v. Ontel Prods.*, No. 2:04-cv-74055-JF-DAS (E.D. Mich., Oct. 18, 2004).

63.    Telebrands is also aware that its knock-off business model invites litigation in response.

64.    Many of the pioneering products targeted by Telebrands are provided by small companies without substantial resources to litigate.

65.    The lack of resources of the typical companies behind the pioneering products targeted for copying by Telebrands reduces the risk that lawsuits will be brought against Telebrands for infringement of the targeted companies' intellectual property.

HPI V. ONTEL COMPLAINT

66.     Nevertheless, over the past quarter-century, Telebrands has been repeatedly sued in the United States for such conduct, including tens of claims for each of trademark and/or trade dress infringement, patent infringement, and copyright infringement.

67.     In the 2007 New York Magazine article (see ¶ 44, above), when confronted with a charge that Telebrands copied the advertisement of a competing product frame-by-frame, AJ Khubani responded that he "didn't steal the idea from them" and claimed that "people are always borrowing in business.  The first person that came up with the laptop—how many times were they copied?  The first person who came up with the minivan?"

68.     AJ Khubani's own LinkedIn profile promotes "his" incredible success with the PedEgg and Pockethose products even though Telebrands and/or its distributors were sued for patent infringement for each of those products by Grace Manufacturing and Ragner Technology Corp., respectively.

69.     Ontel and Telebrands each employ aggressive bullying tactics in response to the potential of adverse litigation when these smaller companies attempt to assert their intellectual property rights against the respective Ontel and Telebrands knock-offs that saturate the market.

70.     Even so, according to a 2023 CBS News investigative report, Ontel and Telebrands have collectively faced over 100 lawsuits for intellectual property infringement.

71.     On information and belief, approximately 80% of these lawsuits have ended via settlement.

72.     On information and belief, Ontel and Telebrands typically condition their settlements upon the plaintiffs agreeing to strict non-disclosure agreements (NDAs) to prevent negative publicity and avoid further public attention on their knock-off business model, flagrant disrespect for innovators' intellectual property rights, unfair competition, and bullying and aggressive tactics.  This prevents these plaintiffs from publicly discussing the damage caused to their companies and IP by Ontel and Telebrands.

73.     At least in part because of the NDAs quashing public communication about the pattern of theft of smaller company IP by each of Ontel and Telebrands, they have each been

HPI V. ONTEL COMPLAINT

able to continue their respective knock-off product business models and thrive over the past decades.

## TELEBRANDS RIPS OFF BUNCH O BALLOONS

74.    The wildly popular "Bunch O Balloons" product was one such pioneering product targeted by Telebrands after it became apparent that there was substantial consumer demand for it.

75.    Josh Malone, the inventor of the Bunch O Balloons, filed a corresponding patent application in February 2014 (which issued as a patent in June 2015) and launched a Kickstarter campaign in July 2014 that raised over $120,000 in its first 48 hours and eventually secured $900,000 in pledges for Bunch O Balloons.  This indicated substantial consumer demand for the product.

76.    The overwhelming initial success of the Bunch O Balloons Kickstarter campaign also attracted substantial media attention, with articles from a wide variety of media outlets including (but not limited to) ABC News, CNN, Wired, Buzzfeed, Popsugar, Gigazine, D Magazine, Consumerist, Good Housekeeping, Woman's Day, Crowdfund Insider, Ars Technica, Vox, Time Magazine, CNET, the Verge, and a number of local news outlets.

77.    After discovering the Bunch O Balloons and learning about its successful Kickstarter campaign, Telebrands quickly worked with an outside consultant to develop a knock-off product that it called Balloon Bonanza,[2] which it began selling in late 2014 as an "As Seen On TV" product.

78.    According to a November 15, 2017 Wall Street Journal article titled "This Water-Balloon Battle Threatens to Soak Everybody," AJ Khubani admitted that he was aware of Bunch O Balloons when it launched its Balloon Bonanza knockoff.

---

[2] On information and belief, these knock-off Telebrands products have been sold under trade names including Battle Balloons, Balloon Bonanza, and Easy Einstein Balloons, each of which was subject to a preliminary injunction.

HPI V. ONTEL COMPLAINT

79.     When it learned that Telebrands was selling a knock-off product, Mr. Malone's exclusive licensee Zuru sent a cease-and-desist letter to Telebrands on December 23, 2014, demanding that Telebrands cease advertising and selling the knock-off Balloon Bonanza product and take down the sales website for its knock-off product.

80.     When Telebrands declined to take down its website and stop selling its knock-off product, Mr. Malone and his affiliated companies filed a lawsuit against Telebrands alleging trade dress infringement, federal and common law trademark infringement, copyright infringement, and fraud on January 27, 2015.

81.     After the Bunch O Balloons patent issued in June 2015, the first of several patent infringement lawsuits was filed by Mr. Malone's affiliated companies against Telebrands on June 9, 2015.  A preliminary injunction was requested on June 18, 2015, which was granted and took effect on December 2, 2015.

82.     In response, Telebrands modified its knock-off Balloon Bonanza product and continued selling similar knock-off products, prompting additional lawsuits by Mr. Malone's affiliated companies.

83.     With the spate of articles about the success of the Bunch O Balloons Kickstarter campaign less than a year old, Mr. Malone's litigation campaign attracted substantial attention beginning shortly after the filing of the first lawsuit.  Articles appeared in media outlets including (but not limited to) D Magazine (the first on June 11, 2015), Business Wire, the Wall Street Journal, Dallas News, Legal News Line, the Washington Examiner, the Bergen Record (NorthJersey.com)—the last of which was the hometown media outlet of Ontel and Telebrands and the Khubanis.

84.     According to the November 15, 2017 Wall Street Journal article, AJ Khubani was worried about losing the lawsuit, recognizing that "An adverse decision could have a crippling impact on the business."

85.     That same article also reported that AJ Khubani claimed that Telebrands's profits from its water balloon knock-off products had been eclipsed by the costs of corresponding litigations.

86.     On November 21, 2017, in Case No. 6:16-cv-00033 (E.D. Tex.), a jury in the Eastern District of Texas entered a patent infringement judgment of $12.3 million in actual damages against Telebrands for infringing U.S. Patent Nos. 9,315,282 and 9,242,479 through its Battle Balloons knock-off product, and further found the infringement was willful.

87.     The Bunch O Balloons litigations against Telebrands continued in 2018.  On information and belief, substantial litigation costs—which AJ Khubani referred to in the November 15, 2017 Wall Street Journal article—not only continued to accrue but accelerated.

88.     In one of these cases, No. 6:17-cv-00170 (E.D. Tex.), there were 270 different events reflected on the docket between January and mid-November 2018.

89.     On information and belief, Telebrands was also incurring substantial expenses relating to discovery in these ongoing litigations.

90.     Mr. Malone stated that his four years of litigation against Telebrands and its retailers involved nearly $20 million in legal fees.

91.     On information and belief, the legal fees incurred by Telebrands—which employed several different law firms, including the top-tier and very expensive Boies Schiller and Irell & Manella law firms—were substantially higher.

92.     The litigation against Telebrands relating to its knock-off quick-filling water balloon toys remained ongoing through early 2019.

93.     In March 2019, the $12.3 million jury verdict was more than doubled because of the finding of willful patent infringement to $26 million, and $4.7 million in attorneys fees awarded against Telebrands.

94.     Judge Schroeder ordered Telebrands to pay these "enhanced damages" based on the jury's finding of willful infringement and after further finding that Telebrands "took

untenable positions" at nearly every stage of the litigation, "demonstrated an intent to delay and obstruct" the proceedings and had "flagrantly ignored" the court's ruling.

95.      In addition, the court issued a permanent injunction against Telebrands.

96.      In May 2019, Telebrands reached a global patent litigation settlement with Mr. Malone and his affiliated companies that included a $31 million payment from Telebrands for the Battle Balloons infringement litigation, an agreement that Telebrands would not sell any of the accused products at issue, and an undisclosed "substantial sum" from Telebrands to settle other litigation over the Balloon Bonanza and Easy Einstein Balloons products that it sold.

97.      Telebrands released a statement characterizing this global patent litigation settlement as "a business decision" that would "allow[] TeleBrands to focus its efforts and resources on its business of developing and marketing innovative products."

## THE PATENTED MEDIA SUPPORT

98.      U.S. Patent No. 9,642,454 ("the '454 patent"), titled "Multiple Viewing Angle Media Support," was duly issued to inventors Bruce Cannon and Juliette Fassett.

99.      The '454 patent describes a media support apparatus that includes three support sides (155) that can be disposed about a central axis (125), each side having a support back (105) and support edge (110), where the top of each back support is in physical communication with the edge support of another side, as shown in Figure 1 (included below).



FIG. 1

100. The application that eventually matured into the '454 patent was filed on June 24, 2016, claiming priority to an application filed on October 20, 2014; the '454 patent issued on May 9, 2017, with ten (10) claims.

101. Claim 1, like every claim of the '454 patent, is directed to "[a]n apparatus comprising: three support sides, each support side comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior" where the plane of each back support is at a particular angle to a specified "virtual plane," providing three specified "viewing angles," and "wherein each back support, each edge support, and each end is a surface of the solid interior [and] the solid interior is a pillow covered in fabric."

102. A true and correct copy of the '454 patent is attached as **Exhibit A**.

103. U.S. Patent No. RE48,479 ("the '479 patent") is a reissue of the '454 patent that issued on March 23, 2021.

HPI V. ONTEL COMPLAINT

104.    The '479 patent has the same figures, title, and descriptions as the '454 patent and includes the same ten (10) claims as the '454 patent, as well as nineteen (19) additional claims.

105.    Claim 12 of the '479 patent, for example, is directed to a "media support apparatus comprising: a body having a first support back, a second support back, and a third support back disposed about a central axis" where each support edge is "disposed between" two support backs, wherein "the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions …" and provides three "viewing angles" that are different from one another.

106.    A true and correct copy of the '479 patent is attached as **Exhibit B**.

107.    HPI is the owner under applicable law and by assignment of all right, title, and interest in the '454 and '479 patents, including the rights to sue, recover damages and obtain equitable relief for the patents' infringement.

## JULIETTE AND BRUCE DESIGN AND DEVELOP FLIPPY

108.    Juliette Fassett and her husband Bruce Cannon co-invented the patented "multiple viewing angle media support" disclosed and claimed in the '454 and '479 patents.

109.    Juliette Fassett is a repeat entrepreneur who has founded multiple businesses since she was in her 20s.  Her interest in consumer products was honed by her having lived and worked in Japan and experiencing its cultural focus on excellence in design and attention to detail.  In particular, while working at Toyota Chuo Kenkyuusho (Toyota's think-tank), Juliette came to understand the concept of "*ii kanji*"—which is defined as something like "good function or feeling" and further connotes the idea of exceeding expectations.

110.    Juliette's husband and co-inventor, Bruce Cannon, is an optical engineer and scientist with 35 years of experience designing optical systems—primarily sighting equipment for military applications, but also for consumer products.  One notable contribution is Bruce's thermal imaging work on the FLIR Star SAFIRE, which is a gyro-stabilized electro-optical infrared system most often used in airborne, land, and maritime force protection and medevac

operations. This system was famously instrumental in the capturing of Boston Marathon bomber Dzhokar Tsarnaev by Massachusetts State Police in 2013.

111.    Juliette and Bruce are the named co-inventors on the Flippy patents, and between them, are the named inventors on 13 patents.

112.    Circa 2011, there were very few tablet stands that could hold a tablet or iPad in a perfect reading position both comfortably and without the user's assistance. Most of the available tablet stands were made of hard metal and/or plastic and required support from the user.

113.    So Juliette spent 2 years researching, thinking, drawing, examining, messing with, building and taking apart tablet stands. She formulated many ideas about what she thought would work and what was missing in the marketplace.

114.    With Bruce's input, they were able to realize their concept of a soft but supportive stand that would provide multiple reading angles—appropriate for multiple positions such as sitting, standing, and lying down—with the flip of the wrists.

115.    Juliette and Bruce had CAD drawings prepared for the Flippy as part of the design and development process.

116.    In particular, the geometry and trigonometry of the Flippy is something that Juliette and Bruce worked on for 18 months before settling on the design. The optical angles for viewing (the trigonometry part) needed to achieve appropriate depth-of-focus and take into account brightness degradation and eye relief—all while meshing perfectly with the support aspect of having the Flippy on the viewer's body (the geometry part) because one primary use is for when the viewer is lying down (e.g., in bed or on the couch).

117.    Juliette and Bruce filed their provisional patent application on Flippy in 2013, and their initial patent issued in 2017.

118.    The Flippy has three support sides, each comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support, and each edge is "disposed between" two support backs—as variously recited in the claims of the '454 and '479 patents.

119.    The claims of the '454 and '479 patents do not, however, specify how any back support is "in physical communication with" any edge support, or how any edge support is "disposed between" two back supports.

120.    The Flippy is and always has been characterized by rounded bumper-like shapes between each back support and the next edge support, as shown in the image below.



121.    Juliette knew that her Flippy had to have a certain "*ii kanji*," so she specifically included these rounded ledges for the lip of the media support in her design for the otherwise prism-like device, which evoke waves rolling onto a beach.



122.   Juliette has always viewed these rounded ledges as a signature aesthetic feature of her design.

123.   Throughout the design iteration process and manufacturing of Flippy, Juliette insisted on maintaining these signature rounded ledges to her precise personal standards of roundedness to produce the right "*ii kanji*" for Flippy

124.   Even back from the earliest days of designing what would become the Flippy in November 2011, Juliette remarked that one proposed product design was "just to[o] sharp" and that she and Bruce "ha[d] to go back to rounding the design."  When viewing a revised design two days later, Juliette again remarked that "we need to round out the [l]edges much, much more."

125.    Juliette refused to compromise on her standards of roundedness for the rounded ledges throughout the product lifecycle, including during manufacturing.

126.   As another example of her commitment to Flippy's "*ii kanji*," Juliette spent months working on indentation force deflection alone in order to determine the optimal foam to use for Flippy.

127.   Overall, each design element of the Flippy product was the result of an exhaustive process of iteration and research on design and material decisions informed by Juliette's and Bruce's decades of experience.

128.    Juliette was determined to create the perfect multi-angle tablet stand and was meticulous in her process of developing Flippy.  The only corners she cut were literal—to form Flippy's signature rounded ledges.

129.    The distinct look and shape of the Flippy design is shown below in its emblematic format, for which the USPTO award HPI registered trademark No. 7,437,967 in 2024.



130.    Juliette's development of Flippy also leveraged her keen sense of style and appreciation for marketing—calling it "Flipy" (and then "Flippy") to emphasize that the multiple angles are provided by flipping the product around its horizontal axis.

131.    Juliette then sought to register trademarks for Flipy and Flippy in order to further protect the brand that she had spent so much time and effort to develop.

**HPI'S FOUNDING AND BUSINESS**

132.    Juliette founded HPI in September 2018 to attract investment to support burgeoning sales of Flippy directly to consumers through various channels.

133.    Based on large purchase orders from QVC, which were based on market tests, Juliette took private investment and formed HPI as a Delaware-registered C Corporation, issuing shares to investors.

134.    This private investment lowered the cost of capital for Juliette and HPI by making it unnecessary to seek traditional purchase order financing (at a higher cost) to fund production of the Flippy units for the QVC purchase order.

135.    Through HPI, Juliette was committed to providing a quality product from a socially conscientious business platform:  HPI was and is a nationally-registered WBENC (Women's Business Enterprise National Council) business and HPI supported its literacy partner www.firstbook.org through product sales and also helped employ developmentally challenged adults through warehouse operations.

136.    In November of 2018, Flippy sold out on QVC in a single airing: $500,000 worth of product in 12.5 minutes.  The product was a hit.  HPI's revenues in 2019 totaled $7,000,000— all from sales of Flippy.

137.    Since selling out on QVC, HPI has offered for sale and sold the Flippy continuously, including on Amazon, Etsy, Grommet, and direct-to-consumer on its own website, getflippy.com .

138.    As shown in the annotated image below, the '454 patent was at all relevant times clearly marked on a tag attached to the Flippy product itself:



139.    As shown in the annotated image below, the '454 patent was at all relevant times also clearly marked on the packaging for the Flippy product:



140.    All product and packaging for Flippy that were manufactured after issuance of the '479 patent were marked with the '479 patent, as were all subsequent orders thereafter by HPI of Flippy product and packaging.

**ONTEL AND TELEBRANDS PERSONNEL ORDER MULTIPLE FLIPPY PRODUCTS**

141.    Prior to its television debut and rapid sell-out on QVC, Flippy sold well on Amazon, showing up as a hot product thanks in large part to an overwhelming number of five-star reviews.

142.    On information and belief, Ontel was monitoring Amazon for popular and/or innovative products.

143.    On information and belief, at least one Ontel product development employee at the time noticed the sales and positive reviews of Flippy and decided to investigate further.

144.    On October 1, 2018, an order was placed with Amazon for a grey Flippy for delivery to Ontel's corporate address (21 Law Drive, Fairfield, NJ 07004).

145.    On information and belief, this Flippy was actually delivered to Ontel's corporate address.

146.    This Flippy was marked (on both the product and the packaging) as patented under the '454 patent.

- 23 -                          HPI V. ONTEL COMPLAINT

147.    About a month later, on November 3, 2018, HPI's Flippy was featured on QVC and HPI sold its entire inventory of product—over 15,000 units—in under 13 minutes, earning over $500,000 in sales revenues.

148.    That same day, Flippy sales on Amazon did another $40,000 in sales, as some potential customers who could not purchase on QVC immediately sought out the Flippy for purchase.

149.    In one day, Flippy had sold more than its three prior years combined.

150.    This tsunami of consumer demand was, like the rapid early success of the Bunch O Balloons Kickstarter campaign in 2014, the sort of data that indicated that substantial sales might justify the marketing and manufacturing of knock-off products.

151.    On information and belief, Telebrands thus saw the opportunity to apply its knock-off business model to the innovative Flippy product, and decided to investigate further.

152.    Nine days later, on November 12, 2018, four charcoal-colored Flippys were purchased on Amazon for delivery to Telebrands's corporate address (79 Two Bridges Road, Fairfield NJ 07004) addressed to Manish Israni, Telebrands's Vice President of Market Research and New Product Acquisition.

153.    On information and belief, each of these Flippys was delivered to Telebrands's corporate address.

154.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

155.    On November 13, 2018, Telebrands founder and principal Ajit ("AJ") Khubani bought four charcoal-colored Flippys on Amazon to be delivered to his home in Saddle River, New Jersey.

156.    On information and belief, each of these Flippys was actually delivered to AJ Khubani's home.

157.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

158.    On information and belief, based on Amazon's typical shipping speeds, at least the November 12, 2018 order to Telebrands's corporate address was actually delivered on or before November 15, 2018.

159.    On information and belief, upon receiving and examining the Flippy products that it ordered, Telebrands formed a belief that, consistent with its typical business model, it could generate substantial revenue with a knock-off product based on Flippy.

160.    However, at this time, Telebrands was less than one year removed from a massive adverse $12.3 million jury verdict in the Bunch O Balloons litigation, which was accompanied by a finding of willful infringement for its Battle Balloons knock-off product.

161.    At this time, the damages enhancement for Telebrands's willful infringement had yet to be decided.

162.    At this time, Telebrands remained also in the thick of substantial litigation involving all of its knock-off quick-fill water balloon products.

163.    On information and belief, Telebrands had expended and was continuing to expend substantial sums on legal fees and other litigation expenses relating to the lawsuits involving its knock-off quick-fill water balloon products.

164.    On information and belief, Telebrands was also continuing to attract periodic negative attention for its behavior in the legal press and even some general media outlets relating to its various efforts to knock off the Bunch O Balloons product.

165.    On information and belief, with the amount of the damages enhancement for its willful infringement by the Battle Balloon knock-off still pending,[3] Telebrands was loath to attract any additional negative publicity.

166.    In particular, and despite the financial opportunity, the last thing that Telebrands wanted at this particular time was to spearhead another high-profile knock-off product that might make its way before the judge who was considering the penalty for Telebrands's willful infringement and convey that Telebrands had not learned its lesson.

_____

[3] As mentioned above, the damages enhancement was decided in March 2019.

167.    On information and belief, recognizing the financial opportunity but concerned about potential blowback and bad optics in its ongoing litigation, Telebrands passed its positive assessment of the opportunity presented by a Flippy knock-off product to Ontel, likewise located in Fairfield, New Jersey, and run by AJ Khubani's brother Chuck and nephew Amar.

168.    On information and belief, beginning on or about November 15, 2018, with knowledge of the '454 patent being marked on the Flippy product and/or packaging, Telebrands and its principals actively encouraged Ontel and its principals to advertise, offer for sale, sell, have made, and import a knock-off multi-angle soft tablet viewing stand based on the Flippy.

169.    On November 15, 2018, another four charcoal-colored Flippys were purchased by "AJ" on Amazon for delivery to Telebrands's corporate address (79 Two Bridges Road, Fairfield NJ 07004).

170.    On information and belief, each of these Flippys was delivered to Telebrands's corporate address.

171.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

172.    Over the two weeks following the first order from Telebrands, beginning on November 15, 2018 (on information and belief, after the Flippys had been received by Telebrands), Ontel employee Lorraine Addice placed multiple orders via Amazon for delivery of another twenty-six (26) Flippy products (comprising multiple quantities of each of the grey, charcoal, dark blue, and burgundy colors) to Ontel's corporate address (21 Law Drive, Fairfield, NJ 07004).

173.    On information and belief, each of these Flippys was actually delivered to Ontel's corporate address.

174.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

175.    While most of these products were addressed for delivery to Ontel employee Carly Buonocore, these orders also included a grey Flippy that was ordered on November 20, 2018 for delivery to Ontel's Vice President Karen How-Lebrenz.

### ONTEL'S AND TELEBRANDS'S KNOWLEDGE OF THE '454 AND '479 PATENTS

176.    Telebrands has thus known about the '454 patent since November 2018.

177.    Ontel has thus known about the '454 patent since November 2018.

178.    In addition, Ontel's President Amar Khubani and Ontel's CEO Chuck Khubani were personally aware of HPI's proprietary interests in the Flippy, and its allegations that Ontel was "stealing" from HPI and needed a license from HPI to sell the Pillow Pad, as of at least March 9, 2019, when HPI's CEO sent an email to them about this.

179.    Ontel's in-house counsel Caroline Kinsey was also personally aware of HPI's proprietary interests in the Flippy, and its allegations that Ontel was "stealing" from HPI and needed a license from HPI to sell the Pillow Pad, as of at least April 11, 2019, as reflected by her email correspondence with HPI's CEO on that date.

180.    Ontel has known about the '479 patent since at least April 2021, when Amazon informed Ontel that HPI filed a complaint with Amazon's seeking to have Ontel's knock-off Pillow Pad product removed from Amazon's listings because it infringed the '479 patent.

181.    On information and belief, in June 2021, Ontel was informed by Amazon that Ontel's knock-off Pillow Pad was being de-listed from Amazon based on Ontel's failure to contest HPI's claim that the knock-off Pillow Pad product likely infringed the '479 patent.

182.    After the communications from Amazon in June 2021 that the Pillow Pad could no longer be sold on Amazon, and without any license from HPI, Ontel has continued to advertise, distribute, offer for sale, and sell its Pillow Pad products through channels other than Amazon.

183.    On information and belief, Ontel was also made aware of HPI's allegations that the knock-off Pillow Pad product infringes the '479 patent by retailers who received letters from

HPI putting them on notice of infringement of the '479 patent due to their sales and offers for sale of knock-off Pillow Pad products sourced by Ontel.

184.    After receiving communications from retailers that HPI's counsel had sent them letters alleging the Pillow Pad infringes the '479 patent and demanding that sales of Pillow Pad cease, and without any license from HPI, Ontel continued to advertise, distribute, offer for sale, and sell its Pillow Pad products.

185.    Flippy was marked, on the product itself and its packaging, with the '454 patent and/or the '479 patent at all relevant times.

186.    Each Retailer Defendant has at least been on constructive notice of the '454 patent and/or the '479 patent at all relevant times.

### ONTEL PROVIDES A KNOCK-OFF PRODUCT CALLED PILLOW PAD

187.    On information and belief, as of 2019, Ontel had entered into agreements with each of numerous retailers pertaining to their purchase, distribution and/or sale of one or more Ontel products.

188.    On information and belief, throughout 2019, Ontel made arrangements with numerous retailers for their purchase, distribution and/or sale of its Pillow Pad product.

189.    Throughout 2019, Ontel's Pillow Pad product was advertised on television.

190.    Ontel aired its first television advertisement for a multi-angle soft tablet product that it called the Pillow Pad in February 2019.

191.    Ontel also created a Facebook page for the Pillow Pad on February 6, 2019, as shown in these screenshots taken in March 2019:





192.    In February 2019, HPI learned of Ontel's knock-off Pillow Pad product when a friend of Juliette Fassett's saw Ontel's "As Seen on TV" late night cable advertisement, and called Juliette to tell her about it.  Shortly thereafter, HPI learned that Ontel had created a website for its knock-off Pillow Pad product, from which it was taking orders.

193.    On information and belief—based on at least the delivery of numerous grey, blue, and burgundy Flippys to Ontel's corporate address; Ontel depicting and showing its Pillow Pad product in substantially similar grey, blue, and burgundy colors; and an apparently sewn-on side pocket in the same location as the Flippy logo—at least the first advertisement for Ontel's knock-off Pillow Pad product and product depictions on Ontel's Pillow Pad 360 Facebook page did not depict anything that Ontel manufactured or had made, but instead depicted the Flippy products that were delivered from Amazon to Ontel as if they were the product that Ontel was offering for sale and selling.

194.    On information and belief, based on the response to Ontel's initial television advertising, Ontel subsequently arranged for a knock-off product to be made, consistent with its

historical business model of testing the market and only arranging for knock-off products to be manufactured if sufficient sales interest could be generated.

195.    Among the numerous misstatements in Ontel's advertisements was a claim that its knock-off Pillow Pad product had an "Innovative Ledge Design!"



https://www.youtube.com/watch?v=RrdibdsDLYw

196.    But this ledge design was no innovation of Ontel's; rather, it was copied directly from the Flippy products that were delivered to Ontel after the QVC Flippy sell-out, as was the rest of the knock-off Pillow Pad's design, right down to the colors offered.

197.    The original logo associated with the "Pillow Pad 360" advertisement also used a logo that was substantially similar to the iconic shape of HPI's innovative and distinctive Flippy product, for which HPI subsequently received a trademark registration.

198.    On information and belief, Ontel directly copied both the functional and design elements of the Flippy products that it ordered.

199. As shown in the attached Exhibit C, the Pillow Pad infringes at least claim 1 of the '454 patent, at least under the doctrine of equivalents.

200. Given that the Flippy products delivered to Ontel in late 2018 included grey, blue, and burgundy Flippys, it was no coincidence that the Pillow Pad was offered in substantially similar (if not identical) grey, blue, and burgundy colors:



https://www.youtube.com/watch?v=RrdibdsDLYw

201. On information and belief, at least initially, Ontel did not offer its Pillow Pad product in any colors other than those in which the Flippy was available.

202. On information and belief, Ontel's Pillow Pad product has been made in and imported from China beginning in late 2018 and/or early 2019.

203. Ontel's Pillow Pad product was (and continues to be) priced more cheaply than Flippy and its initial pricing was intended to drastically undercut Flippy's pricing.

204.    Flippy's pricing was based in part of its use of high-end materials specifically and meticulously selected by Juliette to convey the right "*ii kanji*."  In contrast, Ontel's knock-off Pillow Pad product was of vastly inferior quality, which allowed for its drastically lower price.

205.    Numerous reviews have remarked on the very light weight and flimsy feel of the Pillow Pad product, and the poor quality of the materials for the pad cover and the zipper.

206.    These include a video review from the "Freakin' Reviews" account on YouTube, which noted that most positive reviews of the Pillow Pad were submitted by Ontel or persons at Ontel, and demonstrated the "cheap design" of the Pillow Pad at



https://www.youtube.com/watch?v=b4eMvA0s8zE

207.    A number of comments posted to the "Freakin' Reviews" video review of Ontel's knock-off Pillow Pad product specifically noted its inferior quality as compared to the Flippy. These include the following comments:



"problem is the 'pillow pad' is a ripoff of the Flippy and if you look at the reviews it's [*sic.*] quality is poorer and the original which makes sense since it's a ripoff and cheaper.."



"I bought a flippy 2+ years ago, and at that time it was only one of it's kind [*sic.*] on Amazon and $50. . . . I do think the flippy is a lot firmer than the pillow pad, and perhaps heavier."



"I'm between this [Pillow Pad] and the Flippy, but Flippy has better reviews on Amazon and looks way better. I think I'll pay $5 for a better made pillow. Flippy also looks better on videos."

208.    Numerous Amazon reviews of Ontel's Pillow Pad product also criticized its

inferior quality as compared to Flippy. For example:



"I bought this for my husband. It came earlier today. . . . Once opened, it was not recognizable as compared to illustration on line. . . . It was unusable. I am returning it. And will have to pay more for a Flippy or look locally for one that actually looks and functions as a tablet pillow."



"I have a Flippy brand iPad pillow. It's a great product but it's a little pricey so I purchased this product for a second room. This is a piece of junk. Please just don't buy one. I returned it the next day. Amazon says it's a 'frequently returned item. Haha. That should tell you all you need to know about it."



"I had previously had a flippy which I loved. I was shocked when this one came to my door and was rolled up and shoved in a plastic tube holder. I took it out as it said to do and let it sit out for five hours, and it still look like it was just taken out of the tube. So I shoved it back in and I'm returning it. I will have to pay more for a real flippy, but I'm willing to do it."



"This is no where near as good as a flipy. I actually feel my search misled me to this one but live and learn. . . . I have a flipy and it's wayyyy more solid and easy to move around with the iPad on it. If not for my coardboard hack this would sorta cave under the weight when picked up with one hand . . . . Honestly not worth my time to return. Trust my advice spend the extra 15 and get the real one."



"This pillow came rolled up tight in a skinny little box.. many days ago.. it still hasn't recovered. It's a little lopsided and badly wrinkled. It's hollow in the middle and the foam is split on one side. I bought it because it cost less that the Flippy brand pillow and they made it look nice like the Flippy in the listing. Since then, I bought a real Flippy tablet pillow and it didn't come rolled and squashed and is very nice quality."

209.    In March 2019, Ontel listed the Pillow Pad in its catalog at the housewares show in Chicago that same month.

210.    After receiving emails from HPI's CEO in March and April 2019, without any license from HPI, Ontel continued and/or began to develop, import, advertise, distribute, offer for sale, and sell its Pillow Pad products.[4]

---

[4] On May 10, 2019, Ontel first used the name "Pillow Pad" in commerce.

211.    Through December 2020, Ontel's Pillow Pad product was advertised on TV by Ontel, with almost 4000 airings of 4 different commercials through December 2020.

212.    On information and belief, Ontel spent at least approximately $2 million on television advertising / media for its Pillow Pad product, which ranked as a top-50 product based on advertising spend in the year starting in September 2019—after its commercials had already been airing for about six months.

213.    Among other sales channels, Ontel initially sold its Pillow Pad product on a direct sales website created and run by Ontel.

214.    During this same time, Ontel's Pillow Pad product was also offered for sale by Ontel via Amazon and through various retailers, online and/or in their physical stores.

215.    Following the issuance of the '479 patent in March 2021, Ontel's knock-off Pillow Pad product has been sold primarily by retailers and other third parties.

216.    On information and belief, Ontel agreed to indemnify many of the retailers who sold and/or are selling the knock-off Pillow Pad product against certain claims of patent and/or other intellectual property infringement.

## ONTEL UNFAIRLY COMPETES WITH HPI

217.    On the basis of the QVC sellout, Juliette reached out to the buyer at Bed, Bath and Beyond ("BBB") in January 2019 in an effort to place Flippy in BBB retail channels.  Juliette explained that the Flippy product was patented, had sold out on QVC, and enjoyed consistent 5-star reviews.  Juliette also shared that HPI had a highly experienced team and financing in place, and was ready to add retail partners.

218.    BBB's buyer, Greg Rosenthal, responded tersely via email, stating "we would not bring in that product."

219.    When Juliette followed up, asking if there were other buyers at BBB who would be more appropriate, Greg Rosenthal confirmed "[N]o, this would fall in my area."

220.    On information and belief, BBB had an ongoing relationship with Ontel and had served as a retail outlet for a number of "As Seen on TV" products supplied by Ontel.

221.     BBB was another prominent company based in northern New Jersey, with its headquarters in Union, a mere 20 miles or so away from the Fairfield headquarters of Ontel and Telebrands.

222.     In less than 6 months after stating that "we would not bring in that product" to Juliette, the knock-off Pillow Pad product supplied by Ontel was, on information and belief, in Bed, Bath and Beyond stores across the USA.

223.     A picture of Ontel's Pillow Pad product on the shelves at a BBB retail location on or about July 19, 2019, is shown below:



224.     Ontel's knock-off Pillow Pad product was a multi-year retail success for BBB. Even as BBB was closing, the Pillow Pad was one of the last products still sold in stores and online.

225.    The experience with BBB is illustrative of how the growth trajectory for HPI—especially through the retail sales channel—was quickly eclipsed by the immediate launch of the knock-off Pillow Pad product, consistent with Ontel's knock-off business model.

226.    On information and belief, at that time Ontel had similar arrangements and similar plans in the works with a number of other retailers.

227.    Ontel's knock-off Pillow Pad product began to show up on retail shelves across the nation in or around July 2019.  At this time, Juliette Fassett personally found Ontel's knock-off Pillow Pad product being sold at BBB and in Walmart retail locations.

228.    In September 2019, Juliette Fassett found Ontel's knock-off Pillow Pad product for sale at her local Kroger store, Fred Meyer.  A number of Juliette's friends, familiar with Flippy, contacted her with congratulatory messages that they were pleased to see "Flippy" being sold on the shelves.

229.    Even these friends—who were familiar with Juliette and her years of developing Flippy, and at least some of whom had actual Flippy tablet stands—were confused about the source of Ontel's knock-off Pillow Pad product that they saw on the shelves at Fred Meyer, conflating it with HPI's innovative Flippy.

230.    Even when Josh Malone, the inventor of Bunch O Balloons, posted on his LinkedIn page about Ontel (and Walmart) knocking off Juliette's innovative Flippy tablet stand, one of the commenters congratulated Juliette for a great idea after having seen what he thought was her original Flippy product on the shelves at Fred Meyer—when it was actually Ontel's knock-off Pillow Pad product that was being sold and offered for sale at Fred Meyer.



231. On December 29, 2019, Juliette received an email from an irate Fred Meyer customer who purchased Ontel's knock-off Pillow Pad product. This customer reached out to Juliette and was seeking compensation for the fact that that her red "Flippy" bled on her new white duvet. Juliette responded, explaining that what was purchased was not Flippy but rather Ontel's knock-off Pillow Pad product, and that this customer should reach out to Kroger and Ontel instead.

232. By the end of 2019, Ontel's knock-off Pillow Pad product was in retail locations including at least Defendants BJ's and Boscov's, as well as Walgreens, Target, Walmart, Big Lots, Joann's stores, Lowe's, BBB, and Meijer.

233. Ontel's knock-off Pillow Pad product was also being sold online from a number of the retailers' respective websites (including those of BBB, Target, and Walmart), as well as

HPI V. ONTEL COMPLAINT

Amazon and the various direct-sales website that Ontel had created for its knock-off Pillow Pad product.

234.    In addition to being blocked from expanding into retail channels because Ontel's knock-off Pillow Pad product was so quickly ensconced across the channel, HPI's successful Amazon and QVC sales channels soon faltered.

235.    On November 22, 2019, Juliette received a return notification from Amazon from a Flippy customer, who indicated that "There is an item almost identical to this being sold at Lowes for $15 cheaper." On information and belief, Lowe's was at least offering for sale Ontel's knock-off Pillow Pad product as of that date.

236.    On New Year's Eve, December 31, 2019, the QVC buyer sent Juliette an email with a photo of the knock-off Pillow Pad being sold at a Walmart location in Boothwyn, PA:



237.    The QVC buyer's email stated:

> Hi Juliette,
>
> Stumbled upon this at Walmart. Is this the competitor we've been discussing for the last year now? Can you update us on the legal standings?
>
> Thanks

238.    That saturation of retail channels by Ontel's inferior quality and lower-priced Pillow Pad product was the beginning of Flippy's demise. As Ontel's knock-off Pillow Pad

product advertised head-to-head with Flippy on Amazon and also sold widely in a variety of retail channels, sales of Ontel's knock-off Pillow Pad eclipsed those of Flippy, and consumers who purchased Ontel's knock-off Pillow Pad continued to confuse and conflate it with Flippy.

239.    Even in response to a Facebook post on Flippy's page in September of 2020, a number of people responded with comments indicating that they had actually purchased a Pillow Pad instead, such as Linda Zary, who thought that she purchased a Flippy at Walmart—which never stocked Flippy, and instead had (and still serves as a seller of) Ontel's knock-off Pillow Pad product:



240.    Two other people commented in response, each that theirs is "called pillow pad," demonstrating actual confusion of Ontel's knock-off with HPI's high-quality innovative product:

241.    Ontel's knock-off product, price-undercutting efforts, and deliberately confusing advertising blocked the forward trajectory of Flippy, destroying the market and freezing any potential monetization of HPI's innovation.  HPI's QVC sales immediately tanked and its Amazon sales softened as Ontel undercut HPI with a cheap, inferior-quality knock-off product that saturated the category in every sales channel.

242.    As Ontel's knock-off Pillow Pad product remained for sale in retail locations, including each of the Retailer Defendants, at prices calculated to undercut HPI's sales, Flippy sales suffered tremendously:  From 2018 sales of $682,000 and 2019 sales of over $6.9 million, Flippy's 2020 sales decreased to $4.3 million, and they continued to decline to $3.277 million in 2021, $1.5 million in 2022, and $1.0 million in 2023.

243.    At least as of May 27, 2023, Boscov's was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow Pad product, as evidenced by the screenshot below taken on that date:



244.    On June 2, 2023, HPI provided actual notice, via email from its outside counsel, to Boscov's that its sales and offers for sale of Ontel's Pillow Pad products infringed the '479 patent.

245.    At least as of May 27, 2023, BJ's was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow Pad product, as evidenced by the screenshot below taken on that date, which indicated that the Pillow Pad was out of stock at that moment:



246.    On June 16, 2023, HPI provided actual notice, via email from its outside counsel, to BJ's that its sales and offers for sale of Ontel's Pillow Pad products infringed the '479 patent.

247.    At least as of around October 25, 2023, UBS was continuing to sell and offer for sale, at least via its website, Ontel's knock-off Pillow Pad product, as evidenced by the packing list dated October 25, 2023 for an order of an Ontel knock-off Pillow Pad delivered to Juliette around that date:

248.    As an example of HPI's declining sales and price erosion due to Ontel's knock-off Pillow Pad product, non-party Ollie's Discount Outlets ("Ollie's") made Juliette an initial low-ball offer of $3/unit in October 2023 in response to September 27, 2023 email correspondence from Juliette.

249.    Ollie's buyer, Jonathan Lampert, elaborated on the rationale behind the low-ball offer in an email sent to Juliette on October 13, 2023: "I know this is <u>way</u> below your cost/handling/etc.  Unfortunately, the price bar was set very low with the excess we bought before.  $3.00 is actually double what we paid them."

250.    On information and belief, Mr. Lampert's use of "the excess we bought before" and "what we paid them" referred to Ontel and its knock-off Pillow Pad products.[5]

---

[5] On information and belief, Ollie's was offering for sale and selling Ontel's knock-off Pillow Pad products from its physical retail locations at least as of May 2023.

251.    After making substantial progress on a purchase agreement through early December 2023, and sending HPI a purchase agreement on December 5, 2023, Ollie's ultimately declined to take a license or purchase the Flippy from HPI just one week later.

252.    But for Ontel's provision and advertising of its knock-off Pillow Pad product—including through its retail partners, including but not limited to the Retail Defendants—HPI was ready and poised to move into big box retailers and their physical and online sales channels. Even beyond Juliette's own decades of experience as a wholesale product developer and seller who has been selling into retail channels her entire career, HPI was set up with connected and experienced partners for warehousing, end-to-end logistics, and oversight for manufacturing in China.   HPI also had an experienced CFO and a network of investors and advisors who were ready and willing to assist with using the momentum from the QVC sellout to see HPI through to providing Flippy to physical retail locations.

**AMAZON REMOVES ONTEL'S KNOCK-OFF PILLOW PAD PRODUCT**

253.    On April 1, 2021, HPI filed a complaint with Amazon's Utility Patent Neutral Evaluation ("UPNE") program in an effort to get Ontel's knock-off Pillow Pad product removed from Amazon's listings for infringing the '479 patent.[6]

254.    As shown in the attached Exhibit D, Ontel's knock-off Pillow pad product infringes at least claim 12 of the '479 patent.

255.    On information and belief, Amazon provided notice of the UPNE process to Ontel in or about April 2021.

256.    In May 2021, Ontel declined to participate in the UPNE process, in which a neutral evaluator was to determine HPI's likelihood of proving that Ontel's Pillow Pad product infringed the '479 patent.

---

[6] At this time, UPNE was in the midst of a three-year beta testing period that began in 2019.  UPNE officially concluded its beta version in 2022 when Amazon formally launched a substantially identical program that it branded as Amazon Patent Evaluation Express ("APEX").

257.    On information and belief, Ontel declined to participate in the UPNE process because it had no real defense to HPI's infringement allegations, and wanted to avoid any record of contesting infringement and losing.

258.    Following Ontel's non-participation in Amazon's UPNE and failure to file a declaratory judgment action against HPI, Ontel's knock-off Pillow Pad product was removed from the Amazon platform in June 2021.

259.    In response, Ontel created a substantially similar version of its knock-off Pillow Pad product – having only two rounded edges instead of the three rounded edges that the first knock-off version copied from Flippy—for sale on Amazon, Walmart.com, and on information and belief, through other retail channels.

260.    Despite introducing this revised version of the Pillow Pad for sale on Amazon, Ontel continued advertising "Pillow Pad" on Amazon with images and video of the direct knock-off version with three rounded edges that it no longer sold on Amazon.

261.    As of the present date, Ontel is still using advertisements depicting the original knock-off Pillow Pad product with three rounded edges for marketing of the version having only two rounded edges.

262.    This "bait and switch" type advertising still continues to this day on Amazon, where Ontel is using "sponsored advertisements" that depict its first version of its knock-off Pillow Pad product with three rounded ledges to sell subsequent versions, as shown in this screenshot taken on June 25, 2024:



263.    Ontel's "Pillow Pad" store on Amazon,[7] which sells later-generation versions of Ontel's knock-off Pillow Pad product, likewise continues to depict the original version of Ontel's knock-off Pillow Pad product in no fewer than two different images used in connection with marketing and selling Ontel's products:

---

[7] https://www.amazon.com/stores/page/B435A563-0DD2-4A2B-8FDC-9AC8EDF584B9/



264.    In particular, the header image for Pillow Pad clearly depicts, on the right side, the first version of Ontel's knock-off Pillow Pad product with three rounded ledges, as shown in the annotated image below:



265.    The usage picture also clearly displays a woman using the first version of Ontel's knock-off Pillow Pad product with three rounded ledges, as shown in the image below:



266.    On information and belief, Ontel's use of images showing a Pillow Pad product with three rounded ledges (which it does not offer on Amazon) to drive sales of subsequent versions of a Pillow Pad with two rounded ledges (which it does offer on Amazon) has contributed to Ontel's ongoing cannibalization of Flippy's sales.

267.    And even when Ontel revised the Pillow Pad to remove one of the rounded ledges and alter the product into a version with two viewing angles, its listings on Amazon and other online sales platforms, including (but on information and belief not limited to) Walmart.com retained the "multi-angle" description even though the revised Pillow Pad only provided two such angles instead of three.

268. On information and belief, the use of images showing a Pillow Pad product with three rounded ledges and continuing to describe both products as a "multi-angle" stand led at least some of Ontel's customers to expect that they would have received that product instead of the version of the Pillow Pad with two rounded ledges that was actually shipped:

 Kric

★★★☆☆ **Hit or miss**
Reviewed in the United States on February 6, 2024
Color: Blue | Style Name: Ultra | **Verified Purchase**

I bought two of these. They gray one is just like Flippy and I'm happy with it. The blue one I purchased, however, was defective as it didn't inflate to the full size. It is actually missing an entire side of foam and there's a plastic bar inside.

I did exchange the blue one and the replacement inflated but it's a different model than the gray version. This one is smaller, uses a softer foam , and one of the <mark>three</mark> sides isn't really usable.

I'm disappointed. The original gray one I got was great. This other version is awful.



 l. r.

★☆☆☆☆ **Not like what I bought before**
Reviewed in the United States on January 13, 2024
Color: Blue | Style Name: Ultra | **Verified Purchase**

I bought a Pillow Pad at least a year ago maybe 2. It fluffed right away and has held up. I decided I would get another one so I didn't have to carry this around the house. It's been out of the tiny box for a couple of days now. It did not move for the first 12 hours. I finally unzipped it and pulled the foam pieces apart so they could start to fluff. It had a little but is nowhere near the same product as the one I own. They both have the handle with same name. They both have a pocket. The old one has 3 distinct sides that hold your tablet at different angles. The new one has 2 curved sides not <mark>three</mark> and has a piece of wood inside on the third side for some reason. It will not hold my iPad. And shipping took longer than it was supposed to but all Amazon seems to be late these days. Return!! The picture shows the same side, same pocket and you can see the blue one has nothing on the left side



 wawie

★★★☆☆ **Mixed results**

Reviewed in the United States on June 24, 2024

Color: Blue | Style Name: Ultra | **Verified Purchase**

I bought the blue one and don't even remember the packaging, it was in full usable shape in no time. I use it a lot, it is great, and easily worthy of a 5 star review, especially for $10. My daughter wanted one of her own so I shared the link and she ordered the burgundy one.. after 3 days it's still flimsy and wrinkled, and it's like it's not even quite the same product even when (if) it fully decompresses. Like, mine has 3 ledges for 3 different viewing angles, I think hers will only have 2. Hers has a rod or something at one edge that I don't detect in mine. We're giving it more time and may try some tricks to get it in shape, will see how it goes.

 Paperpeople

★☆☆☆☆ **Laughably disappointing**

Reviewed in the United States on September 28, 2022

Color: Blue | Style Name: Ultra | **Verified Purchase**

The Ontel Pillow Pad (right side in image) purchased on this site is a sad imitation of the Ontel Pillow Pad (left side in image) bought at a brick and mortar store. The former is too soft, wrinkled, made of two pieces of foam, only holds a pad on two of the three sides, and is unstable. The photo shows how it looked after a week, waiting for it to expand. The latter is larger, made of a single piece of firm foam that is well-balanced and can hold a pad adequately on all three sides.



 Kindle Customer

★★★☆☆ **Not as well made as my old one of the same brand**

Reviewed in the United States on January 22, 2022

Color: Blue | Style Name: Ultra | **Verified Purchase**

I bought my old one ( the gray one) several years ago, but my husband kept stealing it. So when I saw this on amazon I decided to get it for him so I would not have to hide mine. When it arrived it was compressed & even through I followed the directions it is still wrinkled. Not as well made as my old one of the same brand & only has 2 shelves for books or kindle where as my old one has 3.



269.    Likewise, the original version of Ontel's knock-off Pillow Pad product (having three rounded ledges) continues to appear in product listings for sale at other of Ontel's retail partners, including at least Walmart.com:





270.    In each of these listings on Walmart.com, only the original version of Ontel's knock-off Pillow Pad product with three rounded ledges is depicted; there is no indication that a different version of Ontel's knock-off Pillow Pad product (such as the second-generation version with two rounded ledges) is being sold or offered for sale, or would be sent to any consumers who purchase a Pillow Pad through those listings.

271.    On information and belief, Ontel has supplied and continues to supply the original version of the Pillow Pad product with three rounded ledges to Walmart.

272.    Ontel has continued, and to this day continues, to advertise, distribute, offer for sale, and sell the Pillow Pad, including through its retail partners.

**ONTEL REFUSES IN BAD FAITH TO ENGAGE WITH HPI**

273.    Ontel's refusal to engage with HPI's efforts to protect its intellectual property were not limited to Ontel's non-participation in Amazon's UPNE process, but was part of a larger strategic pattern of stonewalling and dilatory engagement to the extent that Ontel engaged at all.

274.    On information and belief, Ontel deliberately refused to meaningfully engage with HPI as part of its knock-off business model, leveraging its superior resources and knowing the cost and time required for HPI to enforce its intellectual property rights while Ontel continued to profit from its knock-off Pillow Pad products.

275.    This practice is known as "efficient infringement".  As the widely-respected

patent policy expert Gene Quinn has explained:

> Efficient infringement is a cold-hearted business calculation whereby
> businesses decide it will be cheaper to use patented technology without
> paying than to license it and pay a fair royalty to the patent owner. This
> calculus is made on the part of large entities who realize there are a certain
> number of patent owners that are just simply not going to assert their patents
> for one reason or another, frequently because they don't have the money to
> do so. Then there is another group of those that will assert their patents but
> will not win. The calculation progresses to realize that there is a small group
> of those who are likely to both assert patents and prevail, thanks to all the
> hurdles put in place (i.e., patent eligibility challenges, the Patent Trial and
> Appeal Board, etc.). The calculation further recognizes that even if a patent
> owner prevails, a permanent injunction is virtually impossible to obtain as
> the result of the Supreme Court's decision in *eBay v. MercExchange*, and
> damages are likely to be minimal thanks to a continual judicial erosion in
> damages available to victorious patent owners.

See https://ipwatchdog.com/2019/09/18/great-escape-efficient-infringers-increasingly-seek-

abuse-antitrust-law/

276.    Consistent with its business model, on information and belief, Ontel had already

decided to engage in efficient infringement when Juliette first reached out to Chuck and Amar

Khubani in March 2019 via email.

277.    During a brief initial telephone conversation occurring on March 12, 2019, when

Amar Khubani called Juliette, Amar claimed that Ontel had done its research and denied that its

knock-off Pillow Pad product infringed on any of HPI's IP and averred that Ontel was "good

people to partner with."

278.    Following her initial contact with the Khubanis, Juliette learned more about Ontel

and its business practices, and among other things, connected with Teddy Shalon, the founder of

ThinOptics, another company whose products and IP were knocked-off by Ontel, and who

litigated against Ontel and Telebrands in *ThinOptics, Inc. v. Ontel Prods. Corp., et al.*, No. 3:16-

cv-1952 (N.D. Cal.), with the original complaint filed on April 13, 2016.

279.    Juliette was dismayed to learn of Ontel's pattern of "efficient infringement" as

part of its business model of creating knock-off products.  This lack of respect for intellectual

property rights and the small businesses who created new products was anathema to Juliette, who strove to operate HPI as a socially conscientious business platform.

280.    Juliette responded to Amar and Chuck Khubani via email on March 14, 2019, stating that a license of HPI's IP to Ontel would not be in HPI's interest.  Juliet explained that "Ontel's business practices and pattern of poor customer support (as evidenced by hundreds of BBB consumer complaints) led us to believe that our customers wouldn't be well served through such a partnership."

281.    Juliette concluded this email with a request that Ontel immediately cease and desist all manufacturing, marketing, sales, advertising, and other activities with regard to Pillow Pad, and requested that Ontel remove the buypillowpad.com website by the close of business on the following day.

282.    But Ontel did not do so.

283.    Instead, Amar Khubani responded by email a few hours later, expressing disappointment in Juliette's demurral.  Amar asked for "help [to] understand what intellectual property [HPI] ha[s] that requires Ontel to cease activities with regard to the Pillow Pad," and further inquired whether HPI had any other IP beyond the one patent (the '454 patent) that Juliette had mentioned during their March 12 telephone conversation.

284.    Juliette did not respond to that email, having made HPI's position clear a few hours prior.

285.    Amar Khubani called Juliette again on March 18, saying that Ontel wanted to work out a deal with HPI, while simultaneously repeating his statement of that he believed Ontel to be in solid position with respect to IP.

286.    During the next few weeks, Amar kept contacting Juliette in various ways.

287.    Between her growing knowledge of Ontel's business practices and the tenor of the communications from the Khubanis continuing to pry for information, Juliette began to feel that the Khubanis and Ontel were toying with her, and had no intention of doing anything but

pressuring HPI into granting a lowball license that would allow Ontel to continue its efficient infringement operation with impunity.

288.    Juliette was aware that Ontel, a large corporation with a big budget, was obviously copying Flippy and continuing to undercut Flippy's pricing with an inferior product while siphoning off its sales and blocking it from retail channels—and based on Ontel's ignoring the requests to cease and desist made in Juliette's March 14 email, had no intention of changing course.

289.    Juliette connected Ontel's efforts to obtain a license from HPI with Greg Rosenthal's curt negative response on behalf of BBB a few months prior to conclude that Ontel was planning on a massive push in the retail channel—and was only interested in reassuring its retail partners about litigation risk.

290.    When Amar Khubani emailed Juliette again on April 9, Juliette felt trapped by Ontel's shamelessness about the knock-off Pillow Pad product cavalier attitude to the effect of their knock-off product on HPI.  Juliet was aware that Ontel believed that HPI was backed into a corner, and had no choice but to engage with Ontel on Ontel's terms or lose in the marketplace due to Ontel's "efficient infringement" business strategy.

291.    Juliette responded:

 **Gmail**

Juliette Fassett <juliette@happyproductsinc.com>

**Hey Amar and Chuck -**
1 message

Juliette Fassett <juliette@happyproductsinc.com>                                              Wed, Apr 10, 2019 at 4:55 PM
To: Amar Khubani <Amar@ontel.com>, chuck@ontel.com

Thanks again for reaching out yesterday.

I have to say. You guys have put me in an incredibly awkward position. I'm really a 'live and let live' kind of person. Until someone fucks with me directly. As you have.

Unless you are willing to buy my company for USD $20,250,000 in cash we're not going to have anything to discuss. Frankly, given how we are doing, our IP, and what is in development that's probably a screaming deal.

BTW that $250,000 has to be donated to my literacy partner, FirstBook.org, in my name.

Otherwise you can both suck my dick.

Thanks -

Juliette

292.     Thereafter, Ontel's general counsel, Caroline Kinsey, stepped in on behalf of Ontel to defuse the situation and to at least appear to try to engage in resolution efforts with HPI.

293.     These efforts, mediated by HPI's outside counsel, quickly proved unavailing, and HPI's efforts to resolve issues relating to Ontel's knock-off Pillow Pad product were stagnant by May 2019.

294.     Ontel did not meaningfully engage with HPI thereafter, refusing to respond participate in the UPNE process that HPI initiated after the '479 patent issued.

295.     Ontel's efficient infringement also continued after the first version of Pillow Pad was removed from Amazon.

296.     On September 30, 2023, counsel for HPI sent email to Ontel's in-house counsel noting the letters sent to the retailers and requesting a conversation.

297.     Ontel's in-house counsel did not respond.

298.     Instead, Ontel's outside counsel, John S. Artz of Dickinson Wright, responded by letter of October 3, 2023, stating that "Ontel has no desire for a business relationship, discussion, or any other sort of contact" with HPI, alleging misconduct by HPI as well as its counsel in seeking to protect HPI's rights, and asserting that any claim by HPI against Ontel would be "frivolous."

299.     In emails sent October 6, 2023, October 9, 2023, and October 19, 2023 to Mr. Artz, counsel for HPI reiterated her requests for an attorney-to-attorney discussion "to see if there is a possibility to resolve the issues" between HPI and Ontel.

300.     In response, Mr. Artz indicated that a dialogue would not be "a productive use of anybody's time" and did not agree to speak with counsel for HPI.

301.     In a formal letter to Mr. Artz dated November 21, 2023, counsel for HPI noted that HPI remained "willing to participate in good faith discussions to resolve its disputes with Ontel and the retailers distributing Pillow Pad products," invited an explanation of Ontel's position regarding HPI's IP, and proposed to "exchange settlement offers and/or participate in pre-suit mediation with an approved JAMS mediator."

302.    By email of December 21, 2023, counsel for Ontel John S. Artz responded that "Ontel has no desire to engage in any discussion with [HPI] or any representative on behalf of [HPI]," "has never manufactured and sold a product that would violate any alleged rights," characterizing the letter sent by HPI's counsel as "harassing," and again characterizing HPI's legals claims as "frivolous."

**Infringement of U.S. Patent No. 7,295,454**

**COUNT I**

**(Direct Infringement of the '454 patent by Ontel)**

303.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

304.    Ontel has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '454 patent under the doctrine of equivalents, by importing into and/or making, using, selling, or offering to sell the Pillow Pad and equivalent products (the "Accused Products") in the United States without license or authority.

305.    Because the Pillow Pad meets each limitation of at least claim 1 of the '454 patent, either literally or under the doctrine of equivalents, in the manner shown above and in Exhibit C, and because Ontel had actual knowledge of the '454 patent as of about November 20, 2018, Ontel's direct infringement was willful.

306.    Ontel's direct infringement of the '454 patent damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

307.    Ontel's actions, including its low pricing of the Pillow Pad and, upon information and belief, its sales to numerous retailers that it contractually relieved of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## COUNT II

### (Induced Infringement of the '454 patent by Ontel)

308.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

309.    Ontel has infringed under 35 U.S.C. § 271(b) at least claim 1 of the '454 patent, by inducing and actively encouraging others (including its retail partners, which include but are not limited to the Retailer Defendants) to infringe under the doctrine of equivalents, through its advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United States without license or authority, knowing that the acts induced constitute patent infringement.

310.    Ontel was aware of the existence of the '454 patent.

311.    Ontel knew that sales and offers for sale of the Pillow Pad constituted infringement of the '454 patent.

312.    Based on its agreements with its retail partners, including but not limited to the Retailer Defendants, Ontel encouraged its retail partners, including but not limited to the Retailer Defendants, to sell and offer for sale Ontel's Pillow Pad product.

313.    Because the Pillow Pad meets each limitation of at least claim 1 of the '454 Patent, either literally or under the doctrine of equivalents, because Ontel directly copied the Pillow Pad from Plaintiff's innovative and patented Flippy, and because Ontel had actual knowledge of the '454 patent as of about November 20, 2018, Ontel's inducement of infringement was willful.

314.    Ontel's inducement of infringement of the '454 patent damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

315.    Ontel's actions, including, its low pricing of the Pillow Pad and, upon information and belief, its agreements with numerous retailers (including but not limited to the Retailer Defendants) contractually relieving them of certain liabilities and/or responsibilities for patent

infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## COUNT III

### (Induced Infringement of the '454 patent by Telebrands)

316.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

317.    Telebrands has infringed under 35 U.S.C. § 271(b) at least claim 1 of the '454 patent, by inducing others (including at least Defendant Ontel) to infringe at least under the doctrine of equivalents, through its importing, selling, offering for sale, advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United States without license or authority, knowing that the acts of at least Ontel would constitute infringement of at least claim 1 of the '454 patent at least under the doctrine of equivalents.

318.    Telebrands was aware of the '454 patent.

319.    Telebrands was aware that importing, selling, and offering for sale a knock-off product copied from Plaintiff's innovative and patented Flippy constituted infringement of the '454 patent.

320.    On information and belief, Telebrands encouraged Ontel to import, sell, and offer for sale a knock-off product copied from Plaintiff's innovative and patented Flippy.

321.    Because the Pillow Pad meets each limitation of at least claim 1 of the '454 Patent, either literally or under the doctrine of equivalents, and because Telebrands had actual knowledge of the '454 patent as of about November 15, 2018, Telebrands's inducement of infringement by Ontel was willful.

322.    Telebrands's inducement of Ontel's infringement of the '454 patent damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

323.    Ontel's and Telebrands's actions, including but not limited to Ontel's low pricing of the Pillow Pad and, upon information and belief, Ontel's agreements with numerous retailers

(including but not limited to the Retailer Defendants) contractually relieving them of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## COUNT IV

### (Direct Infringement of the '454 patent by each of the Retailer Defendants)

324.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

325.    Each of the Retailer Defendants has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '454 patent under the doctrine of equivalents, by selling and/or or offering for sale Accused Products (including but the Pillow Pad and equivalent products) in the United States without license or authority.

326.    The direct infringement of the '454 patent by each of the Retailer Defendants has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling, and offering to sell covered products in the United States.

327.    The actions of each of the Retailer Defendants, including each of their low pricing of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## Infringement of U.S. Patent No. RE48,479

## COUNT V

### (Direct Infringement of the '479 patent by Ontel)

328.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

329.    Ontel has infringed and continues to infringe under 35 U.S.C. § 271(a) at least claim 12 of the '479 patent, either literally or under the doctrine of equivalents, by importing into

and/or making, using, selling, or offering to sell the Pillow Pad and equivalent products (the "Accused Products") in the United States without license or authority.

330.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above and in Exhibit D, and because Ontel has had actual knowledge of the '479 patent as of about May 2021, Ontel's direct infringement has been willful.

331.    Ontel's direct infringement of the '479 patent has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

332.    Ontel's actions, including its low pricing of the Pillow Pad and, upon information and belief, its sales to numerous retailers that it contractually relieved of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

333.    For at least the reasons set forth in the preceding paragraphs, Ontel's continuing direct infringement of the '479 patent irreparably harms Plaintiff, and Plaintiff will continue to suffer irreparable harm absent entry of a permanent injunction enjoining Ontel and all others acting with it from infringing the '479 patent.

## COUNT VI

### (Induced Infringement of the '479 patent by Ontel)

334.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

335.    Ontel has infringed and continues to infringe under 35 U.S.C. § 271(b) at least claim 12 of the '479 patent, by inducing others (including its retail partners, which include but are not limited to the Retailer Defendants) to infringe either literally or under the doctrine of equivalents, through its advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United States without license or authority, knowing that the acts induced constitute patent infringement.

336.    Ontel was aware of the existence of the '479 patent at least as of May 2021.

337.    Ontel knew that sales and offers for sale of the Pillow Pad constituted infringement of the '479 patent.

338.    Based on its agreements with its retail partners, including but not limited to the Retailer Defendants, Ontel encouraged its retail partners, including but not limited to the Retailer Defendants, to sell and offer for sale Ontel's Pillow Pad product.

339.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent, and because Ontel has had actual knowledge of the '479 patent as of about May 2021, Ontel's inducement of infringement by its retail partners, including but not limited to the Retailer Defendants, has been willful.

340.    Ontel's inducement of infringement of the '479 patent has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

341.    Ontel's actions, including, its low pricing of the Pillow Pad and, upon information and belief, its contracts with numerous retailers contractually relieving them of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

342.    For at least the reasons set forth in the preceding paragraphs, Ontel's continuing inducement of infringement of the '479 patent irreparably harms Plaintiff, and Plaintiff will continue to suffer irreparable harm absent entry of a permanent injunction enjoining Ontel and all others acting with it from infringing the '479 patent.

## <u>COUNT VII</u>

### **(Direct Infringement of the '479 patent by the Retailer Defendants)**

343.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

344.    Each of the Retailer Defendants has infringed under 35 U.S.C. § 271(a) at least claim 12 of the '479 patent by selling and/or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority.

345.    The direct infringement of the '479 patent by each of the Retailer Defendants has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling, and offering to sell covered products in the United States.

346.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because Boscov's had actual knowledge of the '479 patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by June 2, 2023, the infringement of the '479 patent by Boscov's has been willful since no later than that date.

347.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because BJ's had actual knowledge of the '479 patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by June 16, 2023, infringement of the '479 patent by BJ's has been willful since no later than that date.

348.    The actions of each of the Retailer Defendants, including their low pricing of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

**Lanham Act Violations**

**COUNT VIII**

**Trade Dress Infringement under the Lanham Act**
**(Against Ontel and the Retailer Defendants)**

349.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

350.    Plaintiff developed and has used the distinctive design of its Flippy media stand, including in particular its soft fabric cover and the rounded ledges between on back support and the next edge support, which are reflected in registered trademark No. 7,437,967 awarded by the USPTO to Plaintiff in 2024.  These distinctive features of the Flippy design can be seen above in paragraphs 120–21 and 129, and are referred to here as the Flippy Trade Dress.

351.    Plaintiff is the owner of all right and title to the Flippy Trade Dress.

352.    The Flippy Trade Dress and particularly the rounded ledges, at specific levels of roundedness, are distinctive of the Flippy.  The rounded ledges are not functional, as they are not essential to the use or purpose of the Flippy pillow, and do not affect the cost or quality of the item.

353.    The Flippy's distinctive rounded ledges also have acquired secondary meaning. Plaintiff has exclusively used this trade dress since 2013 (almost 6 years of exclusive use before Ontel came to market with the infringing Pillow Pad).  During that time, Plaintiff made significant sales and there were no other similar products on the market.  On information and belief, consumers came to associate this trade dress with the Flippy.

354.    Since Ontel's product came to market, there have been numerous instances of actual confusion where consumers bought Ontel's product believing it to be the Flippy, as evidenced by purchasers of the Ontel product complaining about it to Plaintiff HPI.

355.    On information and belief, Ontel copied the Flippy including the distinctive Trade Dress of HPI's Flippy in order to create a likelihood of confusion between the Pillow Pad and HPI's original Flippy, and continues to copy the distinctive Trade Dress of HPI's Flippy.

356.    Ontel's use of HPI's Trade Dress, in an attempt to advertise or promote its own Pillow Pad, misrepresents the nature, characteristics, and quality of Ontel's products, said misrepresentation creating the likelihood that the public would associate Ontel's lower quality Pillow Pad with HPI and/or HPI's Flippy.

357.    On information and belief, Ontel's use of HPI's Trade Dress is and has been done in bad faith, knowingly and willfully and with the intent to confuse the relevant purchasing public.

358.    On information and belief, Ontel has taken no steps to prevent deception or confusion of the relevant purchasing public with respect to its marketing of the infringing Pillow Pad products.

359.    Ontel's unauthorized use of HPI's Trade Dress is an infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT IX

### False Advertising under the Lanham Act
### (Against Ontel, using Flippy to advertise Pillow Pad)

360.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

361.    On information and belief, Ontel has depicted Plaintiff's innovative Flippy product, modified to cover up the Flippy logo, describing it as the Pillow Pad or Pillow Pad 360º in at least its initial advertisements that began airing in February 2020.  Some examples of such advertising can be seen above in paragraphs 189–200 and are referred to here as Ontel's Commercials.

362.    Ontel's Commercials are literally and/or impliedly false and misleading.  They show the Flippy product itself and falsely represent that what is depicted is the Pillow Pad product being advertised and offered for sale, which was of inferior quality compared to the Flippy.

363.    Ontel's Commercials have deceived consumers by tricking them into thinking that they were buying the depicted high-quality multi-angle tablet stands provided by Plaintiff, which were sold and delivered to Ontel.  Ontel's Commercials had a tendency to deceive a substantial portion of the intended audience, causing confusion as to the source, functionality, and quality of the products being depicted.

364.    On information and belief, the Pillow Pad products purchased by viewers of the Ontel's Commercials were shipped to consumer across the United States and hence traveled in interstate commerce.

365.    As a result of Ontel's conduct, Plaintiff has suffered and likely will continue to suffer harm to its business, sales, reputation, and goodwill, entitling Plaintiff to damages and an injunction.

366.     Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to statutory and other damages in an amount to be determined at trial for Ontel's violations of the Lanham Act, including an accounting and award of profits made by Ontel on sales of the Pillow Pad products.

367.     Ontel knew and knows that the depictions of "its" Pillow Pad in Ontel's Commercials were false and misleading.  Ontel's acts were willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees incurred in this action pursuant to 15 U.S.C. § 1117.

## COUNT X

### False Advertising under the Lanham Act
### (Against Ontel, using the original Pillow Pad to advertise later generations)

368.     Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

369.     Ontel has used and continues to use images of its knock-off Pillow Pad product that has three edges providing three different viewing angles and three rounded ledges—as for HPI's Flippy—to advertise its other Pillow Pad products, in particular, its Pillow Pad product that has only two edges providing two different viewing angles.  Such advertising can be seen above in paragraphs 261–64 and is referred to here as Ontel's Ads.

370.     Ontel's Ads are literally and/or impliedly false and misleading.  They show a product having the Flippy Trade Dress and patented features, and falsely represent that the Pillow Pad product available for sale on Amazon has three edges providing three different viewing angles and is otherwise like the highly-rated Flippy, when in fact the Pillow Pad product for sale has only two edges providing two different viewing angles and is of inferior quality compared to the Flippy.

371.     Ontel's Ads have deceived consumers by tricking them into thinking that they are buying a high-quality multi-angle media stand.  The Ads have a tendency to deceive a substantial

portion of the intended audience, causing confusion as to the source, functionality, and quality of the products.

372.    Ontel's Ads have included so-called "sponsored ads" presented to consumers across the United States by Amazon in response to a user's search for certain goods and/or on the Amazon store page for Ontel's Pillow Pad product, and on information and belief, the Pillow Pad products purchased by viewers of the Ads were shipped to consumer across the United States and hence traveled in interstate commerce.

373.    As a result of Ontel's conduct, Plaintiff has suffered and likely will continue to suffer harm to its business, sales, reputation, and goodwill, entitling Plaintiff to damages and an injunction.

374.    Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to statutory and other damages in an amount to be determined at trial for Ontel's violations of the Lanham Act, including an accounting and award of profits made by Ontel on sales of the Pillow Pad products.

375.    Ontel knew and knows that the representations in its Ads are false and misleading. Ontel's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees incurred in this action pursuant to 15 U.S.C. § 1117.

**Violations of New Jersey Law**

**COUNT XI**

**Unfair Competition Under N.J.S.A. § 56:4-1**
**(Against Ontel and the Retailer Defendants)**

376.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

377.    Plaintiff's product is and has been sold and purchased throughout the United States, including in New Jersey.

378.    Defendant Ontel copied the Flippy, including the Flippy Trade Dress (in particular, the rounded ledges), product colors, and marketing and advertising materials, in a deliberate attempt to create confusion because consumers in the United States would assume that the Pillow Pad product sold by Ontel and the Retailer Defendants was the successful and high-quality product of the Plaintiff that had been featured on QVC and garnered high reviews on Amazon.

379.    Ontel intentionally caused the Pillow Pad products to duplicate and replicate the Flippy, including the Flippy Trade Dress, and intentionally caused the advertising for the Pillow Pad products to be substantially similar to that of the Flippy, and both Ontel and the Retailer Defendants have sold and sell the Pillow Pad in markets serving customers that would recognize Plaintiff's trade dress—including direct-to-consumer sales on Amazon and under the "As Seen on TV" brand both online and in retail stores.  Ontel and the Retailer Defendants have used Plaintiff's trade dress intending to profit from consumers' confusion and to capitalize on the goodwill associated with Plaintiff's product.

380.    On information and belief, Ontel's and the Retailer Defendants' adoption of and use of confusingly similar (i.e., identical) trade dress for its Pillow Pad as for Flippy, as described above, allows Ontel and the Retailer Defendants to receive the benefit of Plaintiff's goodwill, which Plaintiff established at great labor and expense.

381.    On information and belief, and through the acts described above, in the course of conducting business, Ontel and the Retailer Defendants conspired and/or collaborated to knowingly engage in unfair acts and/or practices and unfair methods of competition, including but not limited to using designs and trade dress identical and/or confusingly similar to the Flippy, and otherwise engaged in deceptive trade practices.

382.    The acts of Ontel and the Retailer Defendants complained of herein were committed willfully and maliciously, and for the purpose of their own economic benefit at the expense of Plaintiff's rights, monetary gain, and success in business.

383.    The acts of Defendants complained of herein constitute unfair competition in violation of the New Jersey Unfair Competition Statute, N.J.S.A. § 56:4-1.

384.    As a result of Ontel's and the Retailer Defendants' actions, Ontel and the Retailer Defendants have been and are being unjustly enriched—and Plaintiff has been harmed and has suffered injury and is being harmed and is continuing to suffer injury, including loss of revenues, increased expenses, and missed business opportunities—in amounts to be determined at trial.

385.    Unless enjoined by this Court, Ontel's and the Retailer Defendants' wrongful acts will continue and Plaintiff will continue to suffer irreparable harm for which it has no adequate remedy at law.

<u>**COUNT XII**</u>

**Unfair Competition Under Common Law
(Against Ontel and the Retailer Defendants)**

386.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

387.    Plaintiff owns all rights, title, and interest in its Flippy Trade Dress as described above, including all common law rights therein.

388.    The acts of Ontel and the Retailer Defendants set forth above constitute infringement of Plaintiff's rights in its Flippy Trade Dress, and create false representations that Ontel's Pillow Pad are provided by, sponsored by, approved by, licensed by, affiliated with or in some other way legitimately connected to Plaintiff and are of the same character, nature and quality as the goods provided by Plaintiff, thereby damaging Plaintiff and Plaintiff's reputation.

389.    Ontel and the Retailer Defendants, through their trade dress infringement and false statements and advertising, also tortiously interfered with Plaintiff's prospective business opportunities and economic advances as set forth below.

390.    Ontel and the Retailer Defendants undertook these complained of actions willfully and in bad faith.

391.    The acts of Ontel and the Retailer Defendants complained of hereinabove constitute acts of unfair competition against Plaintiff under the common law of the State of New Jersey, which acts have been committed knowingly and willfully and have injured Plaintiff. As a result of Ontel's and the Retailer Defendants' respective intentional and unlawful conduct as alleged herein, Plaintiff has suffered damages, including, but not limited to loss of sales, trade dress infringement, loss of goodwill associated with its products, and damage to its reputation and to existing and potential business relationships.

392.    Unless enjoined by this Court, Ontel's and the Retailer Defendants' wrongful acts will continue and Plaintiff will continue to suffer irreparable harm for which it has no adequate remedy at law.

## COUNT XIII

### Tortious Interference With Prospective Economic Advantage
### (Against Ontel)

393.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

394.    Plaintiff has a protected interest in its advantageous business relationships with its customers, including consumers and direct-to-consumer sellers such as QVC, and in its prospective advantageous business relationships with potential customers, including consumers, direct-to-consumer sellers, and in-store and online retailers.

395.    Since its inception and even more so after selling its product on QVC, Plaintiff had an expectation of continued and increased sales to consumers both directly and via QVC, of opportunities to sell Flippy to in-store and online retailers, and of opportunities to develop relationships leading to potentially profitable business arrangements such as investment and/or acquisition.

396.    On information and belief, Defendant Ontel knew of these protected interests in Plaintiff's actual and prospective advantageous business relationships.  Ontel knew that Plaintiff had been very successful on QVC, which would create opportunities to increase sales to

consumers via Amazon and QVC, to sell more Flippy products to a wider market and audience through United States retailers, and to grow HPI's business.

397.     Defendant Ontel intentionally, wrongfully, and without justification disseminated false statements to United States retailers including Plaintiff's prospective customers to interfere unfairly with Plaintiffs' protected business relationships.

398.     Defendant Ontel advertised that it was the "innovator" of the Pillow Pad and, on information and belief, told retailers that it held and/or would provide them with all necessary rights for the importation, distribution, and sale of the knock-off Pillow Pad.

399.     On information and belief, Defendant Ontel approached and continues to approach retailers, including on-line retailers, with its knock-off Pillow Pad product for the purpose of interfering with Plaintiff's protected business relations.

400.     On information and belief, Defendant Ontel knew and knows that approaching and purposely disseminating false statements to retailers while blatantly infringing the Flippy Trade Dress and flouting Plaintiff's patent rights would materially interfere with Plaintiff's protected business relations, for example, by influencing retailers and sellers to not deal with Plaintiff or buy the Flippy product.

401.     On information and belief, as a result of Ontel's actions, actual and/or potential customers (including consumers, direct-to-consumer sellers, and in-store and online retailers) have refused to deal with Plaintiff, place orders with Plaintiff, and/or contract with Plaintiff.

402.     Such sales, contracts, and business benefits were reasonably likely to have occurred but for Defendants' interference, which has resulted in damage to Plaintiff in the form of lost sales, lost profits, lost business opportunities, tarnished reputation, and loss of good will.

403.     Defendants acted in bad faith and with malice by copying Plaintiff's Flippy and disseminating their false statements to customers.  Defendants made the statements knowing that they were false and/or misleading when made, and did so for the purpose of interfering with Plaintiff's actual and prospective business relations and causing harm to Plaintiff, and for their own economic benefit.

404.    Defendants' conduct constitutes tortious interference with prospective economic advantage.

405.    As a direct and proximate result of this tortious interference of Defendant Ontel, Plaintiff has lost opportunities to enter into prospective agreements and business relationships and has incurred, is suffering, and will continue to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HPI respectfully requests that the Court enter judgment in favor of HPI and against Defendant Ontel as follows:

A.  Finding that Defendants have each infringed the '454 patent;

B.  Finding that Ontel and the Retailer Defendants have each infringed the '479 patent;

C.  Issuing a permanent injunction that prohibits Ontel, each of the Retailer Defendants, and their respective affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from infringing the '479 patent;

D.  Requiring that Ontel and each of the Retailer Defendants render a full and complete accounting to Plaintiff for each of their profits, gains, advantages or the value of business opportunities received from their respective sales of Ontel's Pillow Pad products;

E.  Requiring that Defendants each pay Plaintiff damages sufficient to compensate Plaintiff for their respective infringements of the '454 patent, including lost profits suffered by Plaintiff as a result of their respective infringements and in an amount not less than a reasonably royalty;

F.  Requiring that each of Ontel and each of the Retailer Defendants pay Plaintiff damages sufficient to compensate Plaintiff for their respective infringements of the '479 patent, including lost profits suffered by Plaintiff as a result of their respective infringements and in an amount not less than a reasonably royalty;

G. Enhancing by three-fold the damages that Ontel must pay Plaintiff pursuant to 35 U.S.C. § 284;

H. Finding the case exceptional under 35 U.S.C. § 285 at least as to Ontel and requiring that at least Ontel pay to Plaintiff all of its attorneys' fees and costs and expenses in this action;

I. Finding that Flippy's signature rounded ledges constitute distinctive trade dress;

J. Finding that Ontel and the Retailer Defendants have infringed Plaintiff's trade dress;

K. Finding that Ontel has falsely advertised its knock-off Pillow Pad product using Plaintiff's Flippy;

L. Finding that Ontel has falsely advertised later generations of its knock-off Pillow Pad product using images of the original version of the knock-off Pillow Pad product having three rounded ledges;

M. For each violation of the Lanham Act, each of Ontel's and each Retailer Defendant's profits pursuant to 15 U.S.C. § 1117(a);

N. For each violation of the Lanham Act, Plaintiff's damages sustained pursuant to 15 U.S.C. § 1117(a);

O. Enhancing by three-fold the disgorgement of at least Ontel's profits and Plaintiff's damages sustained due to Ontel, pursuant to 15 U.S.C. § 1117(a);

P. The costs of this action, pursuant to 15 U.S.C. § 1117(a);

Q. Finding this case exceptional under 15 U.S.C. § 1117(a) at least as to Ontel and requiring that at least Ontel pay to Plaintiff all of its attorneys' fees in this action;

R. Pursuant to 15 U.S.C. § 1118, an order that all images, advertising, packaging, and products constituting or depicting the knock-off Pillow Pad product—whether instantiated in physical form, digital form, or other electronic format—with three rounded ledges in the possession of any Defendant be delivered up and destroyed.

S. Finding that Ontel and the Retailer Defendants have each competed unfairly with Plaintiff.

T.  Finding that Ontel has falsely advertised its Pillow Pad products.

U.  Finding that Ontel has interfered with Plaintiff's prospective business relationships;

V.  For the New Jersey statutory and common law claims, Plaintiff's lost profits;

W.  For the New Jersey statutory and common law claims, Defendants' unjust enrichment;

X.  For violations of N.J.S.A. § 56:4-1, punitive damages, treble damages, and injunctive relief pursuant to N.J.S.A § 56:4-2;

Y.  Awarding Plaintiff prejudgment interest, post-judgment interest, and costs; and

Z.  Such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues raised by this Complaint that are properly triable by a jury.

**FOX ROTHSCHILD LLP**

Dated: October 15, 2024

Marc J. Gross, Esq.
Gerard P. Norton, Esq.
Jordan B. Kaplan, Esq.
49 Market Street
Morristown, NJ 07960-5122
Tel:   973.992.4800
Fax:   973.992.9125

*Attorneys for Plaintiff Happy Products, Inc.*

# EXHIBIT A

US009642454B2

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 9,642,454 B2**
Cannon et al.　　　　　　　　　　　　(45) **Date of Patent:**　　**May 9, 2017**

(54) **MULTIPLE VIEWING ANGLE MEDIA SUPPORT**

(71) Applicants:**Bruce Cannon**, Portland, OR (US);
**Juliette Fassett**, Portland, OR (US)

(72) Inventors: **Bruce Cannon**, Portland, OR (US);
**Juliette Fassett**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/192,737**

(22) Filed: **Jun. 24, 2016**

(65) **Prior Publication Data**

US 2016/0302568 A1　　Oct. 20, 2016

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 14/518,443, filed on Oct. 20, 2014, now abandoned.

(60) Provisional application No. 61/896,540, filed on Oct. 28, 2013.

(51) **Int. Cl.**
*A47B 97/04*　　　(2006.01)
*A47B 23/04*　　　(2006.01)

(52) **U.S. Cl.**
CPC ................................. *A47B 23/042* (2013.01)

(58) **Field of Classification Search**
CPC .... A47B 23/042; A47B 23/043; F16M 13/00;
F16M 13/022
USPC ................................................... 40/124.15
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 805,895 | A | 11/1905 | Wedderburn |
| 3,364,603 | A | 1/1968 | Tate, Jr. |
| 4,274,616 | A | 6/1981 | Radtke |
| 4,541,190 | A | 9/1985 | Weiner et al. |
| 4,593,876 | A | 6/1986 | Greiner |
| 4,880,327 | A | 11/1989 | Sanabria |
| 4,991,812 | A | 2/1991 | MacEwan |
| 5,029,797 | A | 7/1991 | Levorchick et al. |
| D320,319 | S | 10/1991 | Brothers et al. |
| 5,365,687 | A | 11/1994 | Sclater |
| 5,413,305 | A | 5/1995 | Leeb |
| D365,461 | S | 12/1995 | Falter |
| 5,582,382 | A | 12/1996 | Pan-Yang |
| D392,474 | S | 3/1998 | Frasketi |
| 6,196,512 | B1 | 3/2001 | Ure |
| 6,270,049 | B1 | 8/2001 | Olvey |
| 6,651,367 | B1 | 11/2003 | Barragan |
| 6,934,084 | B2 | 8/2005 | Pandya |
| D640,112 | S | 6/2011 | Smith |
| 8,038,116 | B2 | 10/2011 | Lee et al. |
| D677,669 | S | 3/2013 | Liu |
| D690,308 | S | 9/2013 | McCoy |
| D703,216 | S | 4/2014 | Klepar |

(Continued)

*Primary Examiner* — Shin Kim
(74) *Attorney, Agent, or Firm* — Kunzler Law Group

(57) **ABSTRACT**

For multiple viewing angle media support, and apparatus includes three support sides. Each support side includes a back support and an edge support. A top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior. Each back support, each edge support, and each end is a surface of the solid interior, the solid interior is a pillow covered in fabric, a first viewing angle of the first back support is 36 degrees, a second viewing angle of the second back support is 74 degrees, and a third viewing angle of the third back support is 49 degrees.

**10 Claims, 4 Drawing Sheets**



**US 9,642,454 B2**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

2003/0001063  A1     1/2003  Halpin
2003/0136036  A1     7/2003  Zubli



**FIG. 1**

U.S. Patent        May 9, 2017        Sheet 2 of 4        US 9,642,454 B2



FIG. 2



FIG. 3



FIG. 4

US 9,642,454 B2

**1**

## MULTIPLE VIEWING ANGLE MEDIA SUPPORT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation-in-part of and claims priority to U.S. patent application Ser. No. 14/518,443 entitled "MULTIPLE VIEWING ANGLE MEDIA SUPPORT" and filed on Oct. 20, 2014 for Bruce Cannon, which is incorporated herein by reference. U.S. patent application Ser. No. 14/518,443 claims priority to U.S. Provisional Patent Application No. 61/896,540 entitled "FLIPY EREADER PILLOW" and filed on Oct. 28, 2013 for Bruce Cannon, which is incorporated herein by reference.

### FIELD

The subject matter disclosed herein relates to media support and more particularly relates to multiple viewing angle media support.

### BACKGROUND

#### Description of the Related Art

It is often comfortable to support media such as electronic readers, tablet computers, magazines, and books while viewing the media.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more particular description of the embodiments briefly described above will be rendered by reference to specific embodiments that are illustrated in the appended drawings. Understanding that these drawings depict only some embodiments and are not therefore to be considered to be limiting of scope, the embodiments will be described and explained with additional specificity and detail through the use of the accompanying drawings, in which:

FIG. 1 is a perspective drawing illustrating one embodiment of a media support;

FIG. 2 is a side view drawing illustrating one embodiment of a media support;

FIG. 3 is a perspective drawing illustrating one alternate embodiment of a media support; and

FIG. 4 is a perspective drawing illustrating one embodiment of media disposed on a media support.

### DETAILED DESCRIPTION

Reference throughout this specification to "one embodiment," "an embodiment," or similar language means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," and similar language throughout this specification may, but do not necessarily, all refer to the same embodiment, but mean "one or more but not all embodiments" unless expressly specified otherwise. The terms "including," "comprising," "having," and variations thereof mean "including but not limited to" unless expressly specified otherwise. An enumerated listing of items does not imply that any or all of the items are mutually exclusive and/or mutually inclusive, unless expressly specified otherwise. The terms "a," "an," and "the" also refer to "one or more" unless expressly specified otherwise.

**2**

Furthermore, the described features, advantages, and characteristics of the embodiments may be combined in any suitable manner. One skilled in the relevant art will recognize that the embodiments may be practiced without one or more of the specific features or advantages of a particular embodiment. In other instances, additional features and advantages may be recognized in certain embodiments that may not be present in all embodiments.

The description of elements in each figure may refer to elements of proceeding figures. Like numbers refer to like elements in all figures, including alternate embodiments of like elements.

FIG. 1 is a perspective drawing illustrating one embodiment of a media support 100. The media support 100 may position media at one of three varied and carefully chosen angles for viewing by a user. The media may be handheld media. In addition, the media may be an electronic reader, a tablet computer, a video display, a magazine, a book, or the like. Because the media may be handheld, it is often viewed while the user is sitting at a table with the media on the table, while the user is sitting with the media disposed in the user's lap, or while the user is lying down.

During extended periods of viewing, it may be comfortable for the user to prop up the media to reduce hand and arm fatigue. Unfortunately, the use of traditional pillows may position the media at a less than advantageous angle. In addition, during extended viewing periods, the user may shift position, resulting in a need for a support with a different viewing angle. For example, a user may shift from reading while sitting on a couch to reading while lying on the couch.

The embodiments described herein provide support for multiple viewing angles. The angles are carefully chosen to support the media on a table for a sitting user, in the lap of a sitting user, and on a lying user. As a result, the media support 100 provides a comfortable support at an appropriate angle for the most common viewing positions.

In the depicted embodiment, the media support 100 includes three support sides 155. Each support side 155 comprises a support back 105 and a support edge 110. The support sides 155 may be disposed about a central axis 125. The media support 100 may have a latitudinal length 150. The latitudinal length 150 may be in the range of 6 to 50 centimeters (cm). In a certain embodiment, the latitudinal length 150 is in the range of 9 to 25 cm. In one embodiment, the latitudinal length 150 is 15 cm.

In one embodiment, the latitudinal length 150 of an edge support 110 may be different from the latitudinal length 150 of the corresponding side support 155. The edge support latitudinal length 150 may be in the range of 2 to 10 cm. In a certain embodiment, the edge support latitudinal length 150 is in the range of 6 to 8 cm. In one embodiment, the edge support latitudinal length 150 is 7 cm.

The side supports 155 may be arranged to provide three different viewing angles 160 for three different user positions. Each viewing angle 160 is orthogonal to a support back 105. The arrangement of the side supports 155 are disclosed in greater detail in FIG. 2.

In one embodiment, each back support 105 and each edge support 110 is a surface 175 of a solid. The solid media support 100 may have one or more ends 165. Each back support 105 and each edge support 110 may be in physical communication with two ends 165 of a solid interior.

The solid media support 100 may be a pillow. The solid interior may be foam. The foam may have an Indentation Force Deflection (IFD) of in the range of 15-30 kilograms at 25% indentation. In one embodiment, the surface 175 of the

US 9,642,454 B2

3

solid may be a fabric. Each back support **105**, each edge support **110**, and each end **165** may a surface **175** of the solid interior. The surface **175** of the solid interior may be a pillow is covered in fabric. In one embodiment, the fabric is ultra-suede.

A user may place the media support **100** on a table, in the user's lap, or on the user while lying down. The semi-rigid pillow feel of the media support **100** comfortably contacts the user while providing firm support for the media. The user may further rotate the media support **100** to select a back support **105** with a comfortable viewing angle **160**. The user may place media on the edge support **110**. The edge support **110** holds the media with the back of the media against the back support **105**. As a result, the media may be viewed at the viewing angle **160**.

FIG. **2** is a side view drawing illustrating one embodiment of a media support **100**. The support backs **105** and the support edges **110** of the three support sides **155** are shown about an end **165**. A top of each back support **105** is in physical communication with an adjacent edge support **110** about the central axis **125**. A plane of a first back support **105***a* may be at a first plane angle **120***a* in a range of 50 to 60 degrees to a second virtual plane **130***b* between the top of a second back support **105***b* counterclockwise to the first back support **105***a* and an outer edge of a second edge support **110***b* counterclockwise to the first back support **105***a*. In addition, a plane of the second back support **105***b* may be at a second plane angle **120***b* in a range of 55 to 65 degrees to a third virtual plane **130***c* between the top of a third back support **105***c* counterclockwise to the second back support **105***b* and an outer edge of a third edge support **110***c* counterclockwise to the second back support **110***b*. A plane of a third back support **105***c* may be at a third plane angle **120***c* in a range of 50 to 75 degrees to a first virtual plane **130***a* between the top of the first back support **105***c* and an outer edge of the first edge support **110***a* counterclockwise to the third back support **105***c*.

In one embodiment, the first back support **105***a* has a longitudinal length **115***a* in the range of 12 to 26 cm, the second back support **105***b* has a longitudinal length **115***b* in the range of 9 to 21 cm, and the third back support **105***c* has a longitudinal length **115***c* in the range of 10 to 22 cm. In a certain embodiment, the first longitudinal length **115***a* is 19 cm, the first plane angle **120***a* is 60 degrees, the second longitudinal length **115***b* is 15 cm, the second plane angle **120***b* is 68 degrees, the third longitudinal length **115***c* is 17 cm, and the third plane angle **120***c* is 52 degrees.

The arrangement of the longitudinal lengths **115** and the plane angles **120** generate three distinct viewing angles **160**. In one embodiment, the first viewing angle **120***a* may be 36 degrees, the second viewing angle **120***b* may be 74 degrees, and the third viewing angle **120**C may be 49 degrees.

In one embodiment, each edge support **110** forms an edge angle **140** with an adjacent back support **105**. The edge angle **140** may be in the range of 85 to 120 degrees. The edge angle **140** may be 90 degrees. Each edge support **110** may have an edge support width **135**. The edge support width **135** may be in the range of 1 to 5 cm. In a certain embodiment, the edge support width **135** is 2 cm.

FIG. **3** is a perspective drawing illustrating one alternate embodiment of a media support **100**. In the depicted embodiment, each back support **105** and each edge support **110** is a surface **180** of a frame. Each end **165** may also be a surface **180** of a frame. The frame may include a molded mashed, a fabric mash, a wire mesh, or the like. In the

4

depicted embodiment, the media support **100** includes ends **165**. Alternatively, there may be no ends **165** on the media support **100**.

FIG. **4** is a perspective drawing illustrating one embodiment of media **170** disposed on the media support **100**. A bottom edge of the media **170** is disposed in the edge support **110** while the back of the media **170** is disposed against a back support **105**.

The embodiments arrange three support sides **155** to generate three distinct viewing angles **160**. Each viewing angle **160** is chosen for a specific viewing orientation. The first viewing angle **160***a* may be employed when the media support **100** and the media is disposed in the user's lap. The second viewing angle **160***b* may be used when the media support **100** and the media is disposed on a table and the user is sitting upright. In addition, the 3rd viewing angle **160***c* may be used when the user is lying down and the media support **100** is disposed on the user.

When the user changes position, the media support **100** may be quickly rotated to provide a different viewing angle **160**. As a result, the media support **100** is quickly deployed to provide the appropriate viewing angle **160**. In addition, the comfort of the user is greatly enhanced as the media may be viewed at the appropriate viewing angle **160** without the user holding the media.

The media support **100** has been marketed as the "Flipy Tablet Pillow" since 2013 at a retail price of $49.98. Because of the media support's unique properties, it has enjoyed significant commercial success, with 800 units sold in 2013, 2,233 units in 2014, 925 units in 2015 and 997 units year-to-date in 2016.

Embodiments may be practiced in other specific forms. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed is:

**1**. An apparatus comprising:

three support sides, each support side comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior, each edge support comprises an edge support width of 2 centimeters (cm) with an edge angle of 90 degrees to an adjacent back support, a face of each edge support width oriented clockwise about the central axis, a plane of a first back support is at a first plane angle of 60 degrees to a second virtual plane between the top of a second back support counterclockwise to the first back support and an outer edge of a second edge support counterclockwise to the first back support, a plane of the second back support is at a second plane angle of 80 degrees to a third virtual plane between the top of a third back support counterclockwise to the second back support and an outer edge of a third edge support counterclockwise to the second back support, a plane of a third back support is at a third plane angle of 40 degrees to a first virtual plane between the top of the first back support counterclockwise to the third back support and an outer edge of the first edge support counterclockwise to the third back support, and wherein each back support, each edge support, and each end is a surface of the solid interior, the solid

US 9,642,454 B2

5

6

interior is a pillow covered in fabric, a first viewing angle of the first back support is 36 degrees, a second viewing angle of the second back support is 74 degrees, and a third viewing angle of the third back support is 49 degrees.

**2**. The apparatus of claim **1**, wherein the first back support has a longitudinal length in the range of 12 to 26 centimeters (cm), the second back support has a longitudinal length in the range of 9 to 21 cm, and the third back support has a longitudinal length in the range of 10 to 22 cm.

**3**. The apparatus of claim **2**, wherein the first longitudinal length is 19 cm, the first plane angle is 60 degrees, the second longitudinal length is 15 cm, the second plane angle is 68 degrees, the third longitudinal length is 17 cm, and the third plane angle is 52 degrees.

**4**. The apparatus of claim **1**, wherein each back support has a latitudinal length in the range of 9 to 25 cm.

**5**. The apparatus of claim **4**, wherein each back support has a latitudinal length of 15 cm.

**6**. The apparatus of claim **1**, wherein each edge support has a latitudinal length in the range of 2 to 10 cm.

**7**. The apparatus of claim **6**, wherein each edge support has a latitudinal length of 7 cm.

**8**. The apparatus of claim **1**, wherein each edge support has an edge support width in the range of 1 to 5 centimeters (cm).

**9**. The apparatus of claim **1**, wherein a plane of each edge support forms an edge angle in the range of 85 to 120 degrees with an adjacent back support.

**10**. The apparatus of claim **9**, wherein the edge angle is 90 degrees.

\* \* \* \* \*

# EXHIBIT B

US00RE48479E

(19) **United States**
(12) **Reissued Patent**
Cannon et al.

(10) Patent Number: **US RE48,479 E**
(45) Date of Reissued Patent: **Mar. 23, 2021**

(54) **MULTIPLE VIEWING ANGLE MEDIA SUPPORT**

(71) Applicant: **Happy Products, Inc.**, Portland, OR (US)

(72) Inventors: **Bruce Cannon**, Portland, OR (US); **Juliette Fassett**, Portland, OR (US)

(73) Assignee: **Happy Products, Inc.**, Portland, OR (US)

(21) Appl. No.: **16/262,797**

(22) Filed: **Jan. 30, 2019**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **9,642,454**
Issued: **May 9, 2017**
Appl. No.: **15/192,737**
Filed: **Jun. 24, 2016**

U.S. Applications:
(63) Continuation-in-part of application No. 14/518,443, filed on Oct. 20, 2014, now abandoned.

(60) Provisional application No. 61/896,540, filed on Oct. 28, 2013.

(51) **Int. Cl.**
*A47B 97/04* (2006.01)
*A47B 23/04* (2006.01)

(52) **U.S. Cl.**
CPC .................................. *A47B 23/042* (2013.01)

(58) **Field of Classification Search**
CPC .................................................. A47B 23/042
USPC ............ 248/441.1, 454; D6/419, 406; D9/91
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 805,895 | A | 11/1905 | Wedderburn | |
| 1,928,806 | A * | 10/1933 | Barcalo ................ | A47G 9/1045 |
| | | | | 5/639 |
| 3,364,603 | A | 1/1968 | Tate, Jr. | |
| 3,746,296 | A * | 7/1973 | Dean ..................... | A47B 65/00 |
| | | | | 248/441.1 |
| 4,274,616 | A | 6/1981 | Radtke | |
| 4,462,096 | A | 7/1984 | Kusaka | |
| 4,541,190 | A | 9/1985 | Weiner et al. | |
| 4,593,876 | A | 6/1986 | Greiner | |
| 4,880,327 | A | 11/1989 | Sanabria | |
| 4,991,812 | A | 2/1991 | MacEwan | |
| 5,029,797 | A | 7/1991 | Levorchick et al. | |
| D320,319 | S | 10/1991 | Brothers et al. | |
| 5,365,687 | A | 11/1994 | Sclater | |
| 5,413,305 | A | 5/1995 | Leeb | |
| D365,461 | S | 12/1995 | Falter | |
| 5,582,382 | A | 12/1996 | Pan-Yang | |
| D392,474 | S | 3/1998 | Frasketi | |
| 6,196,512 | B1 | 3/2001 | Ure | |

(Continued)

*Primary Examiner* — Cary E Wehner
(74) *Attorney, Agent, or Firm* — Schaffer IP Law, LLC

(57) **ABSTRACT**

For multiple viewing angle media support, and apparatus includes three support sides. Each support side includes a back support and an edge support. A top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior. Each back support, each edge support, and each end is a surface of the solid interior, the solid interior is a pillow covered in fabric, a first viewing angle of the first back support is 36 degrees, a second viewing angle of the second back support is 74 degrees, and a third viewing angle of the third back support is 49 degrees.

**29 Claims, 4 Drawing Sheets**



**US RE48,479 E**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,270,049 | B1 | 8/2001 | Olvey |
| 6,651,367 | B1 | 11/2003 | Barragan |
| 6,934,084 | B2 | 8/2005 | Pandya |
| 7,492,538 | B2 | 2/2009 | Ishizawa et al. |
| 7,626,776 | B2 | 12/2009 | Honma et al. |
| 7,627,238 | B2 | 12/2009 | Osaka et al. |
| 7,639,440 | B2 | 12/2009 | Ishizawa et al. |
| 7,641,403 | B2 | 1/2010 | Ishizawa et al. |
| 7,652,833 | B2 | 1/2010 | Honma |
| 7,705,909 | B2 | 4/2010 | Ishizawa et al. |
| 7,852,579 | B2 | 12/2010 | Osaka et al. |
| D640,112 | S | 6/2011 | Smith |
| 8,038,116 | B2 | 10/2011 | Lee et al. |
| D677,669 | S | 3/2013 | Liu |
| D690,308 | S | 9/2013 | McCoy |
| D696,258 | S  * | 12/2013 | Padilla ....................... D14/447 |
| D703,216 | S | 4/2014 | Klepar |
| 2003/0001063 | A1 | 1/2003 | Halpin |
| 2003/0136036 | A1 | 7/2003 | Zubli |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



**FIG. 4**

US RE48,479 E

**1**

## MULTIPLE VIEWING ANGLE MEDIA SUPPORT

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue; a claim printed with strikethrough indicates that the claim was canceled, disclaimed, or held invalid by a prior post-patent action or proceeding.

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation-in-part of and claims priority to U.S. patent application Ser. No. 14/518,443 entitled "MULTIPLE VIEWING ANGLE MEDIA SUPPORT" and filed on Oct. 20, 2014 for Bruce Cannon, which is incorporated herein by reference. U.S. patent application Ser. No. 14/518,443 claims priority to U.S. Provisional Patent Application No. 61/896,540 entitled "FLIPY EREADER PILLOW" and filed on Oct. 28, 2013 for Bruce Cannon, which is incorporated herein by reference.

### FIELD

The subject matter disclosed herein relates to media support and more particularly relates to multiple viewing angle media support.

### BACKGROUND

#### Description of the Related Art

It is often comfortable to support media such as electronic readers, tablet computers, magazines, and books while viewing the media.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more particular description of the embodiments briefly described above will be rendered by reference to specific embodiments that are illustrated in the appended drawings. Understanding that these drawings depict only some embodiments and are not therefore to be considered to be limiting of scope, the embodiments will be described and explained with additional specificity and detail through the use of the accompanying drawings, in which:

FIG. **1** is a perspective drawing illustrating one embodiment of a media support;

FIG. **2** is a side view drawing illustrating one embodiment of a media support;

FIG. **3** is a perspective drawing illustrating one alternate embodiment of a media support; and

FIG. **4** is a perspective drawing illustrating one embodiment of media disposed on a media support.

### DETAILED DESCRIPTION

Reference throughout this specification to "one embodiment," "an embodiment," or similar language means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," and similar language throughout this specification may, but do not necessarily, all refer to the same embodiment, but mean "one or more but

**2**

not all embodiments" unless expressly specified otherwise. The terms "including," "comprising," "having," and variations thereof mean "including but not limited to" unless expressly specified otherwise. An enumerated listing of items does not imply that any or all of the items are mutually exclusive and/or mutually inclusive, unless expressly specified otherwise. The terms "a," "an," and "the" also refer to "one or more" unless expressly specified otherwise.

Furthermore, the described features, advantages, and characteristics of the embodiments may be combined in any suitable manner. One skilled in the relevant art will recognize that the embodiments may be practiced without one or more of the specific features or advantages of a particular embodiment. In other instances, additional features and advantages may be recognized in certain embodiments that may not be present in all embodiments.

The description of elements in each figure may refer to elements of proceeding figures. Like numbers refer to like elements in all figures, including alternate embodiments of like elements.

FIG. **1** is a perspective drawing illustrating one embodiment of a media support **100**. The media support **100** may position media at one of three varied and carefully chosen angles for viewing by a user. The media may be handheld media. In addition, the media may be an electronic reader, a tablet computer, a video display, a magazine, a book, or the like. Because the media may be handheld, it is often viewed while the user is sitting at a table with the media on the table, while the user is sitting with the media disposed in the user's lap, or while the user is lying down.

During extended periods of viewing, it may be comfortable for the user to prop up the media to reduce hand and arm fatigue. Unfortunately, the use of traditional pillows may position the media at a less than advantageous angle. In addition, during extended viewing periods, the user may shift position, resulting in a need for a support with a different viewing angle. For example, a user may shift from reading while sitting on a couch to reading while lying on the couch.

The embodiments described herein provide support for multiple viewing angles. The angles are carefully chosen to support the media on a table for a sitting user, in the lap of a sitting user, and on a lying user. As a result, the media support **100** provides a comfortable support at an appropriate angle for the most common viewing positions.

In the depicted embodiment, the media support **100** includes three support sides **155**. Each support side **155** comprises a support back **105** and a support edge **110**. The support sides **155** may be disposed about a central axis **125**. The media support **100** may have a latitudinal length **150**. The latitudinal length **150** may be in the range of 6 to 50 centimeters (cm). In a certain embodiment, the latitudinal length **150** is in the range of 9 to 25 cm. In one embodiment, the latitudinal length **150** is 15 cm.

In one embodiment, the latitudinal length **150** of an edge support **110** may be different from the latitudinal length **150** of the corresponding side support **155**. The edge support latitudinal length **150** may be in the range of 2 to 10 cm. In a certain embodiment, the edge support latitudinal length **150** is in the range of 6 to 8 cm. In one embodiment, the edge support latitudinal length **150** is 7 cm.

The side supports **155** may be arranged to provide three different viewing angles **160** for three different user positions. Each viewing angle **160** is orthogonal to a support back **105**. The arrangement of the side supports **155** are disclosed in greater detail in FIG. **2**.

US RE48,479 E

3

In one embodiment, each back support **105** and each edge support **110** is a surface **175** of a solid. The solid media support **100** may have one or more ends **165**. Each back support **105** and each edge support **110** may be in physical communication with two ends **165** of a solid interior.

The solid media support **100** may be a pillow. The solid interior may be foam. The foam may have an Indentation Force Deflection (IFD) of in the range of 15-30 kilograms at 25% indentation. In one embodiment, the surface **175** of the solid may be a fabric. Each back support **105**, each edge support **110**, and each end **165** may a surface **175** of the solid interior. The surface **175** of the solid interior may be a pillow is covered in fabric. In one embodiment, the fabric is ultra-suede.

A user may place the media support **100** on a table, in the user's lap, or on the user while lying down. The semi-rigid pillow feel of the media support **100** comfortably contacts the user while providing firm support for the media. The user may further rotate the media support **100** to select a back support **105** with a comfortable viewing angle **160**. The user may place media on the edge support **110**. The edge support **110** holds the media with the back of the media against the back support **105**. As a result, the media may be viewed at the viewing angle **160**.

FIG. **2** is a side view drawing illustrating one embodiment of a media support **100**. The support backs **105** and the support edges **110** of the three support sides **155** are shown about an end **165**. A top of each back support **105** is in physical communication with an adjacent edge support **110** about the central axis **125**. A plane of a first back support **105a** may be at a first plane angle **120a** in a range of 50 to 60 degrees to a second virtual plane **130b** between the top of a second back support **105b** counterclockwise to the first back support **105a** and an outer edge of a second edge support **110b** counterclockwise to the first back support **105a**. In addition, a plane of the second back support **105b** may be at a second plane angle **120b** in a range of 55 to 65 degrees to a third virtual plane **130c** between the top of a third back support **105c** counterclockwise to the second back support **105b** and an outer edge of a third edge support **110c** counterclockwise to the second back support **110b**. A plane of a third back support **105c** may be at a third plane angle **120c** in a range of 50 to 75 degrees to a first virtual plane **130a** between the top of the first back support **105a** counterclockwise to the third back support **105c** and an outer edge of the first edge support **110a** counterclockwise to the third back support **105c**.

In one embodiment, the first back support **105a** has a longitudinal length **115a** in the range of 12 to 26 cm, the second back support **105b** has a longitudinal length **115b** in the range of 9 to 21 cm, and the third back support **105c** has a longitudinal length **115c** in the range of 10 to 22 cm. In a certain embodiment, the first longitudinal length **115a** is 19 cm, the first plane angle **120a** is 60 degrees, the second longitudinal length **115b** is 15 cm, the second plane angle **120b** is 68 degrees, the third longitudinal length **115c** is 17 cm, and the third plane angle **120c** is 52 degrees.

The arrangement of the longitudinal lengths **115** and the plane angles **120** generate three distinct viewing angles **160**. In one embodiment, the first viewing angle **120a** may be 36 degrees, the second viewing angle **120b** may be 74 degrees, and the third viewing angle **120**C may be 49 degrees.

In one embodiment, each edge support **110** forms an edge angle **140** with an adjacent back support **105**. The edge angle **140** may be in the range of 85 to 120 degrees. The edge angle **140** may be 90 degrees. Each edge support **110** may have an

4

edge support width **135**. The edge support width **135** may be in the range of 1 to 5 cm. In a certain embodiment, the edge support width **135** is 2 cm.

FIG. **3** is a perspective drawing illustrating one alternate embodiment of a media support **100**. In the depicted embodiment, each back support **105** and each edge support **110** is a surface **180** of a frame. Each end **165** may also be a surface **180** of a frame. The frame may include a molded mashed, a fabric mash, a wire mesh, or the like. In the depicted embodiment, the media support **100** includes ends **165**. Alternatively, there may be no ends **165** on the media support **100**.

FIG. **4** is a perspective drawing illustrating one embodiment of media **170** disposed on the media support **100**. A bottom edge of the media **170** is disposed in the edge support **110** while the back of the media **170** is disposed against a back support **105**.

The embodiments arrange three support sides **155** to generate three distinct viewing angles **160**. Each viewing angle **160** is chosen for a specific viewing orientation. The first viewing angle **160a** may be employed when the media support **100** and the media is disposed in the user's lap. The second viewing angle **160b** may be used when the media support **100** and the media is disposed on a table and the user is sitting upright. In addition, the 3rd viewing angle **160c** may be used when the user is lying down and the media support **100** is disposed on the user.

When the user changes position, the media support **100** may be quickly rotated to provide a different viewing angle **160**. As a result, the media support **100** is quickly deployed to provide the appropriate viewing angle **160**. In addition, the comfort of the user is greatly enhanced as the media may be viewed at the appropriate viewing angle **160** without the user holding the media.

The media support **100** has been marketed as the "Flipy Tablet Pillow" since 2013 at a retail price of $49.98. Because of the media support's unique properties, it has enjoyed significant commercial success, with 800 units sold in 2013, 2,233 units in 2014, 925 units in 2015 and 997 units year-to-date in 2016.

Embodiments may be practiced in other specific forms. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed is:

**1**. An apparatus comprising:

three support sides, each support side comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior, each edge support comprises an edge support width of 2 centimeters (cm) with an edge angle of 90 degrees to an adjacent back support, a face of each edge support width oriented clockwise about the central axis, a plane of a first back support is at a first plane angle of 60 degrees to a second virtual plane between the top of a second back support counterclockwise to the first back support and an outer edge of a second edge support counterclockwise to the first back support, a plane of the second back support is at a second plane angle of 80 degrees to a third virtual plane between the top of a third back support counterclockwise to the

US RE48,479 E

5

second back support and an outer edge of a third edge support counterclockwise to the second back support, a plane of a third back support is at a third plane angle of 40 degrees to a first virtual plane between the top of the first back support counterclockwise to the third back support and an outer edge of the first edge support counterclockwise to the third back support, and wherein each back support, each edge support, and each end is a surface of the solid interior, the solid interior is a pillow covered in fabric, a first viewing angle of the first back support is 36 degrees, a second viewing angle of the second back support is 74 degrees, and a third viewing angle of the third back support is 49 degrees.

**2**. The apparatus of claim **1**, wherein the first back support has a longitudinal length in the range of 12 to 26 centimeters (cm), the second back support has a longitudinal length in the range of 9 to 21 cm, and the third back support has a longitudinal length in the range of 10 to 22 cm.

**3**. The apparatus of claim **2**, wherein the first longitudinal length is 19 cm, the first plane angle is 60 degrees, the second longitudinal length is 15 cm, the second plane angle is 68 degrees, the third longitudinal length is 17 cm, and the third plane angle is 52 degrees.

**4**. The apparatus of claim **1**, wherein each back support has a latitudinal length in the range of 9 to 25 cm.

**5**. The apparatus of claim **4**, wherein each back support has a latitudinal length of 15 cm.

**6**. The apparatus of claim **1**, wherein each back support has a latitudinal length in the range of 2 to 10 cm.

**7**. The apparatus of claim **6**, wherein each back support has a latitudinal length of 7 cm.

**8**. The apparatus of claim **1**, wherein each edge support has an edge support width in the range of 1 to 5 centimeters (cm).

**9**. The apparatus of claim **1**, wherein a plane of each edge support forms an edge angle in the range of 85 to 120 degrees with an adjacent back support.

**10**. The apparatus of claim **9**, wherein the edge angle is 90 degrees.

*11. The apparatus of claim 1, wherein a latitudinal length of each of the first, second, and third edge supports is different from a latitudinal length of the corresponding first, second, and third side supports.*

*12. A media support apparatus comprising:*

*a body having a first support back, a second support back, and a third support back disposed about a central axis;*

*a first support edge disposed between the first support back and the second support back, the first support back and first support edge are configured to support a media device at a first support angle;*

*a second support edge disposed between the second support back and third support back, the second support back and second support edge are configured to support a media device at a second support angle;*

*a third support edge disposed between the third support back and first support back, the third support back and third support edge are configured to support a media device at a third support angle, wherein each edge support comprises an edge support width with an edge angle in the range of 85 to 120 degrees to an adjacent support back, a face of each edge support width oriented clockwise about the central axis;*

*wherein the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions including on a first virtual plane between a top of the*

6

*second support back and an outer edge of the second edge support, on a second virtual plane between a top of the third support back and an outer edge of the third edge support, and on a third virtual plane between a top of the first support back and an outer edge of the first edge support; and*

*wherein the media support apparatus is configured to provide a first viewing angle of the media device when the media support apparatus body rests on the first virtual plane and the media device is supported at the first support angle, a second viewing angle when the media support apparatus body rests on the second virtual plane and the media device is supported at the second support angle, and a third viewing angle when the media support apparatus body rests on the third virtual plane and the media device is supported at the third support angle, wherein the first viewing angle, the second viewing angle, and the third viewing angle are different from one another.*

*13. The apparatus of claim 12, wherein the first support angle is between 50 and 60 degrees to the second virtual plane, the second support angle is between 55 and 65 degrees to the third virtual plane, and the third support angle is between 50 and 75 degrees to the first virtual plane.*

*14. The apparatus of claim 12, wherein the first support angle is 60 degrees to the second virtual plane, the second support angle is 68 degrees to the third virtual plane, and the third support angle is 52 degrees to the first virtual plane.*

*15. The apparatus of claim 12, wherein the edge support angle is 90 degrees.*

*16. The apparatus of claim 15 wherein the edge support width is 2 cm.*

*17. The apparatus of claim 12, wherein the body includes three solid corners, with each of the corners interposed between two adjacent support backs and including a respective edge support.*

*18. The apparatus of claim 12, wherein the body is foam having an indentation force deflection (IFD) in the range of 15-30 kilograms at 25% indentation.*

*19. The apparatus of claim 12, wherein the edge support width is in the range of 1 to 5 cm.*

*20. An apparatus comprising:*

*three support sides, each support side comprising a back support and an edge support,*

*wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends,*

*wherein each edge support comprises an edge support width with an edge angle to an adjacent back support in the range of 85 to 120 degrees to an adjacent back support,*

*wherein a face of each edge support width is oriented clockwise about the central axis,*

*wherein a plane of a first back support is at a first plane angle to a second virtual plane between the top of a second back support counterclockwise to the first back support and an outer edge of a second edge support counterclockwise to the first back support,*

*wherein a plane of the second back support is at a second plane angle to a third virtual plane between the top of a third back support counterclockwise to the second back support and an outer edge of a third edge support counterclockwise to the second back support,*

*wherein a plane of a third back support is at a third plane angle to a first virtual plane between the top of the first*

US RE48,479 E

**7**

back support counterclockwise to the third back support and an outer edge of the first edge support counterclockwise to the third back support,

wherein the first plane angle, the second plane angle, and the third plane angle are different from one another and are configured to provide a first viewing angle, a second viewing angle, and a third viewing angle that are different from one another; and

wherein each back support, each edge support, and each end is a surface of an interior.

21. The apparatus of claim 20, wherein the first back support has a longitudinal length in the range of 12 to 26 centimeters (cm), the second back support has a longitudinal length in the range of 9 to 21 cm, and the third back support has a longitudinal length in the range of 10 to 22 cm.

22. The apparatus of claim 21, wherein the first longitudinal length is 19 cm, the first plane angle is 60 degrees, the second longitudinal length is 15 cm, the second plane angle

**8**

is 68 degrees, the third longitudinal length is 17 cm, and the third plane angle is 52 degrees.

23. The apparatus of claim 20, wherein each back support has a latitudinal length in the range of 9 to 25 cm.

24. The apparatus of claim 23, wherein each back support has a latitudinal length of 15 cm.

25. The apparatus of claim 20, wherein each edge support has a latitudinal length in the range of 2 to 10 cm.

26. The apparatus of claim 25, wherein each edge support has a latitudinal length of 7 cm.

27. The apparatus of claim 20, wherein each edge support has an edge support width in the range of 1 to 5 centimeters (cm).

28. The apparatus of claim 20, wherein a plane of each edge support forms an edge angle of 90 degrees with an adjacent back support.

29. The apparatus of claim 28, wherein each edge support has an edge support width of 2 centimeters (cm).

\* \* \* \* \*

# EXHIBIT C

# ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454

## U.S. Patent No. 9,642,454 – Ontel, Telebrands, & Retailer Defendants

### Claim 1

Happy Product, Inc. ("HPI") provides evidence of infringement of claim 1 of U.S. Patent No. 9,642,454 (hereinafter "the '454 patent") by Ontel's Pillow Pad ("Ontel"). In support thereof, HPI provides the following claim charts.

"Accused Products" as used herein is defined in HPI's Complaint, and includes, but is not limited to, all versions of Ontel's Pillow Pad product containing three rounded ledges, as well as any other multi-angle soft tablet stands having three rounded ledges sold or offered by sale by Ontel and/or each Retailer Defendant. It is further understood, on information and belief, that Ontel is responsible, in material part, for the functionality and design of those products that it provides.

These claim charts demonstrate each Defendant's infringement, and provide notice of such infringement, by comparing each element of the asserted claims to corresponding components, aspects, and/or features of the Accused Products. These claim charts are not intended to constitute an expert report on infringement. These claim charts include information provided by way of example, and not by way of limitation.

The analysis set forth below is based only upon information from available resources regarding the Accused Products, as each Defendant has not yet provided any further non-public information. An analysis of each Defendant's (or other third parties') technical documentation and/or software source code may assist in fully identifying all infringing features and functionality. Accordingly, HPI reserves the right to supplement this infringement analysis once such information is made available to HPI. Furthermore, HPI reserves the right to revise this infringement analysis, as appropriate, upon issuance of a court order construing any terms recited in the asserted claims. HPI provides this evidence of infringement and related analysis without the benefit of claim construction or expert reports or discovery. HPI reserves the right to supplement, amend or otherwise modify this analysis and/or evidence based on any such claim construction or expert reports or discovery.

Unless otherwise noted, HPI contends that each Defendant directly infringes the '454 patent in violation of 35 U.S.C. § 271(a) at least by selling and offering to sell at least the Accused Products. The following exemplary analysis demonstrates that infringement.

Unless otherwise noted, HPI further contends that the evidence below supports a finding of indirect infringement under 35 U.S.C. § 271(b) in conjunction with other evidence of liability under one or more of those subsections. As set forth in the Complaint, Ontel and Telebrands each induces others to make, use, sell, import, or offer for sale in the United States, or has induced others to make, use, sell, import, or offer for sale in the past, without authority products, equipment, or services that infringe at least claim 1 of the '454 patent, including without limitation, the Accused Products.

Unless otherwise noted, HPI believes and contends that each element of each claim asserted herein is literally met through each Defendant's provision of the Accused Products. However, to the extent that any Defendant attempts to allege that any asserted claim

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

element is not literally met, HPI believes and contends that such elements are met under the doctrine of equivalents. More specifically, in its investigation and analysis of the Accused Products, HPI did not identify any substantial differences between the elements of the patent claims and the corresponding features of the Accused Products, as set forth herein. In each instance, the identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.

To the extent the chart of an asserted claim relies on evidence about certain specifically identified Accused Products, HPI asserts that, on information and belief, any similarly functioning instrumentalities also infringes the charted claim. HPI reserves the right to amend this infringement analysis based on other products made, used, sold, imported, or offered for sale by each Defendant. HPI also reserves the right to amend this infringement analysis by citing other claims of the '454 patent, not listed in the claim chart, that are infringed by the Accused Products. HPI further reserves the right to amend this infringement analysis by adding, subtracting, or otherwise modifying content in the "Accused Products" column of each chart.

2

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| Claim 1 | Accused Products |
|---|---|
| 1. An apparatus comprising: | Each Accused Product is an apparatus: |



3

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| | |
|---|---|
| three support sides, each support side comprising a **back support and an edge support,** | As shown below, **each Accused Product has three support sides. Each support side comprises a back support and an edge support.**  |
| wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in | **Each Accused Product has a top of each back support in physical communication with an adjacent edge support clockwise about a central axis. Each back support and each edge support is in physical communication with two ends of a solid interior.** |

4

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

physical communication with two ends of a solid interior,



5

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| | |
|---|---|
| | As recited further on in claim 1, "the solid interior *is* a pillow covered in fabric," which does not require the pillow (which is inside the fabric cover) itself to be solid, or lack any hollows, cutouts, cavities, or other lacunae. As shown above, the end of the interior is solid at the very least, on the exterior of the Accused Product. |
| | To the extent that Ontel or any Defendant would argue that this element may not be met in one or more Accused Products due to hollows, cutouts, cavities, or other lacunae of any size disposed within the interior of the product, this element is still satisfied under the doctrine of equivalents. |
| | In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein, as demonstrated by the solid appearance on the exterior of the Accused Product. The identified features of the Accused Products perform at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element. |
| | In particular, an interior that may have a hollow, cutout, cavity, or lacuna performs substantially the same function (providing structural integrity sufficient to support a tablet) in substantially the same way (by substantially maintaining and viewing angle shape under compression of the weight of the tablet or other object being viewed) to achieve substantially the same result (providing multiple viewing angles for a tablet or other viewing object). |
| each edge support comprises an edge support width of 2 centimeters (cm) with an edge angle of 90 degrees to an adjacent back support, | **Each edge support in the Accused Products comprises an edge support width of 2 centimeters with an edge angle of 90 degrees to an adjacent back support.** |

6

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454



To the extent that Ontel or any Defendant would argue that this element may not be met in one or more Accused Products due to differences in the angle of attachment and/or the width of the edge support, this element is still satisfied under the doctrine of equivalents.

In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein, as demonstrated by the solid appearance on the exterior of the Accused Product. The identified feature of the Accused Products performs at least

7

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| | |
|---|---|
| | substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element. |
| a face of each edge support width oriented clockwise about the central axis, | In particular, angles that approximate 90 degrees and edge widths that are approximately 2cm each perform substantially the same function (providing a particular viewing angle and sufficient space to hold the object being viewed) in substantially the same way (by maintaining an appropriate viewing angle when an object is being displayed and having sufficient space on the edge to hold and display the object) to achieve substantially the same result (successfully disposing an object for display at a particular angle).<br><br>**Each Accused Product has a face of each edge support width oriented clockwise about the central axis,** as shown below:<br><br> |

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| | |
|---|---|
| a plane of a first back support is at a first plane angle of 60 degrees to a second virtual plane between the top of a second back support counterclockwise to the first back support and an outer edge of a second edge support counterclockwise to the first back support, | **This element is met for each Accused Product at least under the doctrine of equivalents.**<br><br>In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein.<br><br><br><br><br><br>The identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.<br><br>In particular, an angle that approximates 60 degrees performs substantially the same function (providing a particular viewing angle) in substantially the same way (by maintaining a particular viewing angle a when an object is being displayed based on a first plane angle of approximately 60 degrees to a second virtual plane) to achieve substantially the same result (successfully disposing an object for display at a particular angle) to achieve substantially the same result based on the first plane angle of approximately 60 degrees). *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283 (Fed. Cir. 2010) |

9

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454

| | |
|---|---|
| a plane of the second back support is at a second plane angle of 80 degrees to a third virtual plane between the top of a third back support counterclockwise to the second back support and an outer edge of a third edge support counterclockwise to the second back support, | **This element is met for each Accused Product at least under the doctrine of equivalents.**<br><br>In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein.<br><br><br><br>The identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.<br><br>In particular, an angle that approximates 80 degrees performs substantially the same function (providing a particular viewing angle) in substantially the same way (by maintaining a particular viewing angle a when an object is being displayed based on a first plane angle of approximately 80 degrees to a second virtual plane) to achieve substantially the same result (successfully disposing an object for display at a particular angle based on the first plane angle of approximately 80 degrees). *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283 (Fed. Cir. 2010).<br><br>**This element is met for each Accused Product at least under the doctrine of equivalents.** |
| a plane of a third back support is at a third plane | |

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| angle of 40 degrees to a first virtual plane between the top of the first back support counterclockwise to the third back support and an outer edge of the first edge support counterclockwise to the third back support, | In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein.<br><br><br><br><br><br>The identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.<br><br>In particular, an angle that approximates 40 degrees performs substantially the same function (providing a particular viewing angle) in substantially the same way (by maintaining a particular viewing angle a when an object is being displayed based on a first plane angle of approximately 40 degrees to a second virtual plane) to achieve substantially the same result (successfully disposing an object for display at a particular angle based on the first plane angle of approximately 40 degrees). *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283 (Fed. Cir. 2010). |

11

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454

| and wherein each back support, each edge support, and each end is a surface of the solid interior, | |
|---|---|
| | **In each Accused Product, each back support, each edge support, and edge end is a surface of the solid interior.**  |

12

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454

the solid interior is a pillow covered in fabric.

**In each Accused Product, the solid interior is a pillow covered in fabric.**



13

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**

| | |
|---|---|
| a first viewing angle of the first back support is 36 degrees, | |
| | At least certain of the Accused Products appear to satisfy this element literally because those **Accused Products have a first viewing angle of the first back support at 36 degrees,** as shown at left below.<br><br>In the alternative, **this element is met for each Accused Product at least under the doctrine of equivalents.**<br><br> |

14

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454

| | |
|---|---|
| a second viewing angle of the second back support is 74 degrees, and | . In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein. |
| |  |
| | The identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element. |
| | In particular, an angle that approximates 36 degrees performs substantially the same function (providing a particular viewing angle) in substantially the same way (by maintaining a particular viewing angle a when an object is being displayed based on a first plane angle of approximately 36 degrees to a second virtual plane) to achieve substantially the same result (successfully disposing an object for display at a particular angle based on the first plane angle of approximately 36 degrees). *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283 (Fed. Cir. 2010). |
| | **This element is met for each Accused Product at least under the doctrine of equivalents.** |
| | In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein. |

15

| | |
|---|---|
| a third viewing angle of the third back support is 49 degrees. | <br><br>The identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.<br><br>In particular, an angle that approximates 74 degrees performs substantially the same function (providing a particular viewing angle) in substantially the same way (by maintaining a particular viewing angle a when an object is being displayed based on a first plane angle of approximately 74 degrees to a second virtual plane) to achieve substantially the same result (successfully disposing an object for display at a particular angle based on the first plane angle of approximately 74 degrees). *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,* 616 F.3d 1283 (Fed. Cir. 2010).<br><br>**This element is met for each Accused Product at least under the doctrine of equivalents.**<br><br>In particular, there are no substantial differences between this claim element and the corresponding features of any Accused Product, as set forth herein. |

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,454**





The identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.

In particular, an angle that approximates 49 degrees performs substantially the same function (providing a particular viewing angle) in substantially the same way (by maintaining a particular viewing angle a when an object is being displayed based on a first plane angle of approximately 49 degrees to a second virtual plane) to achieve substantially the same result (successfully disposing an object for display at a particular angle based on the first plane angle of approximately 49 degrees). *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283 (Fed. Cir. 2010).

17

# EXHIBIT D

# ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

## U.S. Patent No. RE 48,479 – Ontel and the Retailer Defendants

### Claim 12

Happy Product, Inc. ("HPI") provides evidence of infringement of claim 12 of U.S. Patent No. RE 48,479 (hereinafter "the '479 patent") by Ontel's Pillow Pad ("Ontel"). In support thereof, HPI provides the following claim charts.

"Accused Products" as used herein is defined in HPI's Complaint, and includes, but is not limited to, all versions of Ontel's Pillow Pad product containing three rounded ledges, as well as any other multi-angle soft tablet stands having three rounded ledges sold or offered by sale by each Ontel and/or Retailer Defendant. It is further understood, on information and belief, that Ontel is responsible, in material part, for the functionality and design of those products that it provides.

These claim charts demonstrate Ontel's and each Retailer Defendant's infringement, and provide notice of such infringement, by comparing each element of the asserted claims to corresponding components, aspects, and/or features of the Accused Products. These claim charts are not intended to constitute an expert report on infringement. These claim charts include information provided by way of example, and not by way of limitation.

The analysis set forth below is based only upon information from available resources regarding the Accused Products, as no Defendant has yet provided any further non-public information. An analysis of Ontel's and/or each Retailer Defendant's (or other third parties') technical documentation and/or software source code may assist in fully identifying all infringing features and functionality. Accordingly, HPI reserves the right to supplement this infringement analysis once such information is made available to HPI. Furthermore, HPI reserves the right to revise this infringement analysis, as appropriate, upon issuance of a court order construing any terms recited in the asserted claims. HPI provides this evidence of infringement and related analysis without the benefit of claim construction or expert reports or discovery. HPI reserves the right to supplement, amend or otherwise modify this analysis and/or evidence based on any such claim construction or expert reports or discovery.

Unless otherwise noted, HPI contends that Ontel and each Retailer Defendant directly infringes the '79 patent in violation of 35 U.S.C. § 271(a) at least by selling and offering to sell at least the Accused Products. The following exemplary analysis demonstrates that infringement.

Unless otherwise noted, HPI further contends that the evidence below supports a finding of indirect infringement under 35 U.S.C. § 271(b) in conjunction with other evidence of liability under one or more of those subsections. As set forth in the Complaint, Ontel induces others to make, use, sell, import, or offer for sale in the United States, or has induced others to make, use, sell, import, or offer for sale in the past, without authority products, equipment, or services that infringe at least claim 1 of the '454 patent, including without limitation, the Accused Products.

1

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

Unless otherwise noted, HPI believes and contends that each element of each claim asserted herein is literally met through each Ontel's and each Retailer Defendant's provision of the Accused Products. However, to the extent that any Defendant attempts to allege that any asserted claim element is not literally met, HPI believes and contends that such elements are met under the doctrine of equivalents. More specifically, in its investigation and analysis of the Accused Products, HPI did not identify any substantial differences between the elements of the patent claims and the corresponding features of the Accused Products, as set forth herein. In each instance, the identified feature of the Accused Products performs at least substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim element.

To the extent the chart of an asserted claim relies on evidence about certain specifically identified Accused Products, HPI asserts that, on information and belief, any similarly functioning instrumentalities also infringes the charted claim. HPI reserves the right to amend this infringement analysis based on other products made, used, sold, imported, or offered for sale by Ontel and/or each Retailer Defendant. HPI also reserves the right to amend this infringement analysis by citing other claims of the '479 patent, not listed in the claim chart, that are infringed by the Accused Products. HPI further reserves the right to amend this infringement analysis by adding, subtracting, or otherwise modifying content in the "Accused Products" column of each chart.

2

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

| Claim 12 | Accused Products |
|---|---|
| 12. A media support apparatus comprising: | **Each Accused Product is a media support apparatus:**<br> |

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

| A body having a first support back, a second support back, and a third support back disposed about a central axis | As shown below, **each Accused Product includes a body having a first support back, a second support back, and a third support back disposed about a central axis.** |
|---|---|
| |  |

4

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. No. 9,642,479

| a first support edge disposed between the first support back and the second support back, the first support back and first support edge are configured to support a media device at a first support angle; | Each Accused Product has a first support edge disposed between the first support back and the second support back. The first support back and first support edge are configured to support a media device at a first support angle: |
| --- | --- |



first support edge

first support back

first support angle

5

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

| | |
|---|---|
| a second support edge disposed between the second support back and third support back, the second support back and second support edge are configured to support a media device at a second support angle: | **Each Accused Product has a second support edge disposed between the second support back and third support back. The second support back and second support edge are configured to support a media device at a second support angle:** |

6



Second support back

Second support edge

Second support angle

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

7

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

| | |
|---|---|
| a third support edge disposed between the third support back and first support back, the third support back and third support edge are configured to support a media device at a third support angle, | Each Accused Product has a third support edge disposed between the third support back and first support back. The third support back and third support edge are configured to support a media device at a third support angle: |
| |  |
| wherein each edge support comprises an edge support width with an edge angle in the range of 85 to 120 | The edge support of each Accused Product comprises an edge support width with an edge angle in the range of 85 to 120 degrees to an adjacent support back, a face of each edge support width oriented clockwise about the central axis: |

8

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

degrees to an adjacent support back, a face of each edge support width oriented clockwise about the central axis;



6

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

wherein the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions including

Each Accused Product is configured to be rotated about its central axis so that the body can rest on a horizontal support in any one of three positions:









**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

| | |
|---|---|
| on a first virtual plane between a top of the second support back and an outer edge of the second edge support, | **Each Accused Product is configured to be rotated about its central axis so that the body can rest on a horizontal support on a first virtual plane between a top of the second support back and an outer edge of the second edge support:**<br><br> |
| on a second virtual plane between a top of the third | **Each Accused Product is configured to be rotated about its central axis so that the body can rest on a horizontal support on a second virtual plane between a top of the third support back and an outer edge of the third edge support:** |

**O**NTEL **P**ILLOW **P**AD **I**NFRINGEMENT **A**NALYSIS – U.S. **P**AT. **N**O. 9,642,479

| | |
|---|---|
| support back and an outer edge of the third edge support, and | |
| on a third virtual plane between a top of the first support back and an outer edge of the first edge support; and | 

**Each Accused Product is configured to be rotated about its central axis so that the body can rest on a horizontal support on a third virtual plane between a top of the first support back and an outer edge of the first edge support:** |

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

| wherein the media support apparatus is configured to provide a first viewing angle of the media device when the media support apparatus body rests on | |
|---|---|
| | **Each Accused Product is configured to provide a first viewing angle of the media device when the media support apparatus body rests on the first virtual plane and the media device is supported at the first support angle:**  |

13

**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**

| | |
|---|---|
| the first virtual plane and the media device is supported at the first support angle, | |
| a second viewing angle when the media support apparatus body rests on the second virtual plane and the media device is supported at the second support angle, and | **Each Accused Product is configured to provide a second viewing angle when the media support apparatus body rests on the second virtual plane and the media device is supported at the second support angle:**  |

14

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

| | |
|---|---|
| a third viewing angle when the media support apparatus body rests on the third virtual plane and the media device is supported at the third support angle. | |
| | **Each Accused Product is configured to provide a third viewing angle when the media support apparatus body rests on the third virtual plane and the media device is supported at the third support angle:**  |

ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479

wherein the first viewing angle, the second viewing angle, and the third viewing angle are different from one another.

**In each Accused Product, the first viewing angle, the second viewing angle, and the third viewing angle are different from one another,** as shown above and below:



**ONTEL PILLOW PAD INFRINGEMENT ANALYSIS – U.S. PAT. NO. 9,642,479**



17