Timothy Devlin (*pro hac vice* forthcoming)
tdevlin@devlinlawfirm.com
Lowell D. Jacobson (admitted *pro hac vice* ~~forthcoming~~)
ljacobson@devlinlawfirm.com
**DEVLIN LAW FIRM, LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010 –Fax: (302) 353-4251

Tamara D. Fraizer (admitted *pro hac vice*)
tamara.fraizer@squirepb~~Marc J. Gross, Esq.
mgross@foxrothschild~~.com
~~Gerard P. Norton, Esq.
gnorton@foxrothschild.com~~
**SQUIRE PATTON BOGGS (US)**~~Jordan B. Kaplan, Esq.
jbkaplan@foxrothschild.com~~
**FOX ROTHSCHILD** LLP
1841 Page Mill Road, Suite 110
Palo Alto, California 94304
~~49 Market Street
Morristown, New Jersey 07960~~
Tel: ~~973-992-4800~~
650 856 6500  Fax: ~~973-992-9125~~650 454 8777
*Attorneys for Plaintiff Happy Products, Inc.*

Marc J. Gross
mgross@foxrothschild~~Tamara D. Fraizer (*pro hac vice* forthcoming)
tamara.fraizer@squirepb~~.com
Jordan B. Kaplan~~SQUIRE PATTON BOGGS (US)~~
jbkaplan@foxrosthschild.com
**FOX ROTHSCHILD, LLP**
49 Market Street
Morristown, New Jersey 07960
~~1841 Page Mill Road, Suite 110
Palo Alto, California 94304~~
Telephone: ~~650 856 6500~~ (973) 992-4800
Facsimile: ~~650 454 8777~~(973) 992-9125

***Attorneys for Plaintiff Happy Products, Inc.***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HAPPY PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ONTEL PRODUCTS ~~CORPORATION; TELEBRANDS~~ CORPORATION; BOSCOV'S DEPARTMENT STORE, LLC; BJ'S WHOLESALE CLUB, INC.; AND UNBEATABLESALE.COM, INC., <br><br> Defendants. | Civil Action No. 2:24-cv-09819-EP-JRA <br><br> AMENDED COMPLAINT FOR PATENT INFRINGEMENT, TRADE DRESS INFRINGEMENT, FALSE ADVERTISING, UNFAIR COMPETITION, AND TORTIOUS INTERFERENCE <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Happy Products, Inc. ("Plaintiff" or "HPI"), by and through its undersigned

counsel, files this complaint against Defendants Ontel Products Corporation ("Ontel~~")~~;

~~Telebrands Corporation ("Telebrands");");:~~ Boscov's Department Store, LLC ("Boscov's"); BJ's Wholesale Club, Inc. (BJ's"); and Unbeatablesale.com, Inc. ("UBS") (together with Boscov's and BJ's, "Retailer Defendants," and collectively, "Defendants") and alleges as follows:

### NATURE OF THE ACTION

1.     This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, the federal Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, the New Jersey Unfair Competition Act, N.J. Stat. Ann. § 56:4-1, and New Jersey common law for acts relating to Ontel's importation into and sale, offer for sale, distribution, marketing, advertising, and use in the United States of the Pillow Pad or Pill-O-Pad media support device (hereinafter, "Pillow Pad"). Pillow Pad is a knock-off copy of HPI's visually distinct and patented Flippy® or Flipy® tablet pillow stand (hereinafter, "Flippy") that has been distributed throughout the United States online and at virtually all major retailers, and used to sell other and inferior media support products, to the detriment of consumers and Plaintiff HPI.

2.     Shown below are HPI's Flippy (left) and Ontel's knock-off Pillow Pad product (right).  As shown in the diagram below them, the Flippy and the Pillow Pad each provide three different viewing angles for a supported media.  Each of the three viewing angles is obtained by flipping the device to rest upon each of its three sides.

 

HPI V. ONTEL AMENDED COMPLAINT



3.      By virtue of this action, HPI seeks monetary damages and a preliminary and/or permanent injunction that prohibits Ontel and its principals from importing, making, using, distributing, marketing, advertising, selling and offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) into or in the United States, prohibits each Retailer Defendant and its principals from marketing, advertising, selling and/or offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) in the United States, and further prohibits Ontel, the other Defendants and their principals from assisting any other Entity in importing, making, using, distributing, marketing, advertising, selling or offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) and any product marked as "Pillow Pad" into or in the United States.

## THE PARTIES

4.      Plaintiff Happy Products, Inc. ("HPI") is a small woman-owned business that invented, developed, and continues to market and sell the Flippy.

5.      Happy Products, Inc. is a Delaware corporation located in Portland, Oregon.

6.      On information and belief, Defendant Ontel Products Corporation was founded by Ashok (aka "Chuck") Khubani in 1994, and offers "As Seen on TV" products including the Pillow Pad, which is indicated at www.asseenontvlive.com/best-sellers/ to be a "best seller."

7.      On information and belief, Ontel is a family-owned New Jersey corporation with its principal place of business at 21 Law Drive, Fairfield, New Jersey, 07004.

8. ~~On information and belief, Defendant Telebrands Corporation was founded by Ajit (aka "AJ") Khubani and, having created the "As Seen on TV" brand, offers "As Seen on TV" products.~~

9. ~~On information and belief, Telebrands is a New Jersey corporation with its principal place of business at 79 Two Bridges Road, Fairfield, New Jersey, 07004.~~

~~10.~~8.    Chuck Khubani is the founder, owner, and CEO of Ontel and a resident of New Jersey.

~~11.~~9.    On information and belief, Chuck Khubani was personally and directly involved in all aspects of the business of Ontel during at least the 2018–2019 period and through approximately summer of 2022.

10.    Chuck Khubani is the brother of  AJ Khubani, the CEO of Telebrands, another family-owned "As Seen On TV" direct response company.

~~12.~~11.    Amar Khubani is the President of Ontel and a resident of New Jersey.

~~13.~~12.    On information and belief, Amar Khubani is personally and directly involved in all aspects of the business of Ontel.

14. ~~AJ Khubani is the CEO of Telebrands and is a resident of New Jersey.~~

15. ~~On information and belief, AJ Khubani is personally and directly involved in all aspects of the business of Telebrands.~~

16. ~~Chuck Khubani and AJ Khubani are brothers.~~

~~17.~~13.    Amar Khubani is Chuck Khubani's son and AJ Khubani's nephew.

~~18.~~14.    On information and belief, defendant Boscov's Department Store, LLC is a Delaware entity with its corporate headquarters located at 4500 Perkiomen Ave., Reading, PA, 19606.

~~19.~~15.    On information and belief, defendant BJ's Wholesale Club, Inc., is a Delaware corporation with its corporate headquarters located at 350 Campus Drive, Marlborough, MA 01752.

20.16.  On information and belief, defendant Unbeatablesale.com, Inc. is a New Jersey corporation with its corporate headquarters located at 195 Lehigh Ave., Ste. 5, Lakewood, NJ, 08701.

## JURISDICTION AND VENUE

21.17.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a)–(b) under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1051, 1121.  This Court also has subject matter over this action pursuant to 28 U.S.C. § 1367(a) for the claims arising under the New Jersey Unfair Competition Act, N.J. Stat. Ann. § 56:4-1, and New Jersey common law.

22.18.  On information and belief, this Court has personal jurisdiction over Ontel because Ontel is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

23.    On information and belief, this Court has personal jurisdiction over Telebrands because Telebrands is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

24.19.  On information and belief, defendantOn information and belief, Defendant Boscov's is subject to the general personal jurisdiction of this Court based its continuous and systematic activities in New Jersey that include but are not limited to the eight Boscov's department stores operating in the state of New Jersey.  See https://locations.boscovs.com/nj/ .

25.20.  On information and belief, dDefendant BJ's is subject to the general personal jurisdiction of this Court based on its continuous and systematic activities in New Jersey that include but are not limited to the twenty-five BJ's club locations operating in the state of New Jersey.  See https://www.bjs.com/clubLocator .

26.21.  On information and belief, dDefendant UBS is subject to the general personal jurisdiction of this Court based its continuous and systematic activities in New Jersey that including its incorporation, business location, and operation in the state of New Jersey.

27.22.  On information and belief, this Court has personal jurisdiction over dDefendant UBS because UBS is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

28.23.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Ontel because Ontel resides in this District, because Ontel has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Ontel occurred in this District.

29.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Telebrands because Telebrands resides in this District, because Telebrands has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Telebrands occurred in this District.

30.24.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Boscov's because Boscov's has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Boscov's occurred in this District.

31.25.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to BJ's because BJ's has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against BJ's occurred in this District.

32.26.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to UBS because UBS resides in this District, because UBS has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against UBS occurred in this District.

## THE BUSINESS AND BUSINESS MODEL OF ONTEL ~~AND TELEBRANDS~~

~~33.~~27.  Ontel ~~and Telebrands are each~~is infamous for a pattern of copying successful proprietary products and seeking to piggyback on the innovations of others by selling "knock-off" products (often made in China), which are then imported into the United States.

~~34.1.    As alleged in an infringement lawsuit filed against Telebrands by MyPillow, "the principal of Telebrands, AJ Khubani, is known as the infamous 'Knock Off King' of the infomercial industry."~~

~~35.~~28.  Ontel promotes and ~~Telebrands each promote and offer~~offers for sale products online and through national direct response television commercials (aka "infomercials").

~~36.~~29.  ~~Each of~~ Ontel ~~and Telebrands~~ is a big player in the direct response industry and a well-known marketer of "As Seen On TV" branded products.[1]



~~37.~~30.  On information and belief, "As Seen on TV" is a brand used to identify products that are or were advertised and offered on direct response TV—i.e., via infomercials.

31.    Telebrands ~~further~~, a family-owned company founded and run by AJ Khubani—the brother of Ontel CEO Chuck Khubani—touts itself as the creator of the "As Seen On TV"

---

[1] See https://www.asseenontvlive.com/brands/telebrands and https://www.asseenontvlive.com/brands/ontel .

HPI V. ONTEL AMENDED COMPLAINT

brand and logo.  As alleged in an infringement lawsuit filed against Telebrands by MyPillow, "the principal of Telebrands, AJ Khubani, is known as the infamous 'Knock Off King' of the infomercial industry."

38.

39.32.  Because of their superior size, market penetration, and retail connections, Ontel and Telebrands are able to quickly generate advertising and commercials to aggressively market "knock-off" products.

40.33.  Because these companies are often trying to determine whether they can generate sufficient sales *before* incurring the expenses of arranging for knock-off products to be manufactured, on information and belief, they typically do not have any products of their own on hand to be featured in their initial commercials and/or website materials.

41.34.  On information and belief, at least their initial commercials and related advertising and sales materials relating to such knock-off products thus instead typically feature the products that they are seeking to copy.

42.35.  If justified by the response to their initial commercials and other "test marketing," Ontel and Telebrands are each able to quickly arrange for knock-off products to be manufactured and get those knock-off products placed into "big box" stores and other retail channels.

43.36.  On information and belief, it is a standard business practice for each of Ontel and, like Telebrands, with the substantial involvement of their respective CEOscompany principals, to intentionally "test the market" to determine whether sufficient sales can be generated to justify the manufacturing and marketing of products.

44.37.  This was explained in a 2007 article in New York Magazine about Telebrands, which stated:

> The hard part, in fact, is accurately predicting demand, which Khubani's test-launches sometimes fail to do.  To roll out five new items, as Khubani will do this year, he'll film infomercials for at least twenty and try each one out for a week.  Each trial needs to generate double its advertising costs to make it to a full launch, which involves buying millions of dollars in national advertising time and ordering between a half-million and a million pieces.

See https://nymag.com/news/features/31806/ .

45.38.  Ontel and Telebrands each also markets and sells products at the retail level through well-known retailers.  For Ontel, these retailers have includedcomprised Amazon, (including its Woot.com sub-brand), Target Stores, BJ's Wholesale Club, Boscov's, Kroger's (and various other brands operated by Kroger's, including but not limited to Fred Meyer), Meijer, Big Lots, Ollie's Bargain Outlets, Walmart, Ace Hardware, Rite Aid, the JoAnn Stores, Lowe's, Bed Bath & Beyond, CVS, and Walgreens.

46.39.  Ontel's business model is straightforward: it typically identifies a successful pioneering product, has knock-off copies manufactured (often in China), and then imports the knock-off products into the United States for sale (both directly and through retail partners) at a substantially lower price than the pioneering product.

47.40.  On information and belief, Ontel seeks to free-ride on the success of pioneering products by undercutting them in the market, selling them at discounted prices relative to the original pioneering product.

48.41.  Ontel typically makes little (if any) effort to meaningfully distinguish its knock-off products from the pioneering products being copied.

49.42.  Rather, on information and belief, Ontel deliberately seeks to blur the lines between its knock-off products and the pioneering products being copied.

50.43.  The design of such knock-off products is normally substantially similar, if not identical, to the pioneering product being copied.

51.44.  Ontel's knock-off products are typically of inferior quality to the pioneering product being copied.

52.45.  Ontel's knock-off products being of inferior quality to the pioneering product being copied is a substantial reason why Ontel is able to offer its knock-off products at a lower price and undercut the pricing of the pioneering product being copied.

53.46.  Ontel's efforts to blur the lines between its knock-off products and the pioneering products are not just limited to knocking-off the design of the pioneering product being copied.

54.47.  Ontel also seeks to knock-off the advertising and marketing of the pioneering product being copied, including copying or emulating the messaging, images, and/or terminology used to advertise and market the pioneering product.

55.48.  Ontel's marketing for its knock-off products is typically substantially similar to that of the pioneering product being copied.

56.49.  On information and belief, in some instances, Ontel has actually used the product being copied to advertise its knock-off before any knock-off product has been manufactured for Ontel.

57.50.  Ontel is aware that this business model invites litigation in response.

58.51.  Many of the pioneering products targeted by Ontel are provided by small companies without substantial resources to litigate.

59.52.  The lack of resources of the typical companies behind the pioneering products targeted for copying by Ontel reduces the risk that lawsuits will be brought against Ontel for infringement of the targeted companies' intellectual property.

60.53.  Nevertheless, over the past quarter-century, Ontel has been repeatedly sued in the United States for such conduct, including tens of claims for each of trademark and/or trade dress infringement, patent infringement, and copyright infringement.

61.54.  The products copied by Ontel in such fashion include (but are not limited to) "the Perfect Push-Up," the "Pocket Hose", the "Pet-Rider," the "Guidelight" and the "SnapPower Charger," the "Sure Clip," the "Cami Secret," the "Firminator," ThinOptics reading glasses and attachable smartphone case, and the "Hair Master"—all of which are products covered by patents, copyrights, and/or trademarks.

62.55.  Ontel's approach has been described in detail in numerous other lawsuits, including (but not limited to) in paragraphs 48–54 of the complaint (Dkt. 1) in *KNR Indus. v. Ontel Prods.*, No. 2:04-cv-74055-JF-DAS (E.D. Mich., Oct. 18, 2004).

63.    Telebrands is also aware that its knock-off business model invites litigation in response.

HPI V. ONTEL AMENDED COMPLAINT

64.    Many of the pioneering products targeted by Telebrands are provided by small companies without substantial resources to litigate.

65.    The lack of resources of the typical companies behind the pioneering products targeted for copying by Telebrands reduces the risk that lawsuits will be brought against Telebrands for infringement of the targeted companies' intellectual property.

66.    Nevertheless, over the past quarter-century, Telebrands has been repeatedly sued in the United States for such conduct, including tens of claims for each of trademark and/or trade dress infringement, patent infringement, and copyright infringement.

67.    In the 2007 New York Magazine article (see ¶ 44, above), when confronted with a charge that Telebrands copied the advertisement of a competing product frame-by-frame, AJ Khubani responded that he "didn't steal the idea from them" and claimed that "people are always borrowing in business.  The first person that came up with the laptop—how many times were they copied?  The first person who came up with the minivan?"

68.    AJ Khubani's own LinkedIn profile promotes "his" incredible success with the PedEgg and Pockethose products even though Telebrands and/or its distributors were sued for patent infringement for each of those products by Grace Manufacturing and Ragner Technology Corp., respectively.

69.56.  Ontel and Telebrands each employOntel, like Telebrands, employs aggressive bullying tactics in response to the potential of adverse litigation when these smaller companies attempt to assert their intellectual property rights against the respective Ontel and Telebrands knock-offs that saturate the market.

70.57.  Even so, according to a 2023 CBS News investigative report, about the "family behind some 'As Seen on TV' products," Ontel and Telebrands have collectively faced over 100 lawsuits for intellectual property infringement.  See https://www.cbsnews.com/news/inventors-allege-family-behind-some-as-seen-on-tv-products-profit-from-knocking-off-creations/ .

71.58.  On information and belief, approximately 80% of these lawsuits have ended via settlement.

HPI V. ONTEL AMENDED COMPLAINT

72.59.  On information and belief, Ontel and Telebrands typically condition their settlements upon the plaintiffs agreeing to strict non-disclosure agreements (NDAs) to prevent negative publicity and avoid further public attention on their knock-off business model, flagrant disrespect for innovators' intellectual property rights, unfair competition, and bullying and aggressive tactics.  This prevents these plaintiffs from publicly discussing the damage caused to their companies and IP by Ontel and Telebrands.

73.60.  At least in part because of the NDAs quashing public communication about the pattern of theft of smaller company IP by each of Ontel and Telebrands, they have each been able to continue their respective knock-off product business models and thrive over the past decades.

**TELEBRANDS RIPS THE 'AS SEEN ON TV' RIP-OFF OF "BUNCH O BALLOONS"**

61.    To fully understand how Ontel's knock-off product business model has harmed Plaintiff and too many other similarly-situated innovators to name, the behavior of its fellow "As Seen On TV" company Telebrands, headed by the brother of Ontel's CEO and the uncle of its President, in the saga of Telebrands's repeated and systematic efforts to rip off that innovation.[2]

74.62.  The wildly popular "Bunch O Balloons" product was one such pioneering product targeted by Telebrands after it became apparent that there was substantial consumer demand for it.

75.63.  Josh Malone, the inventor of the Bunch O Balloons, filed a corresponding patent application in February 2014 (which issued as a patent in June 2015) and launched a Kickstarter campaign in July 2014 that raised over $120,000 in its first 48 hours and eventually secured

---

[2] To be clear, and for the avoidance of doubt, none of Telebrands's conduct as to its efforts to rip off "Bunch O Balloons" should be imputed, directly or indirectly, to Ontel.  However, it is provided here as context for how these "Rapid Response" companies operate, and because it is the best-documented and most extensively-covered of these stories in an area where (as discussed above) NDAs typically shield these companies from the light of public scrutiny.  As such, the efforts of a fellow "As Seen On TV" company's utter disregard for intellectual property and innovation and its deliberate flooding of the marketplace with knock-off variants of a hot viral product are illustrative of how such companies operate.

HPI V. ONTEL AMENDED COMPLAINT

$900,000 in pledges for Bunch O Balloons.  ~~This~~Much like the rapid sellout of Flippy on QVC, this indicated substantial consumer demand for the product.

~~76.~~64.  The overwhelming initial success of the Bunch O Balloons Kickstarter campaign also attracted substantial media attention, with articles from a wide variety of media outlets including (but not limited to) ABC News, CNN, Wired, Buzzfeed, Popsugar, Gigazine, D Magazine, Consumerist, Good Housekeeping, Woman's Day, Crowdfund Insider, Ars Technica, Vox, Time Magazine, CNET, the Verge, and a number of local news outlets.

~~77.~~65.  After discovering the Bunch O Balloons and learning about its successful Kickstarter campaign, Telebrands quickly worked with an outside consultant to develop a knock-off product that it called Balloon Bonanza,[3] which it began selling in late 2014 as an "As Seen On TV" product.

~~78.    According to a November 15, 2017 Wall Street Journal article titled "This Water Balloon Battle Threatens to Soak Everybody," AJ Khubani admitted that he was aware of Bunch O Balloons when it launched its Balloon Bonanza knockoff.~~

~~79.    When it learned that Telebrands was selling a knock-off product, Mr. Malone's exclusive licensee Zuru sent a cease-and-desist letter to Telebrands on December 23, 2014, demanding that Telebrands cease advertising and selling the knock-off Balloon Bonanza product and take down the sales website for its knock-off product.~~

~~80.    When Telebrands declined to take down its website and stop selling its knock-off product, Mr. Malone and his affiliated companies filed a lawsuit against Telebrands alleging trade dress infringement, federal and common law trademark infringement, copyright infringement, and fraud on January 27, 2015.~~

~~81.~~66.  After the Bunch O Balloons patent issued in June 2015, the first of several patent infringement lawsuits was filed by Mr. Malone's affiliated companies against Telebrands on

---

[3] On information and belief, these knock-off Telebrands products have been sold under trade names including Battle Balloons, Balloon Bonanza, and Easy Einstein Balloons, each of which was subject to a preliminary injunction.

June 9, 2015.  A preliminary injunction was requested on June 18, 2015, which was granted and took effect on December 2, 2015.

82.67.  In response, Telebrands modified its knock-off Balloon Bonanza product and continued selling similar knock-off products, prompting additional lawsuits by Mr. Malone's affiliated companies.

83.68.  With the spate of articles about the success of the Bunch O Balloons Kickstarter campaign less than a year old, Mr. Malone's litigation campaign attracted substantial attention beginning shortly after the filing of the first lawsuit.  Articles appeared in media outlets including (but not limited to) D Magazine (the first on June 11, 2015), Business Wire, the Wall Street Journal, Dallas News, Legal News Line, the Washington Examiner, and the Bergen Record (NorthJersey.com) — the last of which was the hometown media outlet of Ontel and Telebrands and the Khubanis.)

84.    According to the November 15, 2017 Wall Street Journal article, AJ Khubani was worried about losing the lawsuit, recognizing that "An adverse decision could have a crippling impact on the business."

85.69.  That same article also reported that AJ Khubani claimed that Telebrands's profits from its water balloon knock-off products had been eclipsed by the costs of corresponding litigations..

86.70.  On November 21, 2017, in Case No. 6:16-cv-00033 (E.D. Tex.), a jury in the Eastern District of Texas entered a patent infringement judgment of $12.3 million in actual damages against Telebrands for infringing U.S. Patent Nos. 9,315,282 and 9,242,479 through its Battle Balloons knock-off product, and further found the infringement was willful.

87.71.  The Bunch O Balloons litigations against Telebrands continued in 2018.  On information and belief, substantial litigation costs—which AJ Khubani referred to in the November 15, 2017 Wall Street Journal article—not only continued to accrue but accelerated.

88.    In one of these cases, No. 6:17-cv-00170 (E.D. Tex.), there were 270 different events reflected on the docket between January and mid-November 2018.

89.    On information and belief, Telebrands was also incurring substantial expenses relating to discovery in these ongoing litigations.

90.72.  Mr. Malone stated that his four years of litigation against Telebrands and its retailers involved nearly $20 million in legal fees.

91.73.  On information and belief, the legal fees incurred by Telebrands—which employed several different law firms, including the top-tier and very expensive Boies Schiller and Irell & Manella law firms—were substantially higher.

92.74.  The litigation against Telebrands relating to its knock-off quick-filling water balloon toys remained ongoing through early 2019.

93.75.  In March 2019, the $12.3 million jury verdict was more than doubled because of the finding of willful patent infringement to $26 million, and $4.7 million in attorneys fees awarded against Telebrands.

94.76.  Judge Schroeder ordered Telebrands to pay these "enhanced damages" based on the jury's finding of willful infringement and after further finding that Telebrands "took untenable positions" at nearly every stage of the litigation, "demonstrated an intent to delay and obstruct" the proceedings and had "flagrantly ignored" the court's ruling.

95.77.  In addition, the court issued a permanent injunction against Telebrands.

96.78.  In May 2019, Telebrands reached a global patent litigation settlement with Mr. Malone and his affiliated companies that included a $31 million payment from Telebrands for the Battle Balloons infringement litigation, an agreement that Telebrands would not sell any of the accused products at issue, and an undisclosed "substantial sum" from Telebrands to settle other litigation over the Balloon Bonanza and Easy Einstein Balloons products that it sold.

97.79.  Telebrands released a statement characterizing this global patent litigation settlement as "a business decision" that would "allow[] TeleBrands to focus its efforts and resources on its business of developing and marketing innovative products."

## THE PATENTED MEDIA SUPPORT

98.80.  U.S. Patent No. 9,642,454 ("the '454 patent"), titled "Multiple Viewing Angle Media Support," was duly issued to inventors Bruce Cannon and Juliette Fassett.

99.81.  The '454 patent describes a media support apparatus that includes three support sides (155) that can be disposed about a central axis (125), each side having a support back (105) and support edge (110), where the top of each back support is in physical communication with the edge support of another side, as shown in Figure 1 (included below).



FIG. 1

100.82. The application that eventually matured into the '454 patent was filed on June 24, 2016, claiming priority to an application filed on October 20, 2014; the '454 patent issued on May 9, 2017, with ten (10) claims.

101.83. Claim 1, like every claim of the '454 patent, is directed to "[a]n apparatus comprising: three support sides, each support side comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in

physical communication with two ends of a solid interior" where the plane of each back support is at a particular angle to a specified "virtual plane," providing three specified "viewing angles," and "wherein each back support, each edge support, and each end is a surface of the solid interior [and] the solid interior is a pillow covered in fabric."

102.84. A true and correct copy of the '454 patent is attached as **Exhibit A**.

103.85. U.S. Patent No. RE48,479 ("the '479 patent") is a reissue of the '454 patent that issued on March 23, 2021.

104.86. The '479 patent has the same figures, title, and descriptions as the '454 patent and includes the same ten (10) claims as the '454 patent, as well as nineteen (19) additional claims.

105.87. Claim 12 of the '479 patent, for example, is directed to a "media support apparatus comprising: a body having a first support back, a second support back, and a third support back disposed about a central axis" where each support edge is "disposed between" two support backs, wherein "the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions ..." and provides three "viewing angles" that are different from one another.

106.88. A true and correct copy of the '479 patent is attached as **Exhibit B**.

107.89. HPI is the owner under applicable law and by assignment of all right, title, and interest in the '454 and '479 patents, including the rights to sue, recover damages and obtain equitable relief for the patents' infringement.

## JULIETTE AND BRUCE DESIGN AND DEVELOP FLIPPY

108.90. Juliette Fassett and her husband Bruce Cannon co-invented the patented "multiple viewing angle media support" disclosed and claimed in the '454 and '479 patents.

109.91. Juliette Fassett is a repeat entrepreneur who has founded multiple businesses since she was in her 20s. Her interest in consumer products was honed by her having lived and worked in Japan and experiencing its cultural focus on excellence in design and attention to detail. In particular, while working at Toyota Chuo Kenkyuusho (Toyota's think-tank), Juliette

came to understand the concept of "*ii kanji*"—which is defined as something like "good function or feeling" and further connotes the idea of exceeding expectations.

~~110.~~92. Juliette's husband and co-inventor, Bruce Cannon, is an optical engineer and scientist with 35 years of experience designing optical systems—primarily sighting equipment for military applications, but also for consumer products. One notable contribution is Bruce's thermal imaging work on the FLIR Star SAFIRE, which is a gyro-stabilized electro-optical infrared system most often used in airborne, land, and maritime force protection and medevac operations. This system was famously instrumental in the capturing of Boston Marathon bomber Dzhokar Tsarnaev by Massachusetts State Police in 2013.

~~111.~~93. Juliette and Bruce are the named co-inventors on the Flippy patents, and between them, are the named inventors on 13 patents.

~~112.~~94. Circa 2011, there were very few tablet stands that could hold a tablet or iPad in a perfect reading position both comfortably and without the user's assistance. Most of the available tablet stands were made of hard metal and/or plastic and required support from the user.

~~113.~~95. So Juliette spent 2 years researching, thinking, drawing, examining, messing with, building and taking apart tablet stands. She formulated many ideas about what she thought would work and what was missing in the marketplace.

~~114.~~96. With Bruce's input, they were able to realize their concept of a soft but supportive stand that would provide multiple reading angles—appropriate for multiple positions such as sitting, standing, and lying down—with the flip of the wrists.

~~115.~~97. Juliette and Bruce had CAD drawings prepared for the Flippy as part of the design and development process.

~~116.~~98. In particular, the geometry and trigonometry of the Flippy is something that Juliette and Bruce worked on for 18 months before settling on the design. The optical angles for viewing (the trigonometry part) needed to achieve appropriate depth-of-focus and take into account brightness degradation and eye relief—all while meshing perfectly with the support

aspect of having the Flippy on the viewer's body (the geometry part) because one primary use is for when the viewer is lying down (e.g., in bed or on the couch).

117.99. Juliette and Bruce filed their provisional patent application on Flippy in 2013, and their initial patent issued in 2017.

118.100.     The Flippy has three support sides, each comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support, and each edge is "disposed between" two support backs—as variously recited in the claims of the '454 and '479 patents.

119.101.     The claims of the '454 and '479 patents do not, however, specify how any back support is "in physical communication with" any edge support, or how any edge support is "disposed between" two back supports.

120.102.     The Flippy is and always has been characterized by rounded bumper-like shapes between each back support and the next edge support, as shown in the image below.



121.103.    Juliette knew that her Flippy had to have a certain "*ii kanji*," so she specifically included these rounded ledges for the lip of the media support in her design for the otherwise prism-like device, which evoke waves rolling onto a beach.



104.    Without these signature rounded ledges, a media support device would have the same functionality and satisfy the claims of the '479 patent, but it would appear weapon-like. Specifically, it would look like a "ninja star" or shuriken when viewed from the side, as above, which would not reflect the proper "*ii kanji*" of the product she sought to create. In other words, it would not be Flippy, or even be like Flippy.

122.105.    Juliette has always viewed these rounded ledges as a signature aesthetic feature of her design.

123.106.    Throughout the design iteration process and manufacturing of Flippy, Juliette insisted on maintaining these signature rounded ledges to her precise personal standards of roundedness to produce the right "*ii kanji*" for Flippy

124.107.    Even back from the earliest days of designing what would become the Flippy in November 2011, Juliette remarked that one proposed product design was "just to[o] sharp" and that she and Bruce "ha[d] to go back to rounding the design." When viewing a revised design two days later, Juliette again remarked that "we need to round out the [l]edges much, much more."

125.108.    Juliette refused to compromise on her standards of roundedness for the rounded ledges throughout the product lifecycle, including during manufacturing.

126.109.    As another example of her commitment to Flippy's "*ii kanji*," Juliette spent months working on indentation force deflection alone in order to determine the optimal foam to use for Flippy.

127.110.    Overall, each design element of the Flippy product was the result of an exhaustive process of iteration and research on design and material decisions informed by Juliette's and Bruce's decades of experience.

128.111.    Juliette was determined to create the perfect multi-angle tablet stand and was meticulous in her process of developing Flippy.  The only corners she cut were literal—to form Flippy's signature rounded ledges.

129.112.    The distinct look and shape of the Flippy design is shown below in its emblematic format, for which the USPTO award HPI registered trademark No. 7,437,967 in 2024.



130.113.    Juliette's development of Flippy also leveraged her keen sense of style and appreciation for marketing—calling it "Flipy" (and then "Flippy") to emphasize that the multiple angles are provided by flipping the product around its horizontal axis.

131.114.    Juliette then sought to register trademarks for Flipy and Flippy in order to further protect the brand that she had spent so much time and effort to develop.

**HPI'S FOUNDING AND BUSINESS**

132.115.    Juliette founded HPI in September 2018 to attract investment to support burgeoning sales of Flippy directly to consumers through various channels.

133.116.    Based on large purchase orders from QVC, which were based on market tests, Juliette took private investment and formed HPI as a Delaware-registered C Corporation, issuing shares to investors.

134.117.    This private investment lowered the cost of capital for Juliette and HPI by making it unnecessary to seek traditional purchase order financing (at a higher cost) to fund production of the Flippy units for the QVC purchase order.

135.118.    Through HPI, Juliette was committed to providing a quality product from a socially conscientious business platform:  HPI was and is a nationally-registered WBENC (Women's Business Enterprise National Council) business and HPI supported its literacy partner www.firstbook.org through product sales and also helped employ developmentally challenged adults through warehouse operations.

136.119.    In November of 2018, Flippy sold out on QVC in a single airing: $500,000 worth of product in 12.5 minutes.  The product was a hit.  HPI's revenues in 2019 totaled $7,000,000—all from sales of Flippy.

137.120.    Since selling out on QVC, HPI has offered for sale and sold the Flippy continuously, including on Amazon, Etsy, Grommet, and direct-to-consumer on its own website, getflippy.com .

138.121.    As shown in the annotated image below, the '454 patent was at all relevant times clearly marked on a tag attached to the Flippy product itself:



139.122.    As shown in the annotated image below, the '454 patent was at all relevant times also clearly marked on the packaging for the Flippy product:



140.123.    All product and packaging for Flippy that were manufactured after issuance of the '479 patent were marked with the '479 patent, as were all subsequent orders thereafter by HPI of Flippy product and packaging.

**ONTEL AND TELEBRANDS PERSONNEL ORDER MULTIPLE FLIPPY PRODUCTS; TELEBRANDS DECLINES TO COPY FLIPPY WHILE UNDER THE SPOTLIGHT**

141.124.    Prior to its television debut and rapid sell-out on QVC, Flippy sold well on Amazon, showing up as a hot product thanks in large part to an overwhelming number of five-star reviews.

142.125.    On information and belief, Ontel was monitoring Amazon for popular and/or innovative products.

143.126.    On information and belief, at least one Ontel product development employee at the time noticed the sales and positive reviews of Flippy and decided to investigate further.

144.127.    On October 1, 2018, an order was placed with Amazon for a grey Flippy for delivery to Ontel's corporate address (21 Law Drive, Fairfield, NJ 07004).

145.128.    On information and belief, this Flippy was actually delivered to Ontel's corporate address.

146.129.    This Flippy was marked (on both the product and the packaging) as patented under the '454 patent.

147.130.    About a month later, on November 3, 2018, HPI's Flippy was featured on QVC and HPI sold its entire inventory of product—over 15,000 units—in under 13 minutes, earning over $500,000 in sales revenues.

148.131.    That same day, Flippy sales on Amazon did another $40,000 in sales, as some potential customers who could not purchase on QVC immediately sought out the Flippy for purchase.

149.132.    In one day, Flippy had sold more than its three prior years combined.

150.133.    This tsunami of consumer demand was, like the rapid early success of the Bunch O Balloons Kickstarter campaign in 2014, the sort of data that indicated that substantial sales might justify the marketing and manufacturing of knock-off products.

151.134.    On information and belief, Telebrands thus saw the opportunity to apply its knock-off business model to the innovative Flippy product, and decided to investigate further.

152.135.    Nine days later, on November 12, 2018, four charcoal-colored Flippys were purchased on Amazon for delivery to Telebrands's corporate address (79 Two Bridges Road, Fairfield NJ 07004) addressed to Manish Israni, Telebrands's Vice President of Market Research and New Product Acquisition.

153.136.    On information and belief, each of these Flippys was delivered to Telebrands's corporate address.

154.137.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

155.138.    On November 13, 2018, Telebrands founder and principal Ajit ("AJ") Khubani bought four charcoal-colored Flippys on Amazon to be delivered to his home in Saddle River, New Jersey.

156.139.    On information and belief, each of these Flippys was actually delivered to AJ Khubani's home.

157.140.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

158.141.    On information and belief, based on Amazon's typical shipping speeds, at least the November 12, 2018 order to Telebrands's corporate address was actually delivered on or before November 15, 2018.

142.    On November 15, 2018, another four charcoal-colored Flippys were purchased by "AJ" on Amazon for delivery to Telebrands's corporate address (79 Two Bridges Road, Fairfield NJ 07004).

143.    On information and belief, each of these Flippys was delivered to Telebrands's corporate address.

144.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

159.145.    On information and belief, upon receiving and examining the Flippy products that it ordered, Telebrands formed a belief that, consistent with its typical business model, it could generate substantial revenue with a knock-off product based on Flippy.

160.146.    However, at this time, Telebrands was less than one year removed from a massive adverse $12.3 million jury verdict in the Bunch O Balloons litigation, which was accompanied by a finding of willful infringement for its Battle Balloons knock-off product.

161.147.    At this time, the damages enhancement for Telebrands's willful infringement had yet to be decided.

162.148.    At this time, Telebrands remained also in the thick of substantial litigation involving all of its knock-off quick-fill water balloon products.

163.149.    On information and belief, Telebrands had expended and was continuing to expend substantial sums on legal fees and other litigation expenses relating to the lawsuits involving its knock-off quick-fill water balloon products.

164.150.    On information and belief, Telebrands was also continuing to attract periodic negative attention for its behavior in the legal press and even some general media outlets relating to its various efforts to knock off the Bunch O Balloons product.

165.151.    On information and belief, with the amount of the damages enhancement for its willful infringement by the Battle Balloon knock-off still pending,[4] Telebrands was loath to attract any additional negative publicity.

166.152.    In particular, and despite the financial opportunity, the last thing that Telebrands wanted at this particular time was to spearhead another high-profile knock-off product that might make its way before the judge who was considering the penalty for Telebrands's willful infringement and convey that Telebrands had not learned its lesson.

167.153.    On information and belief, recognizing the financial opportunity but concerned about potential blowback and bad optics in its ongoing litigation, Telebrands passed its positive assessment of the opportunity presented by a Flippy knock-off product to Ontel, likewise located in Fairfield, New Jersey, and run by AJ Khubani's brother Chuck and nephew Amar. made a deliberate decision to pass on trying to "test the market" with a knock-off version of Flippy.

168.    On information and belief, beginning on or about November 15, 2018, with knowledge of the '454 patent being marked on the Flippy product and/or packaging, Telebrands and its principals actively encouraged Ontel and its principals to advertise, offer for sale, sell, have made, and import a knock-off multi-angle soft tablet viewing stand based on the Flippy.

169.1.    On November 15, 2018, another four charcoal-colored Flippys were purchased by "AJ" on Amazon for delivery to Telebrands's corporate address (79 Two Bridges Road, Fairfield NJ 07004).

170.1.    On information and belief, each of these Flippys was delivered to Telebrands's corporate address.

---

[4] As mentioned above, the damages enhancement was decided in March 2019.

171.1.   Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

172.154.      Over the two weeks following the first order from Telebrands, beginning on November 15, 2018 (on information and belief, after the Flippys had been received by Telebrands), Ontel employee Lorraine Addice placed multiple orders via Amazon for delivery of another twenty-six (26) Flippy products (comprising multiple quantities of each of the grey, charcoal, dark blue, and burgundy colors) to Ontel's corporate address (21 Law Drive, Fairfield, NJ 07004).

173.155.      On information and belief, each of these Flippys was actually delivered to Ontel's corporate address.

174.156.      Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

175.157.      While most of these products were addressed for delivery to Ontel employee Carly Buonocore, these orders also included a grey Flippy that was ordered on November 20, 2018 for delivery to Ontel's Vice President Karen How-Lebrenz.

**ONTEL'S AND TELEBRANDS'S KNOWLEDGE OF THE '454 AND '479 PATENTS**

176.   Telebrands has thus known about the '454 patent since November 2018.
.

177.158.      Ontel has thus known about the '454 patent since November 2018.

178.159.      In addition, Ontel's President Amar Khubani and Ontel's CEO Chuck Khubani were personally aware of HPI's proprietary interests in the Flippy, and its allegations that Ontel was "stealing" from HPI and needed a license from HPI to sell the Pillow Pad, as of at least March 9, 2019, when HPI's CEO sent an email to them about this.

179.160.      Ontel's in-house counsel Caroline Kinsey was also personally aware of HPI's proprietary interests in the Flippy, and its allegations that Ontel was "stealing" from HPI and needed a license from HPI to sell the Pillow Pad, as of at least April 11, 2019, as reflected by her email correspondence with HPI's CEO on that date.

180.161.    Ontel has known about the '479 patent since at least April 2021, when Amazon informed Ontel that HPI filed a complaint with Amazon's seeking to have Ontel's knock-off Pillow Pad product removed from Amazon's listings because it infringed the '479 patent.

181.162.    On information and belief, in June 2021, Ontel was informed by Amazon that Ontel's knock-off Pillow Pad was being de-listed from Amazon based on Ontel's failure to contest HPI's claim that the knock-off Pillow Pad product likely infringed the '479 patent.

182.163.    After the communications from Amazon in June 2021 that the Pillow Pad could no longer be sold on Amazon, and without any license from HPI, Ontel has continued to advertise, distribute, offer for sale, and sell its Pillow Pad products through channels other than Amazon.

183.164.    On information and belief, Ontel was also made aware of HPI's allegations that the knock-off Pillow Pad product infringes the '479 patent by retailers who received letters from HPI putting them on notice of infringement of the '479 patent due to their sales and offers for sale of knock-off Pillow Pad products sourced by Ontel.

184.165.    After receiving communications from retailers that HPI's counsel had sent them letters alleging the Pillow Pad infringes the '479 patent and demanding that sales of Pillow Pad cease, and without any license from HPI, Ontel continued to advertise, distribute, offer for sale, and sell its Pillow Pad products.

185.166.    Flippy was marked, on the product itself and its packaging, with the '454 patent and/or the '479 patent at all relevant times.

186.167.    Each Retailer Defendant has at least been on constructive notice of the '454 patent and/or the '479 patent at all relevant times.

### ONTEL PROVIDES A KNOCK-OFF PRODUCT CALLED PILLOW PAD

187.168.    On information and belief, as of 2019, Ontel had entered into agreements with each of numerous retailers pertaining to their purchase, distribution and/or sale of one or more Ontel products.

HPI V. ONTEL AMENDED COMPLAINT

188.169.     On information and belief, throughout 2019, Ontel made arrangements with numerous retailers for their purchase, distribution and/or sale of its Pillow Pad product.

189.170.     Throughout 2019, Ontel's Pillow Pad product was advertised on television.

190.171.     Ontel aired its first television advertisement for a multi-angle soft tablet product that it called the Pillow Pad in February 2019.

191.172.     Ontel also created a Facebook page for the Pillow Pad on February 6, 2019, as shown in these screenshots taken in March 2019:





192.173.    In February 2019, HPI learned of Ontel's knock-off Pillow Pad product when a friend of Juliette Fassett's saw Ontel's "As Seen on TV" late night cable advertisement, and called Juliette to tell her about it.  Shortly thereafter, HPI learned that Ontel had created a website for its knock-off Pillow Pad product, from which it was taking orders.

193.174.    On information and belief—based on at least the delivery of numerous grey, blue, and burgundy Flippys to Ontel's corporate address; Ontel depicting and showing its Pillow Pad product in substantially similar grey, blue, and burgundy colors; and an apparently sewn-on side pocket in the same location as the Flippy logo—at least the first advertisement for Ontel's knock-off Pillow Pad product and product depictions on Ontel's Pillow Pad 360 Facebook page did not depict anything that Ontel manufactured or had made, but instead depicted the Flippy products that were delivered from Amazon to Ontel as if they were the product that Ontel was offering for sale and selling.

194.175.    On information and belief, based on the response to Ontel's initial television advertising, Ontel subsequently arranged for a knock-off product to be made,

consistent with its historical business model of testing the market and only arranging for knock-off products to be manufactured if sufficient sales interest could be generated.

195.176.      Among the numerous misstatements in Ontel's advertisements was a claim that its knock-off Pillow Pad product had an "Innovative Ledge Design!"



https://www.youtube.com/watch?v=RrdibdsDLYw

196.177.      But this ledge design was no innovation of Ontel's; rather, it was copied directly from the Flippy products that were delivered to Ontel after the QVC Flippy sell-out, as was the rest of the knock-off Pillow Pad's design, right down to the colors offered.

197.178.      The original logo associated with the "Pillow Pad 360" advertisement also used a logo that was substantially similar to the iconic shape of HPI's innovative and distinctive Flippy product, for which HPI subsequently received a trademark registration.

198.179.      On information and belief, Ontel directly copied both the functional and design elements of the Flippy products that it ordered.

~~199.~~180.          As shown in the attached Exhibit C, the Pillow Pad infringes at least claim 1 of the '454 patent, at least under the doctrine of equivalents.

~~200.~~181.          Given that the Flippy products delivered to Ontel in late 2018 included grey, blue, and burgundy Flippys, it was no coincidence that the Pillow Pad was offered in substantially similar (if not identical) grey, blue, and burgundy colors:



Pillow Pad Tablet Stand Commercial - As Seen on TV

59,421 views Jun 29, 2019 #AsSeenOnTV

https://www.youtube.com/watch?v=RrdibdsDLYw

~~201.~~182.          On information and belief, at least initially, Ontel did not offer its Pillow Pad product in any colors other than those in which the Flippy was available.

~~202.~~183.          On information and belief, Ontel's Pillow Pad product has been made in and imported from China beginning in late 2018 and/or early 2019.

~~203.~~184.          Ontel's Pillow Pad product was (and continues to be) priced more cheaply than Flippy and its initial pricing was intended to drastically undercut Flippy's pricing.

~~204.~~185.          Flippy's pricing was based in part of its use of high-end materials specifically and meticulously selected by Juliette to convey the right "*ii kanji*."  In contrast,

Ontel's knock-off Pillow Pad product was of vastly inferior quality, which allowed for its drastically lower price.

205.186.    Numerous reviews have remarked on the very light weight and flimsy feel of the Pillow Pad product, and the poor quality of the materials for the pad cover and the zipper.

206.187.    These include a video review from the "Freakin' Reviews" account on YouTube, which noted that most positive reviews of the Pillow Pad were submitted by Ontel or persons at Ontel, and demonstrated the "cheap design" of the Pillow Pad at



https://www.youtube.com/watch?v=b4eMvA0s8zE

207.188.    A number of comments posted to the "Freakin' Reviews" video review of Ontel's knock-off Pillow Pad product specifically noted its inferior quality as compared to the Flippy.  These include the following comments:



HPI V. ONTEL AMENDED COMPLAINT

"problem is the 'pillow pad' is a ripoff of the Flippy and if you look at the reviews it's [*sic.*] quality is poorer and the original which makes sense since it's a ripoff and cheaper.."



"I bought a flippy 2+ years ago, and at that time it was only one of it's kind [*sic.*] on Amazon and $50. . . . I do think the flippy is a lot firmer than the pillow pad, and perhaps heavier."



"I'm between this [Pillow Pad] and the Flippy, but Flippy has better reviews on Amazon and looks way better. I think I'll pay $5 for a better made pillow. Flippy also looks better on videos."

208.189.    Numerous Amazon reviews of Ontel's Pillow Pad product also criticized its inferior quality as compared to Flippy. For example:



"I bought this for my husband. It came earlier today. . . . Once opened, it was not recognizable as compared to illustration on line. . . . It was unusable. I am returning it. And will have to pay more for a Flippy or look locally for one that actually looks and functions as a tablet pillow."



"I have a Flippy brand iPad pillow. It's a great product but it's a little pricey so I purchased this product for a second room. This is a piece of junk. Please just don't buy one. I returned it the next day. Amazon says it's a 'frequently returned item. Haha. That should tell you all you need to know about it."



"I had previously had a flippy which I loved. I was shocked when this one came to my door and was rolled up and shoved in a plastic tube holder. I took it out as it said to do and let it sit out for five hours, and it still look like it was just taken out of the tube. So I shoved it back in and I'm returning it. I will have to pay more for a real flippy, but I'm willing to do it."

HPI V. ONTEL AMENDED COMPLAINT

"I had previously had a flippy which I loved.  I was shocked when this one came to my door and was rolled up and shoved in a plastic tube holder.  I took it out as it said to do and let it sit out for five hours, and it still look like it was just taken out of the tube.  So I shoved it back in and I'm returning it.  I will have to pay more for a real flippy, but I'm willing to do it."



This is no where near as good as a flippy. I actually feel my search misled me to this one but live and learn. I ended up cutting a piece of cardboard to tuck inside on the bottom. It's two days later and it's still sorta sad and not taking shape. I have a flipy and it's wayyyy more solid and easy to move around with the iPad on it. If not for my cardboard hack this would sorta cave under the weight when picked up with one hand as I can with my good one. Honestly not worth my time to return. Trust my advice spend the extra 15 and get the real one.

"This is no where near as good as a flipy.  I actually feel my search misled me to this one but live and learn. . . . I have a flipy and it's wayyyy more solid and easy to move around with the iPad on it. If not for my coardboard hack this would sorta cave under the weight when picked up with one hand . . . . Honestly not worth my time to return.  Trust my advice spend the extra 15 and get the real one."



This pillow came rolled up tight in a skinny little box.. many days ago.. it still hasn't recovered. It's a little lopsided and badly wrinkled. It's hollow in the middle and the foam is split on one side. I bought it because it cost less that the Flippy brand pillow and they made it look nice like the Flippy in the listing. Since then, I bought a real Flippy tablet pillow and it didn't come rolled and squashed and is very nice quality.

"This pillow came rolled up tight in a skinny little box.. many days ago.. it still hasn't recovered.  It's a little lopsided and badly wrinkled.  It's hollow in the middle and the foam is split on one side.  I bought it because it cost less that the Flippy brand pillow and they made it look nice like the Flippy in the listing.  Since then, I bought a real Flippy tablet pillow and it didn't come rolled and squashed and is very nice quality."

209. 190.    In March 2019, Ontel listed the Pillow Pad in its catalog at the housewares show in Chicago that same month.

210. 191.    After receiving emails from HPI's CEO in March and April 2019, without any license from HPI, Ontel continued and/or began to develop, import, advertise, distribute, offer for sale, and sell its Pillow Pad products.[5]

211. 192.    Through December 2020, Ontel's Pillow Pad product was advertised on TV by Ontel, with almost 4000 airings of 4 different commercials through December 2020.

_____

[5] On May 10, 2019, Ontel first used the name "Pillow Pad" in commerce.

212.193.    On information and belief, Ontel spent at least approximately $2 million on television advertising / media for its Pillow Pad product, which ranked as a top-50 product based on advertising spend in the year starting in September 2019—after its commercials had already been airing for about six months.

213.194.    Among other sales channels, Ontel initially sold its Pillow Pad product on a direct sales website created and run by Ontel.

214.195.    During this same time, Ontel's Pillow Pad product was also offered for sale by Ontel via Amazon and through various retailers, online and/or in their physical stores.

215.196.    Following the issuance of the '479 patent in March 2021, Ontel's knock-off Pillow Pad product has been sold primarily by retailers and other third parties.

216.197.    On information and belief, Ontel agreed to indemnify many of the retailers who sold and/or are selling the knock-off Pillow Pad product against certain claims of patent and/or other intellectual property infringement.

**ONTEL UNFAIRLY COMPETES WITH HPI**

217.198.    On the basis of the QVC sellout, Juliette reached out to the buyer at Bed, Bath and Beyond ("BBB") in January 2019 in an effort to place Flippy in BBB retail channels. Juliette explained that the Flippy product was patented, had sold out on QVC, and enjoyed consistent 5-star reviews.  Juliette also shared that HPI had a highly experienced team and financing in place, and was ready to add retail partners.

218.199.    BBB's buyer, Greg Rosenthal, responded tersely via email, stating "we would not bring in that product."

219.200.    When Juliette followed up, asking if there were other buyers at BBB who would be more appropriate, Greg Rosenthal confirmed "[N]o, this would fall in my area."

220.201.    On information and belief, BBB had an ongoing relationship with Ontel and had served as a retail outlet for a number of "As Seen on TV" products supplied by Ontel.

221.202.      BBB was another prominent company based in northern New Jersey, with its headquarters in Union, a mere 20 miles or so away from the Fairfield headquarters of Ontel and Telebrands.

222.203.      In less than 6 months after stating that "we would not bring in that product" to Juliette, the knock-off Pillow Pad product supplied by Ontel was, on information and belief, in Bed, Bath and Beyond stores across the USA.

223.204.      A picture of Ontel's Pillow Pad product on the shelves at a BBB retail location on or about July 19, 2019, is shown below:



224.205.      Ontel's knock-off Pillow Pad product was a multi-year retail success for BBB.  Even as BBB was closing, the Pillow Pad was one of the last products still sold in stores and online.

225.206.    The experience with BBB is illustrative of how the growth trajectory for HPI—especially through the retail sales channel—was quickly eclipsed by the immediate launch of the knock-off Pillow Pad product, consistent with Ontel's knock-off business model.

226.207.    On information and belief, at that time Ontel had similar arrangements and similar plans in the works with a number of other retailers.

227.208.    Ontel's knock-off Pillow Pad product began to show up on retail shelves across the nation in or around July 2019.  At this time, Juliette Fassett personally found Ontel's knock-off Pillow Pad product being sold at BBB and in Walmart retail locations.

228.209.    In September 2019, Juliette Fassett found Ontel's knock-off Pillow Pad product for sale at her local Kroger store, Fred Meyer.  A number of Juliette's friends, familiar with Flippy, contacted her with congratulatory messages that they were pleased to see "Flippy" being sold on the shelves.

229.210.    Even these friends—who were familiar with Juliette and her years of developing Flippy, and at least some of whom had actual Flippy tablet stands—were confused about the source of Ontel's knock-off Pillow Pad product that they saw on the shelves at Fred Meyer, conflating it with HPI's innovative Flippy.

230.211.    Even when Josh Malone, the inventor of Bunch O Balloons, posted on his LinkedIn page about Ontel (and Walmart) knocking off Juliette's innovative Flippy tablet stand, one of the commenters congratulated Juliette for a great idea after having seen what he thought was her original Flippy product on the shelves at Fred Meyer—when it was actually Ontel's knock-off Pillow Pad product that was being sold and offered for sale at Fred Meyer.





212.    On or about September 5, 2019, Juliette sent correspondence to Kroger principals, including CEO W. Rodney McMullen, VP of Merchandising Valerie Jabbar, General Counsel Christine Wheatley, and VP and Chief Ethics and Compliance Officer Martha Sarra, informing them of their infringement of HPI's intellectual property via Kroger's provision of Ontel's knock-off Pillow Pad product.

213.    In that correspondence, Juliette also invited Kroger to work with her to find a mutually beneficial solution, requested to come present her innovative Flippy product to Kroger, and asked that Kroger remove Ontel's knock-off Pillow Pad product from its shelves and cancel any existing purchase orders.

214.    Approximately two weeks later on September 17, 2019, J. Mark Wilkinson, a senior in-house attorney at Kroger who testified in January 2018 in the *Zuru v. Telebrands*

litigation that he "speak[s] directly to the general counsel on IP matters," responded to Juliette via email.

215.    During that January 2018 testimony, Mr. Wilkinson also stated that Kroger does not do any independent investigation as to the non-infringement of a vendor's products sold in Kroger's stores.  Instead, according to Mr. Wilkinson, Kroger relies upon its standard vendor agreement, which (among other things), requires the vendor to indemnify Kroger for any liability for IP infringement.  Mr. Wilkinson also testified that it was "fair enough" to characterize Kroger's approach to infringement diligence as being "[a]s long as the vendor represents to [Kroger] it's clear, green light, it's full steam ahead" as far as Kroger is concerned.

216.    In that email response to Juliet, Mr. Wilkinson claimed that "Kroger respects IP rights of others" and informed Juliette that Kroger had tendered Juliette's "claim to Ontel Products for handling and response . . . consistent with Kroger's standard practice of not resolving disputes between vendors or potential vendors."  Mr. Wilkinson closed by conveying his view that "using a cease and desist letter with allegations of patent infringement in hopes of becoming a vendor to Kroger is not a tactic that is well received by Kroger or its merchandising team."

217.    On information and belief, following its receipt of Juliette's September 5, 2019 correspondence, Kroger did not alter its practices involving sales and offers for sale of Ontel's knock-off Pillow Pad product, nor did Kroger's commercial relationship with Ontel change.  Instead, Kroger and its various brands continued to sell and offer for sale Ontel's knock-off Pillow pad product, and on information and belief, repurchased additional quantities from Ontel.

218.    On September 17, Juliette replied to Mr. Wilkinson's email, inquiring whether Kroger's referring her claim to Ontel and non-involvement in such disputes abdicated Kroger of responsibility.  Juliette shared her confusion about how her letter advising Kroger of Ontel's IP theft, coupled with supporting evidence and a suggested solution, would not be well-received by Kroger when Kroger claimed to respect the IP rights of others.  Juliette closed by expressing her

disappointment that she did not receive a "more supporting and thoughtful response" and stating that she read Mr. Wilkinson's email as telling her to go away.

219.    Nevertheless, Juliette replied later that morning, disputing Mr. Wilkinson's characterization of her prior correspondence requesting some concern about her IP and seeking the opportunity to show Kroger the actual and original product that Ontel was ripping off. Juliette reiterated her position that Kroger was unlawfully making money selling a product that she created and patented by stating "if you weren't buying this product then we wouldn't be having this conversation would we?". Juliette closed by indicating that she would not be contacting Mr. Wilkinson further.

220.    Mr. Wilkinson did not further respond to Juliette directly.

221.    Instead, Mr. Wilkinson responded the following morning, September 18, 2019, in an email addressed to Juliette's counsel and cc-ing Juliette.  Mr. Wilkinson reiterated his prior assertions, and denied that Kroger's policies abdicated Kroger of responsibility when Kroger declined to "'play judge and jury' for an IP dispute that should be handled" between HPI and Ontel based on its agreement with Ontel.  Mr. Wilkinson also refused to provide any further comment regarding Juliette's disappointment in not receiving a "supporting and thoughtful response," instead reiterating that it was a "strategy" that was not well-received.

231.222.    On December 29, 2019, Juliette received an email from an irate Fred Meyer customer who purchased Ontel's knock-off Pillow Pad product.  This customer reached out to Juliette and was seeking compensation for the fact that that her red "Flippy" bled on her new white duvet.  Juliette responded, explaining that what was purchased was not Flippy but rather Ontel's knock-off Pillow Pad product, and that this customer should reach out to Kroger and Ontel instead.

232.223.    By the end of 2019, Ontel's knock-off Pillow Pad product was in retail locations including at least Defendants BJ's and Boscov's, as well as Walgreens, Target, Walmart, Big Lots, Joann's stores, Lowe's, BBB, and Meijer.

233.224.     Ontel's knock-off Pillow Pad product was also being sold online from a number of the retailers' respective websites (including those of BBB, Target, and Walmart), as well as Amazon and the various direct-sales website that Ontel had created for its knock-off Pillow Pad product.

234.225.     In addition to being blocked from expanding into retail channels because Ontel's knock-off Pillow Pad product was so quickly ensconced across the channel, HPI's successful Amazon and QVC sales channels soon faltered.

235.226.     On November 22, 2019, Juliette received a return notification from Amazon from a Flippy customer, who indicated that "There is an item almost identical to this being sold at Lowes for $15 cheaper."  On information and belief, Lowe's was at least offering for sale Ontel's knock-off Pillow Pad product as of that date.

236.227.     On New Year's Eve, December 31, 2019, the QVC buyer sent Juliette an email with a photo of the knock-off Pillow Pad being sold at a Walmart location in Boothwyn, PA:



237.228.     The QVC buyer's email stated:

> Hi Juliette,
>
> Stumbled upon this at Walmart.  Is this the competitor we've been discussing for the last year now?  Can you update us on the legal standings?

Thanks

238.229.    That saturation of retail channels by Ontel's inferior quality and lower-priced Pillow Pad product was the beginning of Flippy's demise.  As Ontel's knock-off Pillow Pad product advertised head-to-head with Flippy on Amazon and also sold widely in a variety of retail channels, sales of Ontel's knock-off Pillow Pad eclipsed those of Flippy, and consumers who purchased Ontel's knock-off Pillow Pad continued to confuse and conflate it with Flippy.

239.230.    Even in response to a Facebook post on Flippy's page in September of 2020, a number of people responded with comments indicating that they had actually purchased a Pillow Pad instead, such as Linda Zary, who thought that she purchased a Flippy at Walmart—which never stocked Flippy, and instead had (and still serves as a seller of) Ontel's knock-off Pillow Pad product:



240.231.    Two other people commented in response, each that theirs is "called pillow pad," demonstrating actual confusion of Ontel's knock-off with HPI's high-quality innovative product:

**Flippy's Post**

Use mine daily!

3y   Like   Reply   Hide   👍

↩ Flippy replied · 2 Replies

Victoria Law Tapley
I have one but it's called pillow pad love it

3y   Like   Reply   Hide

**Flippy's Post**



241.232.      Ontel's knock-off product, price-undercutting efforts, and deliberately confusing advertising blocked the forward trajectory of Flippy, destroying the market and freezing any potential monetization of HPI's innovation.  HPI's QVC sales immediately tanked and its Amazon sales softened as Ontel undercut HPI with a cheap, inferior-quality knock-off product that saturated the category in every sales channel.

242.233.      As Ontel's knock-off Pillow Pad product remained for sale in retail locations, including each of the Retailer Defendants, at prices calculated to undercut HPI's sales, Flippy sales suffered tremendously:  From 2018 sales of $682,000 and 2019 sales of over $6.9 million, Flippy's 2020 sales decreased to $4.3 million, and they continued to decline to $3.277 million in 2021, $1.5 million in 2022, and $1.0 million in 2023.

243.234.      At least as of May 27, 2023, Boscov's was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow Pad product, as evidenced by the screenshot below taken on that date:



244.235.    On June 2, 2023, HPI provided actual notice, via email from its outside counsel, to Boscov's that its sales and offers for sale of Ontel's Pillow Pad products infringed the '479 patent.

245.236.    At least as of May 27, 2023, BJ's was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow Pad product, as evidenced by the screenshot below taken on that date, which indicated that the Pillow Pad was out of stock at that moment:



237.    On June 6, 2023, Kroger was again put on notice of its infringement through its sales and offers for sale of Ontel's knock-off Pillow Pad product via correspondence from HPI's outside counsel explicitly referencing the '479 patent and including a claim chart and evidence of offers for sale from the website of Kroger and most of its various sub-brands.  Among other things, this letter demanded that Kroger immediately cease and desist its infringing sales and offers for sale of Ontel's knock-off Pillow Pad product.

238.    That same day, Mr. Wilkinson responded via email, referencing the earlier strings of correspondence with Juliette and reiterating that Kroger would tender the matter to Ontel.

239.    HPI's outside counsel acknowledged receipt of Mr. Wilkinson's response the following morning, requesting that Mr. Wilkinson confirm when Kroger has completed its diligence.

240.    On June 12, 2023, Mr. Wilkinson provided that response, claiming that Kroger did not sell any products that violated the claims of the '479 patent.  Mr. Wilkinson closed his response by suggesting that HPI reach out directly to Ontel, the vendor of those products to Kroger.

HPI V. ONTEL AMENDED COMPLAINT

241.    On information and belief, consistent with the statements that Mr. Wilkinson provided in his prior correspondence to Juliette and in his 2018 testimony, Kroger's "diligence" was simply relying on Ontel's say-so that there was no infringement of the '479 patent.  On information and belief, based on Mr. Wilkinson's prior testimony and statements to Juliette, Kroger performed no independent diligence to assess whether or not Ontel's knock-off Pillow Pad product infringed any claims of the '479 patent.

246.242.    On June 16, 2023, HPI provided actual notice, via email from its outside counsel, to BJ's that its sales and offers for sale of Ontel's Pillow Pad products infringed the '479 patent.

247.243.    At least as of around October 25, 2023, UBS was continuing to sell and offer for sale, at least via its website, Ontel's knock-off Pillow Pad product, as evidenced by the packing list dated October 25, 2023 for an order of an Ontel knock-off Pillow Pad delivered to Juliette around that date:



HPI V. ONTEL AMENDED COMPLAINT

248.244.    As an example of HPI's declining sales and price erosion due to Ontel's knock-off Pillow Pad product, non-party Ollie's Discount Outlets ("Ollie's") made Juliette an initial low-ball offer of $3/unit in October 2023 in response to September 27, 2023 email correspondence from Juliette.

249.245.    Ollie's buyer, Jonathan Lampert, elaborated on the rationale behind the low-ball offer in an email sent to Juliette on October 13, 2023: "I know this is <u>way</u> below your cost/handling/etc.  Unfortunately, the price bar was set very low with the excess we bought before.  $3.00 is actually double what we paid them."

250.246.    On information and belief, Mr. Lampert's use of "the excess we bought before" and "what we paid them" referred to Ontel and its knock-off Pillow Pad products.[6]

251.247.    After making substantial progress on a purchase agreement through early December 2023, and sending HPI a purchase agreement on December 5, 2023, Ollie's ultimately declined to take a license or purchase the Flippy from HPI just one week later.

252.248.    But for Ontel's provision and advertising of its knock-off Pillow Pad product—including through its retail partners, including but not limited to the Retail Defendants—HPI was ready and poised to move into big box retailers and their physical and online sales channels.  Even beyond Juliette's own decades of experience as a wholesale product developer and seller who has been selling into retail channels her entire career, HPI was set up with connected and experienced partners for warehousing, end-to-end logistics, and oversight for manufacturing in China.   HPI also had an experienced CFO and a network of investors and advisors who were ready and willing to assist with using the momentum from the QVC sellout to see HPI through to providing Flippy to physical retail locations.

---

[6] On information and belief, Ollie's was offering for sale and selling Ontel's knock-off Pillow Pad products from its physical retail locations at least as of May 2023.

**AMAZON REMOVES ONTEL'S KNOCK-OFF PILLOW PAD PRODUCT**

253.249.      On April 1, 2021, HPI filed a complaint with Amazon's Utility Patent Neutral Evaluation ("UPNE") program in an effort to get Ontel's knock-off Pillow Pad product removed from Amazon's listings for infringing the '479 patent.[7]

254.250.      As shown in the attached Exhibit D, Ontel's knock-off Pillow pad product infringes at least claim 12 of the '479 patent.

255.251.      On information and belief, Amazon provided notice of the UPNE process to Ontel in or about April 2021.

256.252.      In May 2021, Ontel declined to participate in the UPNE process, in which a neutral evaluator was to determine HPI's likelihood of proving that Ontel's Pillow Pad product infringed the '479 patent.

257.253.      On information and belief, Ontel declined to participate in the UPNE process because it had no real defense to HPI's infringement allegations, and wanted to avoid any record of contesting infringement and losing.

258.254.      Following Ontel's non-participation in Amazon's UPNE and failure to file a declaratory judgment action against HPI, Ontel's knock-off Pillow Pad product was removed from the Amazon platform in June 2021.

259.255.      In response, Ontel created a substantially similar version of its knock-off Pillow Pad product – having only two rounded edges instead of the three rounded edges that the first knock-off version copied from Flippy—for sale on Amazon, Walmart.com, and on information and belief, through other retail channels.

260.256.      Despite introducing this revised version of the Pillow Pad for sale on Amazon, Ontel continued advertising "Pillow Pad" on Amazon with images and video of the direct knock-off version with three rounded edges that it no longer sold on Amazon.

---

[7] At this time, UPNE was in the midst of a three-year beta testing period that began in 2019. UPNE officially concluded its beta version in 2022 when Amazon formally launched a substantially identical program that it branded as Amazon Patent Evaluation Express ("APEX").

261.257.     As of the present date, Ontel is still using advertisements depicting the original knock-off Pillow Pad product with three rounded edges for marketing of the version having only two rounded edges.

262.258.     This "bait and switch" type advertising still continues to this day on Amazon, where Ontel is using "sponsored advertisements" that depict its first version of its knock-off Pillow Pad product with three rounded ledges to sell subsequent versions, as shown in this screenshot taken on June 25, 2024:



263.259.     Ontel's "Pillow Pad" store on Amazon,[8] which sells later-generation versions of Ontel's knock-off Pillow Pad product, likewise continues to depict the original version of Ontel's knock-off Pillow Pad product in no fewer than two different images used in connection with marketing and selling Ontel's products:

_____

[8] https://www.amazon.com/stores/page/B435A563-0DD2-4A2B-8FDC-9AC8EDF584B9/



264.260.        In particular, the header image for Pillow Pad clearly depicts, on the right side, the first version of Ontel's knock-off Pillow Pad product with three rounded ledges, as shown in the annotated image below:



265.261.        The usage picture also clearly displays a woman using the first version of Ontel's knock-off Pillow Pad product with three rounded ledges, as shown in the image below:



266.262.    On information and belief, Ontel's use of images showing a Pillow Pad product with three rounded ledges (which it does not offer on Amazon) to drive sales of subsequent versions of a Pillow Pad with two rounded ledges (which it does offer on Amazon) has contributed to Ontel's ongoing cannibalization of Flippy's sales.

267.263.    And even when Ontel revised the Pillow Pad to remove one of the rounded ledges and alter the product into a version with two viewing angles, its listings on Amazon and other online sales platforms, including (but on information and belief not limited to) Walmart.com retained the "multi-angle" description even though the revised Pillow Pad only provided two such angles instead of three.

268.264.        On information and belief, the use of images showing a Pillow Pad product with three rounded ledges and continuing to describe both products as a "multi-angle" stand led at least some of Ontel's customers to expect that they would have received that product instead of the version of the Pillow Pad with two rounded ledges that was actually shipped:

 Kric

★★★☆☆  **Hit or miss**

Reviewed in the United States on February 6, 2024

Color: Blue  |  Style Name: Ultra  |  **Verified Purchase**

I bought two of these. They gray one is just like Flippy and I'm happy with it. The blue one I purchased, however, was defective as it didn't inflate to the full size. It is actually missing an entire side of foam and there's a plastic bar inside.

I did exchange the blue one and the replacement inflated but it's a different model than the gray version. This one is smaller, uses a softer foam , and one of the three sides isn't really usable.

I'm disappointed. The original gray one I got was great. This other version is awful.



 l. r.

★☆☆☆☆  **Not like what I bought before**

Reviewed in the United States on January 13, 2024

Color: Blue  |  Style Name: Ultra  |  **Verified Purchase**

I bought a Pillow Pad at least a year ago maybe 2. It fluffed right away and has held up. I decided I would get another one so I didn't have to carry this around the house. It's been out of the tiny box for a couple of days now. It did not move for the first 12 hours. I finally unzipped it and pulled the foam pieces apart so they could start to fluff. It had a little but is nowhere near the same product as the one I own. They both have the handle with same name. They both have a pocket. The old one has 3 distinct sides that hold your tablet at different angles. The new one has 2 curved sides not three and has a piece of wood inside on the third side for some reason. It will not hold my iPad. And shipping took longer than it was supposed to but all Amazon seems to be late these days. Return!! The picture shows the same side, same pocket and you can see the blue one has nothing on the left side



 wawie

★★★☆☆ **Mixed results**

Reviewed in the United States on June 24, 2024

Color: Blue | Style Name: Ultra | **Verified Purchase**

I bought the blue one and don't even remember the packaging, it was in full usable shape in no time. I use it a lot, it is great, and easily worthy of a 5 star review, especially for $10. My daughter wanted one of her own so I shared the link and she ordered the burgundy one.. after 3 days it's still flimsy and wrinkled, and it's like it's not even quite the same product even when (if) it fully decompresses. Like, mine has 3 ledges for 3 different viewing angles, I think hers will only have 2. Hers has a rod or something at one edge that I don't detect in mine. We're giving it more time and may try some tricks to get it in shape, will see how it goes.

 Paperpeople

★☆☆☆☆ **Laughably disappointing**

Reviewed in the United States on September 28, 2022

Color: Blue | Style Name: Ultra | **Verified Purchase**

The Ontel Pillow Pad (right side in image) purchased on this site is a sad imitation of the Ontel Pillow Pad (left side in image) bought at a brick and mortar store. The former is too soft, wrinkled, made of two pieces of foam, only holds a pad on two of the three sides, and is unstable. The photo shows how it looked after a week, waiting for it to expand. The latter is larger, made of a single piece of firm foam that is well-balanced and can hold a pad adequately on all three sides.



 Kindle Customer

★★★☆☆ **Not as well made as my old one of the same brand**

Reviewed in the United States on January 22, 2022

Color: Blue | Style Name: Ultra | **Verified Purchase**

I bought my old one ( the gray one) several years ago, but my husband kept stealing it. So when I saw this on amazon I decided to get it for him so I would not have to hide mine. When it arrived it was compressed & even through I followed the directions it is still wrinkled. Not as well made as my old one of the same brand & only has 2 shelves for books or kindle where as my old one has 3.



269.265.    Likewise, the original version of Ontel's knock-off Pillow Pad product (having three rounded ledges) continues to appear in product listings for sale at other of Ontel's retail partners, including at least Walmart.com:





270.266.        In each of these listings on Walmart.com, only the original version of Ontel's knock-off Pillow Pad product with three rounded ledges is depicted; there is no indication that a different version of Ontel's knock-off Pillow Pad product (such as the second-generation version with two rounded ledges) is being sold or offered for sale, or would be sent to any consumers who purchase a Pillow Pad through those listings.

271.267.        On information and belief, Ontel has supplied and continues to supply the original version of the Pillow Pad product with three rounded ledges to Walmart.

272.268.        Ontel has continued, and to this day continues, to advertise, distribute, offer for sale, and sell the Pillow Pad, including through its retail partners. and various resellers and distributors.

269.    On information and belief, Ontel specifically and deliberately sells to resellers and distributors operating on Amazon, such as Dave Electronics and its retail partners, mixed lots of its various generation Pillow Pad products.  These are sold shrink-wrapped with the air removed, and so cannot be identified at the point of sale or purchase by either the reseller/distributor or the end-user as the original knock-off Pillow Pad or subsequent design-around.

270.    As just one example, Ontel has sold mixed lots of shrink-wrapped Pillow Pad products to a reseller known as "Dave Electronics" and its retail partners.  On information and belief, these mixed lots comprise various different SKUs across multiple generations of Ontel's Pillow Pad products.

271.    On information and belief, it is difficult (if not impossible) to determine from the as-sold, as-packaged form whether each individual "Pillow Pad" product originally supplied by Ontel has three rounded ledges or is a later-generation product.  Rather, only after the end-user opens the package and allows it to reinflate can the precise product be known.

272.    Since January 30, 2025, Juliette has purchased nine units of the Pillow Pad through Amazon.com.  Eight of those units are the original version of Ontel's knock-off product with three rounded ledges.

## ONTEL REFUSES IN BAD FAITH TO ENGAGE WITH HPI

273.    Ontel's refusal to engage with HPI's efforts to protect its intellectual property werewas not limited to Ontel's non-participation in Amazon's UPNE process, but was part of a larger strategic pattern of stonewalling and dilatory engagement to the extent that Ontel engaged at all.

274.    On information and belief, Ontel deliberately refused to meaningfully engage with HPI as part of its knock-off business model, leveraging its superior resources and knowing the cost and time required for HPI to enforce its intellectual property rights while Ontel continued to profit from its knock-off Pillow Pad products.

275.    This practice is known as "efficient infringement".  As the widely-respected patent policy expert Gene Quinn has explained:

> Efficient infringement is a cold-hearted business calculation whereby businesses decide it will be cheaper to use patented technology without paying than to license it and pay a fair royalty to the patent owner. This calculus is made on the part of large entities who realize there are a certain number of patent owners that are just simply not going to assert their patents for one reason or another, frequently because they don't have the money to do so. Then there is another group of those that will assert their patents but will not win. The calculation progresses to realize that there is a small group of those who are likely to both assert patents and prevail, thanks to all the hurdles put in place (i.e., patent eligibility challenges, the Patent Trial and Appeal Board, etc.). The calculation further recognizes that even if a patent owner prevails, a permanent injunction is virtually impossible to obtain as the result of the Supreme Court's decision in *eBay v. MercExchange*, and damages are likely to be minimal thanks to a continual judicial erosion in damages available to victorious patent owners.

*See* https://ipwatchdog.com/2019/09/18/great-escape-efficient-infringers-increasingly-seek-abuse-antitrust-law/

276. Consistent with its business model, on information and belief, Ontel had already decided to engage in efficient infringement when Juliette first reached out to Chuck and Amar Khubani in March 2019 via email.

277. During a brief initial telephone conversation occurring on March 12, 2019, when Amar Khubani called Juliette, Amar claimed that Ontel had done its research and denied that its knock-off Pillow Pad product infringed on any of HPI's IP and averred that Ontel was "good people to partner with."

278. Following her initial contact with the Khubanis, Juliette learned more about Ontel and its business practices, and among other things, connected with Teddy Shalon, the founder of ThinOptics, another company whose products and IP were knocked-off by Ontel, and who litigated against Ontel and Telebrands in *ThinOptics, Inc. v. Ontel Prods. Corp., et al.*, No. 3:16-cv-1952 (N.D. Cal.), with the original complaint filed on April 13, 2016.

279. Juliette was dismayed to learn of Ontel's pattern of "efficient infringement" as part of its business model of creating knock-off products. This lack of respect for intellectual property rights and the small businesses who created new products was anathema to Juliette, who strove to operate HPI as a socially conscientious business platform.

280. Juliette responded to Amar and Chuck Khubani via email on March 14, 2019, stating that a license of HPI's IP to Ontel would not be in HPI's interest. Juliette explained that "Ontel's business practices and pattern of poor customer support (as evidenced by hundreds of BBB consumer complaints) led us to believe that our customers wouldn't be well served through such a partnership."

281. Juliette concluded this email with a request that Ontel immediately cease and desist all manufacturing, marketing, sales, advertising, and other activities with regard to Pillow Pad, and requested that Ontel remove the buypillowpad.com website by the close of business on the following day.

282.    But Ontel did not do so.

283.    Instead, Amar Khubani responded by email a few hours later, expressing disappointment in Juliette's demurral.  Amar asked for "help [to] understand what intellectual property [HPI] ha[s] that requires Ontel to cease activities with regard to the Pillow Pad," and further inquired whether HPI had any other IP beyond the one patent (the '454 patent) that Juliette had mentioned during their March 12 telephone conversation.

284.    Juliette did not respond to that email, having made HPI's position clear a few hours prior.

285.    Amar Khubani called Juliette again on March 18, saying that Ontel wanted to work out a deal with HPI, while simultaneously repeating his statement of that he believed Ontel to be in solid position with respect to IP.

286.    During the next few weeks, Amar kept contacting Juliette in various ways.

287.    Between her growing knowledge of Ontel's business practices and the tenor of the communications from the Khubanis continuing to pry for information, Juliette began to feel that the Khubanis and Ontel were toying with her, and had no intention of doing anything but pressuring HPI into granting a lowball license that would allow Ontel to continue its efficient infringement operation with impunity.

288.    Juliette was aware that Ontel, a large corporation with a big budget, was obviously copying Flippy and continuing to undercut Flippy's pricing with an inferior product while siphoning off its sales and blocking it from retail channels—and based on Ontel's ignoring the requests to cease and desist made in Juliette's March 14 email, had no intention of changing course.

289.    Juliette connected Ontel's efforts to obtain a license from HPI with Greg Rosenthal's curt negative response on behalf of BBB a few months prior to conclude that Ontel was planning on a massive push in the retail channel—and was only interested in reassuring its retail partners about litigation risk.

290.    When Amar Khubani emailed Juliette again on April 9, Juliette felt trapped by Ontel's shamelessness about the knock-off Pillow Pad product cavalier attitude to the effect of their knock-off product on HPI.  Juliette was aware that Ontel believed that HPI was backed into a corner, and had no choice but to engage with Ontel on Ontel's terms or lose in the marketplace due to Ontel's "efficient infringement" business strategy.

291.    Juliette responded:



Juliette Fassett <juliette@happyproductsinc.com>

**Hey Amar and Chuck -**
1 message

Juliette Fassett <juliette@happyproductsinc.com>                    Wed, Apr 10, 2019 at 4:55 PM
To: Amar Khubani <Amar@ontel.com>, chuck@ontel.com

Thanks again for reaching out yesterday.

I have to say. You guys have put me in an incredibly awkward position. I'm really a 'live and let live' kind of person. Until someone fucks with me directly. As you have.

Unless you are willing to buy my company for USD $20,250,000 in cash we're not going to have anything to discuss. Frankly, given how we are doing, our IP, and what is in development that's probably a screaming deal.

BTW that $250,000 has to be donated to my literacy partner, FirstBook.org, in my name.

Otherwise you can both suck my dick.

Thanks -

Juliette

292.    Thereafter, Ontel's general counsel, Caroline Kinsey, stepped in on behalf of Ontel to defuse the situation and to at least appear to try to engage in resolution efforts with HPI.

293.    These efforts, mediated by HPI's outside counsel, quickly proved unavailing, and HPI's efforts to resolve issues relating to Ontel's knock-off Pillow Pad product were stagnant by May 2019.

294.    Ontel did not meaningfully engage with HPI thereafter, refusing to respond participate in the UPNE process that HPI initiated after the '479 patent issued.

295.    Ontel's efficient infringement also continued after the first version of Pillow Pad was removed from Amazon.

296.    On September 30, 2023, counsel for HPI sent email to Ontel's in-house counsel noting the letters sent to the retailers and requesting a conversation.

297.    Ontel's in-house counsel did not respond.

298.    Instead, Ontel's outside counsel, John S. Artz of Dickinson Wright, responded by letter of October 3, 2023, stating that "Ontel has no desire for a business relationship, discussion, or any other sort of contact" with HPI, alleging misconduct by HPI as well as its counsel in seeking to protect HPI's rights, and asserting that any claim by HPI against Ontel would be "frivolous."

299.    In emails sent October 6, 2023, October 9, 2023, and October 19, 2023 to Mr. Artz, counsel for HPI reiterated her requests for an attorney-to-attorney discussion "to see if there is a possibility to resolve the issues" between HPI and Ontel.

300.    In response, Mr. Artz indicated that a dialogue would not be "a productive use of anybody's time" and did not agree to speak with counsel for HPI.

301.    In a formal letter to Mr. Artz dated November 21, 2023, counsel for HPI noted that HPI remained "willing to participate in good faith discussions to resolve its disputes with Ontel and the retailers distributing Pillow Pad products," invited an explanation of Ontel's position regarding HPI's IP, and proposed to "exchange settlement offers and/or participate in pre-suit mediation with an approved JAMS mediator."

302.    By email of December 21, 2023, counsel for Ontel John S. Artz responded that "Ontel has no desire to engage in any discussion with [HPI] or any representative on behalf of [HPI]," "has never manufactured and sold a product that would violate any alleged rights," characterizing the letter sent by HPI's counsel as "harassing," and again characterizing HPI's legals claims as "frivolous."

**Infringement of U.S. Patent No. RE48,479~~7,295,454~~**

**COUNT I**

**(Direct Infringement of the '4~~54~~79 patent by Ontel)**

303.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

303.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

304.    Ontel has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '45479 patent (which is identical to claim 1 of the '454 patent) under the doctrine of equivalents, by importing into and/or making, using, selling, or offering to sell the Pillow Pad and equivalent products (the "Accused Products") in the United States without license or authority.

305.    Because the Pillow Pad meets each limitation of at least claim 1 of the '45479 patent, either literally or under the doctrine of equivalents, in the manner shown above and in Exhibit C, and because Ontel had actual knowledge of the '454 patent as of about November 20, 2018, Ontel's direct infringement of claim 1 and its dependent claims was willful as of that date.

306.    Ontel's direct infringement of the '454 patent damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

307.1.  Ontel's actions, including its low pricing of the Pillow Pad and, upon information and belief, its sales to numerous retailers that it contractually relieved of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

### COUNT II

### (Induced Infringement of the '454 patent by Ontel)

308.1.  Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

309.    Ontel has infringed under 35 U.S.C. § 271(b) at least claim 1 of the '454 patent, by inducing and actively encouraging others (including its retail partners, which include but are not limited to the Retailer Defendants) to infringe under the doctrine of equivalents, through its advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United States without license or authority, knowing that the acts induced constitute patent infringement.

310.    Ontel was aware of the existence of the '454 patent.

311.1.  Ontel knew that sales and offers for sale of the Pillow Pad constituted infringement of the '454 patent.

312.1.  Based on its agreements with its retail partners, including but not limited to the Retailer Defendants, Ontel encouraged its retail partners, including but not limited to the Retailer Defendants, to sell and offer for sale Ontel's Pillow Pad product.

313.    Because the Pillow Pad meets each limitation of at least claim 1 of the '454 Patent, either literally or under the doctrine of equivalents, because Ontel directly copied the Pillow Pad from Plaintiff's innovative and patented Flippy, and because Ontel had actual knowledge of the '454 patent as of about November 20, 2018, Ontel's inducement of infringement was willful.

314.    Ontel's inducement of infringement of the '454 patent damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

315.    Ontel's actions, including, its low pricing of the Pillow Pad and, upon information and belief, its agreements with numerous retailers (including but not limited to the Retailer Defendants) contractually relieving them of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

**COUNT III**

**(Induced Infringement of the '454 patent by Telebrands)**

316.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

317.    Telebrands has infringed under 35 U.S.C. § 271(b) at least claim 1 of the '454 patent, by inducing others (including at least Defendant Ontel) to infringe at least under the doctrine of equivalents, through its importing, selling, offering for sale, advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United

States without license or authority, knowing that the acts of at least Ontel would constitute infringement of at least claim 1 of the '454 patent at least under the doctrine of equivalents.

318.    Telebrands was aware of the '454 patent.

319.    Telebrands was aware that importing, selling, and offering for sale a knock-off product copied from Plaintiff's innovative and patented Flippy constituted infringement of the '454 patent.

320.    On information and belief, Telebrands encouraged Ontel to import, sell, and offer for sale a knock-off product copied from Plaintiff's innovative and patented Flippy.

321.    Because the Pillow Pad meets each limitation of at least claim 1 of the '454 Patent, either literally or under the doctrine of equivalents, and because Telebrands had actual knowledge of the '454 patent as of about November 15, 2018, Telebrands's inducement of infringement by Ontel was willful.

322.    Telebrands's inducement of Ontel's infringement of the '454 patent damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

323.    Ontel's and Telebrands's actions, including but not limited to Ontel's low pricing of the Pillow Pad and, upon information and belief, Ontel's agreements with numerous retailers (including but not limited to the Retailer Defendants) contractually relieving them of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## COUNT IV

### (Direct Infringement of the '454 patent by each of the Retailer Defendants)

324.1.  Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

325.    Each of the Retailer Defendants has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '454 patent under the doctrine of equivalents, by selling and/or or offering for sale

Accused Products (including but the Pillow Pad and equivalent products) in the United States without license or authority.

326.    The direct infringement of the '454 patent by each of the Retailer Defendants has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling, and offering to sell covered products in the United States.

327.    The actions of each of the Retailer Defendants, including each of their low pricing of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

### Infringement of U.S. Patent No. RE48,479

### COUNT V

### (Direct Infringement of the '479 patent by Ontel)

Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

328.306.    Ontel has infringed and continues to infringe under 35 U.S.C. § 271(a) at least claim 12 of the '479 patent, either literally or under the doctrine of equivalents, by importing into and/or making, using, selling, or offering to sell the Pillow Pad and equivalent products (the "Accused Products") in the United States without license or authority.

329.307.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above and in Exhibit D, and because Ontel has had actual knowledge of the '479 patent as of about May 2021, Ontel's direct infringement of at least claim 12 and its dependent claims has been willful as of that date.

330.308.    Ontel's direct infringement of the '479 patent has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

331.309.    Ontel's actions, including its low pricing of the Pillow Pad and, upon information and belief, its sales to numerous retailers that it contractually relieved of certain liabilities and/or responsibilities for patent infringement based on their sales and offers for sale of

the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

332.310.    For at least the reasons set forth in the preceding paragraphs, Ontel's continuing direct infringement of the '479 patent irreparably harms Plaintiff, and Plaintiff will continue to suffer irreparable harm absent entry of a permanent injunction enjoining Ontel and all others acting with it from infringing the '479 patent.

## COUNT ~~VII~~I

### (Induced Infringement of the '479 patent by Ontel)

311.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

312.    Ontel has infringed under 35 U.S.C. § 271(b) at least claim 1 of the '479 patent (which is identical to claim 1 of the '454 patent), by inducing and actively encouraging others (including its retail partners, which include but are not limited to the Retailer Defendants) to infringe under the doctrine of equivalents, through its advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United States without license or authority, knowing that the acts induced constitute patent infringement.

313.    Ontel was aware of the existence of the '454 patent as of about November 20, 2018.

314.    Ontel knew that sales and offers for sale of the Pillow Pad constituted infringement of the '454 patent.

315.    Based on its agreements with its retail partners, including but not limited to the Retailer Defendants, Ontel encouraged its retail partners, including but not limited to the Retailer Defendants, to sell and offer for sale Ontel's Pillow Pad product.

316.    ~~Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.~~Because the Pillow Pad meets each limitation of at least claim 1 of the '479 patent, either literally or under the doctrine of equivalents, because Ontel directly copied the Pillow Pad from Plaintiff's innovative and patented Flippy, and because

Ontel had actual knowledge of the '454 patent as of about November 20, 2018, Ontel's inducement of infringement of at least claim 1 and its dependent claims was willful as of that date.

333.317.    Ontel has infringed and continues to infringe under 35 U.S.C. § 271(b) at least claim 12 of the '479 patent, by inducing others (including its retail partners, which include but are not limited to the Retailer Defendants) to infringe either literally or under the doctrine of equivalents, through its advertising, promoting, and contracting with retailers for the sale and distribution of the Accused Products in the United States without license or authority, knowing that the acts induced constitute patent infringement.

334.318.    Ontel was aware of the existence of the '479 patent at least as of May 2021.

335.319.    Ontel knew that sales and offers for sale of the Pillow Pad constituted infringement of at least claim 12 of the '479 patent.

336.320.    Based on its agreements with its retail partners, including but not limited to the Retailer Defendants, Ontel encouraged its retail partners, including but not limited to the Retailer Defendants, to sell and offer for sale Ontel's Pillow Pad product.

337.321.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent, and because Ontel has had actual knowledge of the '479 patent as of about May 2021, Ontel's inducement of infringement by its retail partners, including but not limited to the Retailer Defendants, has been willful.

338.322.    Ontel's inducement of infringement of the '479 patent has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling and offering to sell covered products in the U.S.

339.323.    Ontel's actions, including, its low pricing of the Pillow Pad and, upon information and belief, its contracts with numerous retailers contractually relieving them of certain liabilities and/or responsibilities for patent infringement based on their sales and offers

for sale of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

340.324.    For at least the reasons set forth in the preceding paragraphs, Ontel's continuing inducement of infringement of the '479 patent irreparably harms Plaintiff, and Plaintiff will continue to suffer irreparable harm absent entry of a permanent injunction enjoining Ontel and all others acting with it from infringing the '479 patent.

## COUNT VIII

### (Direct Infringement of the '479 patent by the Retailer Defendants)

341.325.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

326.    Each of the Retailer Defendants has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '479 patent (which is identical to claim 1 of the '454 patent) by selling and/or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority.

342.327.    Each of the Retailer Defendants has infringed under 35 U.S.C. § 271(a) at least claim 12 of the '479 patent by selling and/or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority. on or after March 23, 2021.

343.328.    The direct infringement of the '479 patent by each of the Retailer Defendants has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling, and offering to sell covered products in the United States.

344.329.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because Boscov's had actual knowledge of the '479 patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by June 2, 2023, the infringement of the '479 patent by Boscov's has been willful since no later than that date.

345.330.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because BJ's had actual knowledge of the '479 patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by June 16, 2023, infringement of the '479 patent by BJ's has been willful since no later than that date.

346.331.    The actions of each of the Retailer Defendants, including their low pricing of the inferior-quality Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

### Lanham Act Violations

### COUNT VIIIIV

### Trade Dress Infringement under the Lanham Act
### (Against Ontel and the Retailer Defendants)

347.332.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

348.333.    Plaintiff developed and has used the distinctive design of its Flippy media stand, including in particular its soft fabric cover and the rounded ledges between oneach back support and the next edge support, which are reflected in registered trademark No. 7,437,967 awarded by the USPTO to Plaintiff in 2024.  These distinctive features of the Flippy design can be seen above in paragraphs 120–21 and 129, and are referred to here as the Flippy Trade Dress.

349.334.    Plaintiff is the owner of all right and title to the Flippy Trade Dress.

350.335.    The Flippy Trade Dress and particularly the rounded ledges, at specific levels of roundedness, are distinctive of the Flippy.  The rounded ledges are not functional, as they are not essential to the use or purpose of the Flippy pillow, and do not affect the cost or quality of the item.

351.336.    The Flippy's distinctive rounded ledges also have acquired secondary meaning.  Plaintiff has exclusively used this trade dress since 2013 (almost 6 years of exclusive use before Ontel came to market with the infringing Pillow Pad).  During that time, Plaintiff

made significant sales and there were no other similar products on the market.  On information and belief, consumers came to associate this trade dress with the Flippy.

352.337.      Since Ontel's product came to market, there have been numerous instances of actual confusion where consumers bought Ontel's product believing it to be the Flippy, as evidenced by purchasers of the Ontel product complaining about it to Plaintiff HPI.

353.338.      On information and belief, Ontel copied the Flippy including the distinctive Trade Dress of HPI's Flippy in order to create a likelihood of confusion between the Pillow Pad and HPI's original Flippy, and continues to copy the distinctive Trade Dress of HPI's Flippy.

354.339.      Ontel's use of HPI's Trade Dress, in an attempt to advertise or promote its own Pillow Pad, misrepresents the nature, characteristics, and quality of Ontel's products, said misrepresentation creating the likelihood that the public would associate Ontel's lower quality Pillow Pad with HPI and/or HPI's Flippy.

355.340.      On information and belief, Ontel's use of HPI's Trade Dress is and has been done in bad faith, knowingly and willfully and with the intent to confuse the relevant purchasing public.

356.341.      On information and belief, Ontel has taken no steps to prevent deception or confusion of the relevant purchasing public with respect to its marketing of the infringing Pillow Pad products.

357.342.      Ontel's unauthorized use of HPI's Trade Dress is an infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT ~~IX~~V

### False Advertising under the Lanham Act
### (Against Ontel, using Flippy to advertise Pillow Pad)

358.343.      Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

359.344.　　　On information and belief, Ontel has depicted Plaintiff's innovative Flippy product, modified to cover up the Flippy logo, describing it as the Pillow Pad or Pillow Pad 360º in at least its initial advertisements that began airing in February 2020. Some examples of such advertising can be seen above in paragraphs 189–200 and are referred to here as Ontel's Commercials.

360.345.　　　Ontel's Commercials are literally and/or impliedly false and misleading. They show the Flippy product itself and falsely represent that what is depicted is the Pillow Pad product being advertised and offered for sale, which was of inferior quality compared to the Flippy.

361.346.　　　Ontel's Commercials have deceived consumers by tricking them into thinking that they were buying the depicted high-quality multi-angle tablet stands provided by Plaintiff, which were sold and delivered to Ontel. Ontel's Commercials had a tendency to deceive a substantial portion of the intended audience, causing confusion as to the source, functionality, and quality of the products being depicted.

362.347.　　　On information and belief, the Pillow Pad products purchased by viewers of the Ontel's Commercials were shipped to consumer across the United States and hence traveled in interstate commerce.

363.348.　　　As a result of Ontel's conduct, Plaintiff has suffered and likely will continue to suffer harm to its business, sales, reputation, and goodwill, entitling Plaintiff to damages and an injunction.

364.349.　　　Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to statutory and other damages in an amount to be determined at trial for Ontel's violations of the Lanham Act, including an accounting and award of profits made by Ontel on sales of the Pillow Pad products.

365.350.　　　Ontel knew and knows that the depictions of "its" Pillow Pad in Ontel's Commercials were false and misleading. Ontel's acts were willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to

recover additional damages and reasonable attorneys' fees incurred in this action pursuant to 15 U.S.C. § 1117.

## COUNT ~~XVI~~

### False Advertising under the Lanham Act
### (Against Ontel, using images of the original Pillow Pad to advertise later generations)

~~366.~~351.      Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

~~367.~~352.      Ontel has used and continues to use images of its knock-off Pillow Pad product that has three edges providing three different viewing angles and three rounded ledges—as ~~for~~copied from HPI's Flippy—to advertise its other Pillow Pad products, in particular, its Pillow Pad product that has only two edges providing two different viewing angles.  Such advertising can be seen above in paragraphs ~~261–64~~258–61 and is referred to here as Ontel's Ads.

~~368.~~353.      Ontel's Ads are literally and/or impliedly false and misleading.  They show a product having the Flippy Trade Dress and patented features, and falsely represent that the Pillow Pad product available for sale on Amazon has three edges providing three different viewing angles and is otherwise like the highly-rated Flippy, when in fact the Pillow Pad product for sale has only two edges providing two different viewing angles and is of inferior quality compared to the Flippy.

~~369.~~354.      Ontel's Ads have deceived consumers by tricking them into thinking that they are buying a high-quality multi-angle media stand.  ~~The~~Ontel's Ads have a tendency to deceive a substantial portion of the intended audience, causing confusion as to the source, functionality, and quality of the products.

~~370.~~355.      Ontel's Ads have included so-called "sponsored ads" presented to consumers across the United States by Amazon in response to a user's search for certain goods and/or on the Amazon store page for Ontel's Pillow Pad product, and on information and belief,

the Pillow Pad products purchased by viewers of ~~the~~Ontel's Ads were shipped to consumer across the United States and hence traveled in interstate commerce.

356.    As a result of Ontel's conduct, Plaintiff has suffered and likely will continue to suffer harm to its business, sales, reputation, and goodwill, entitling Plaintiff to damages and an injunction.

357.    Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to statutory and other damages in an amount to be determined at trial for Ontel's violations of the Lanham Act, including an accounting and award of profits made by Ontel on such sales of the knock-off Pillow Pad products.

358.    Ontel knew and knows that the representations in Ontel's Ads are false and misleading.  Ontel's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees incurred in this action pursuant to 15 U.S.C. § 1117.

## COUNT VII

### False Advertising under the Lanham Act
### (Against Ontel, using images of later-generation Pillow Pads to sell the original Pillow Pad)

359.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

360.    Ontel has used and continues to use images of its other Pillow Pad products—in particular, its Pillow Pad product that has only two edges providing two different viewing angles—to drive and make sales of its knock-off Pillow Pad product that has three edges providing three different viewing angles and three rounded ledges as copied from HPI's Flippy. An example of such advertising can be seen above in paragraph 265 and is referred to here as Ontel's Other Ads.

361.    Ontel's Other Ads are literally and/or impliedly false and misleading.  They show a product not having the Flippy Trade Dress and patented features, and falsely represent that the

Pillow Pad product available for sale on Amazon does not have three edges providing three different viewing angles, when in fact the Pillow Pad product for sale and sent to purchasers is the knock-off Pillow Pad having three edges providing three different viewing angles that is of inferior quality compared to the Flippy.

362.    Ontel's Other Ads have deceived consumers by tricking them into thinking that they are buying a high-quality media stand that does not have three edges providing three different viewing angles.  Ontel's Other Ads have a tendency to deceive a substantial portion of the intended audience, causing confusion as to the source, functionality, and quality of the products.

363.    Ontel's Other Ads have included so-called "sponsored ads" presented to consumers across the United States by Amazon in response to a user's search for certain goods and/or on the Amazon store page for Ontel's Pillow Pad product, and on information and belief, the Pillow Pad products purchased by viewers of Ontel's Other Ads were shipped to consumer across the United States and hence traveled in interstate commerce.

371.364.    As a result of Ontel's conduct, Plaintiff has suffered and likely will continue to suffer harm to its business, sales, reputation, and goodwill, entitling Plaintiff to damages and an injunction.

372.365.    Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to statutory and other damages in an amount to be determined at trial for Ontel's violations of the Lanham Act, including an accounting and award of profits made by Ontel on such sales of the Pillow Pad products.

373.366.    Ontel knew and knows that the representations in its Ontel's Other Ads are false and misleading.  Ontel's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover additional damages and reasonable attorneys' fees incurred in this action pursuant to 15 U.S.C. § 1117.

**Violations of New Jersey Law**

**COUNT ~~XLVI~~VIII**

**Unfair Competition Under N.J.S.A. § 56:4-1**
**(Against Ontel and the Retailer Defendants)**

~~374.~~367.      Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

~~375.~~368.      Plaintiff's product is and has been sold and purchased throughout the United States, including in New Jersey.

~~376.~~369.      Defendant Ontel copied the Flippy, including the Flippy Trade Dress (in particular, the rounded ledges), product colors, and marketing and advertising materials, in a deliberate attempt to create confusion because consumers in the United States would assume that the Pillow Pad product sold by Ontel and the Retailer Defendants was the successful and high-quality product of the Plaintiff that had been featured on QVC and garnered high reviews on Amazon.

~~377.~~370.      Ontel intentionally caused the Pillow Pad products to duplicate and replicate the Flippy, including the Flippy Trade Dress, and intentionally caused the advertising for the Pillow Pad products to be substantially similar to that of the Flippy, and both Ontel and the Retailer Defendants have sold and sell the Pillow Pad in markets serving customers that would recognize Plaintiff's trade dress—including direct-to-consumer sales on Amazon and under the "As Seen on TV" brand both online and in retail stores.  Ontel and the Retailer Defendants have used Plaintiff's trade dress intending to profit from consumers' confusion and to capitalize on the goodwill associated with Plaintiff's product.

~~378.~~371.      On information and belief, Ontel's and the Retailer Defendants' adoption of and use of confusingly similar (i.e., identical) trade dress for its Pillow Pad as for Flippy, as described above, allows Ontel and the Retailer Defendants to receive the benefit of Plaintiff's goodwill, which Plaintiff established at great labor and expense.

379.372.    On information and belief, and through the acts described above, in the course of conducting business, Ontel and the Retailer Defendants conspired and/or collaborated to knowingly engage in unfair acts and/or practices and unfair methods of competition, including but not limited to using designs and trade dress identical and/or confusingly similar to the Flippy, and otherwise engaged in deceptive trade practices.

380.373.    The acts of Ontel and the Retailer Defendants complained of herein were committed willfully and maliciously, and for the purpose of their own economic benefit at the expense of Plaintiff's rights, monetary gain, and success in business.

381.374.    The acts of Defendants complained of herein constitute unfair competition in violation of the New Jersey Unfair Competition Statute, N.J.S.A. § 56:4-1.

382.375.    As a result of Ontel's and the Retailer Defendants' actions, Ontel and the Retailer Defendants have been and are being unjustly enriched—and Plaintiff has been harmed and has suffered injury and is being harmed and is continuing to suffer injury, including loss of revenues, increased expenses, and missed business opportunities—in amounts to be determined at trial.

383.376.    Unless enjoined by this Court, Ontel's and the Retailer Defendants' wrongful acts will continue and Plaintiff will continue to suffer irreparable harm for which it has no adequate remedy at law.

**COUNT ~~XII~~IX**

**Unfair Competition Under New Jersey Common Law**
**(Against Ontel and the Retailer Defendants)**

384.377.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

385.378.    Plaintiff owns all rights, title, and interest in its Flippy Trade Dress as described above, including all common law rights therein.

386.379.    The acts of Ontel and the Retailer Defendants set forth above constitute infringement of Plaintiff's rights in its Flippy Trade Dress, and create false representations that

Ontel's Pillow Pad are provided by, sponsored by, approved by, licensed by, affiliated with or in some other way legitimately connected to Plaintiff and are of the same character, nature and quality as the goods provided by Plaintiff, thereby damaging Plaintiff and Plaintiff's reputation.

387.380.    Ontel and the Retailer Defendants, through their trade dress infringement and false statements and advertising, also tortiously interfered with Plaintiff's prospective business opportunities and economic advances as set forth below.

388.381.    Ontel and the Retailer Defendants undertook these complained of actions willfully and in bad faith.

389.382.    The acts of Ontel and the Retailer Defendants complained of hereinabove constitute acts of unfair competition against Plaintiff under the common law of the State of New Jersey, which acts have been committed knowingly and willfully and have injured Plaintiff. As a result of Ontel's and the Retailer Defendants' respective intentional and unlawful conduct as alleged herein, Plaintiff has suffered damages, including, but not limited to loss of sales, trade dress infringement, loss of goodwill associated with its products, and damage to its reputation and to existing and potential business relationships.

390.383.    Unless enjoined by this Court, Ontel's and the Retailer Defendants' wrongful acts will continue and Plaintiff will continue to suffer irreparable harm for which it has no adequate remedy at law.

### COUNT XIIIX

**Tortious Interference With Prospective Economic Advantage**
**(Against Ontel)**

391.384.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

392.385.    Plaintiff has a protected interest in its advantageous business relationships with its customers, including consumers and direct-to-consumer sellers such as QVC, and in its prospective advantageous business relationships with potential customers, including consumers, direct-to-consumer sellers, and in-store and online retailers.

393.386.    Since its inception and even more so after selling its product on QVC, Plaintiff had an expectation of continued and increased sales to consumers both directly and via QVC, of opportunities to sell Flippy to in-store and online retailers, and of opportunities to develop relationships leading to potentially profitable business arrangements such as investment and/or acquisition.

394.387.    On information and belief, Defendant Ontel knew of these protected interests in Plaintiff's actual and prospective advantageous business relationships.  Ontel knew that Plaintiff had been very successful on QVC, which would create opportunities to increase sales to consumers via Amazon and QVC, to sell more Flippy products to a wider market and audience through United States retailers, and to grow HPI's business.

395.388.    Defendant Ontel intentionally, wrongfully, and without justification disseminated false statements to United States retailers including Plaintiff's prospective customers to interfere unfairly with Plaintiffs' protected business relationships.

396.389.    Defendant Ontel advertised that it was the "innovator" of the Pillow Pad and, on information and belief, told retailers that it held and/or would provide them with all necessary rights for the importation, distribution, and sale of the knock-off Pillow Pad.

397.390.    On information and belief, Defendant Ontel approached and continues to approach retailers, including on-lineonline retailers, with its knock-off Pillow Pad product for the purpose of interfering with Plaintiff's protected business relations.

398.391.    On information and belief, Defendant Ontel knew and knows that approaching and purposely disseminating false statements to retailers while blatantly infringing the Flippy Trade Dress and flouting Plaintiff's patent rights would materially interfere with Plaintiff's protected business relations, for example, by influencing retailers and sellers to not deal with Plaintiff or buy the Flippy product.

392.    To this day, Ontel continues to intentionally misadvertise, misleadingly advertise, and deceptively and unfairly sell its various Pillow Pad products in an effort to direct consumers

HPI V. ONTEL AMENDED COMPLAINT

(including retailers, resellers, distributors, and end-users) to its lower-quality knockoff products that undercut the price of Plaintiff's innovative Flippy tablet stand.

399.393.    On information and belief, as a result of Ontel's actions, actual and/or potential customers (including consumers, direct-to-consumer sellers, and in-store and online retailers) have refused to deal with Plaintiff, place orders with Plaintiff, and/or contract with Plaintiff.

394.    The full extent of economic opportunities that were foreclosed to Plaintiff are not known to Plaintiff at the present time, prior to discovery.  On information and belief, every customer (whether retailer, distributor, or end-user) who purchased a knock-off Pillow Pad from Ontel or via an Ontel-controlled sales channel, or who purchased a Pillow Pad product that was the subject of Ontel's false advertising, was a customer who would have potentially purchased Plaintiff's innovative Flippy instead—but for Ontel's intentional actions.

395.    On the retail level, Ontel specifically and intentionally interfered with Plaintiff's economic opportunities with retailers, including at least BBB, Ollie's, and Kroger.

400.396.    Such sales, contracts, and business benefits were reasonably likely to have occurred but for Defendants'Ontel's interference, which has resulted in damage to Plaintiff in the form of lost sales, lost profits, lost business opportunities, tarnished reputation, and loss of good will.

401.397.    DefendantsOntel acted in bad faith and with malice by copying Plaintiff's Flippy, directing false advertising towards consumers, and disseminating theirits false statements to customers.  DefendantsOntel made the statements knowing that they were false and/or misleading when made, and did so for the purpose of interfering with Plaintiff's actual and prospective business relations and causing harm to Plaintiff, and for theirits own economic benefit.

402.398.    Defendants'Ontel's conduct constitutes tortious interference with Plaintiff's prospective economic advantage.

HPI V. ONTEL AMENDED COMPLAINT

~~403.~~399.    As a direct and proximate result of this tortious interference of Defendant Ontel, Plaintiff has lost opportunities to enter into prospective agreements and business relationships and has incurred, is suffering, and will continue to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HPI respectfully requests that the Court enter judgment in favor of HPI and against Defendant Ontel as follows:

A.  Finding that Defendants have each infringed the '4~~54~~79 patent;

~~B.  Finding that Ontel and the Retailer Defendants have each infringed the '479 patent;~~

~~C.~~B.    Issuing a permanent injunction that prohibits ~~Ontel,~~ each ~~of the Retailer Defendants~~ Defendant, and ~~their~~its respective affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from infringing the '479 patent;

~~D.~~C.    Requiring that ~~Ontel and each of the Retailer Defendants render~~each Defendant renders a full and complete accounting to Plaintiff for each of their profits, gains, advantages or the value of business opportunities received from ~~their~~its respective sales of Ontel's Pillow Pad products;

~~E.~~  Requiring that ~~Defendants~~ each ~~pay~~Defendant pays Plaintiff damages sufficient to compensate Plaintiff for ~~their respective infringements of the '454 patent, including lost profits suffered by Plaintiff as a result of their respective infringements and in an amount not less than a reasonably royalty;~~

~~F.~~D.    ~~Requiring that each of Ontel and each of the Retailer Defendants pay Plaintiff damages sufficient to compensate Plaintiff for their~~its respective infringements of the '479 patent, including lost profits suffered by Plaintiff as a result of their respective infringements and in an amount not less than a reasonably royalty;

G.E.        Enhancing by three-fold the damages that Ontel must pay Plaintiff pursuant to 35 U.S.C. § 284;

H.F.        Finding the case exceptional under 35 U.S.C. § 285 at least as to Ontel and requiring that at least Ontel pay to Plaintiff all of its attorneys' fees and costs and expenses in this action;

I.G.        Finding that Flippy's signature rounded ledges constitute distinctive trade dress;

J.H.        Finding that Ontel and the Retailer Defendants haveeach Defendant has infringed Plaintiff's trade dress;

K.I.        Finding that Ontel has falsely advertised its knock-off Pillow Pad product using Plaintiff's Flippy;

L.J.Finding that Ontel has falsely advertised later generations of its knock-off Pillow Pad product using images of the original version of the knock-off Pillow Pad product having three rounded ledges;

K.  Finding that Ontel has falsely advertised its original knock-off Pillow Pad product using images of the later generations of product sold as a "Pillow Pad" but lacking three rounded ledges;


M.L.        For each violation of the Lanham Act, each of Ontel's and each Retailer Defendant's profits pursuant to 15 U.S.C. § 1117(a);

N.M.        For each violation of the Lanham Act, Plaintiff's damages sustained pursuant to 15 U.S.C. § 1117(a);

O.N.        Enhancing by three-fold the disgorgement of at least Ontel's profits and Plaintiff's damages sustained due to Ontel, pursuant to 15 U.S.C. § 1117(a);

P.O.        The costs of this action, pursuant to 15 U.S.C. § 1117(a);

Q.P.        Finding this case exceptional under 15 U.S.C. § 1117(a) at least as to Ontel and requiring that at least Ontel pay to Plaintiff all of its attorneys' fees in this action;

~~R.~~Q.    Pursuant to 15 U.S.C. § 1118, an order that all images, advertising, packaging, and products constituting or depicting the knock-off Pillow Pad product—whether instantiated in physical form, digital form, or other electronic format—with three rounded ledges in the possession of any Defendant be delivered up and destroyed.

~~S.~~R.    Finding that ~~Ontel and the Retailer Defendants have each~~each Defendant has competed unfairly with Plaintiff.

~~T.~~S.    Finding that Ontel has falsely advertised its Pillow Pad products.

~~U.~~T.    Finding that Ontel has interfered with Plaintiff's prospective business relationships;

~~V.~~U.    For the New Jersey statutory and common law claims, Plaintiff's lost profits;

~~W.~~V.    For the New Jersey statutory and common law claims, Defendants' unjust enrichment;

~~X.~~W.    For violations of N.J.S.A. § 56:4-1, punitive damages, treble damages, and injunctive relief pursuant to N.J.S.A § 56:4-2;

~~Y.~~X.    Awarding Plaintiff prejudgment interest, post-judgment interest, and costs; and

~~Z.~~Y.    Such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues raised by this Complaint that are properly triable by a jury.

~~FOX ROTHSCHILD LLP~~

~~Dated: October 15, 2024~~

_____

~~Marc J. Gross, Esq.~~
~~Gerard P. Norton, Esq.~~
~~Jordan B. Kaplan, Esq.~~
~~49 Market Street~~
~~Morristown, NJ 07960-5122~~
~~Tel: 973.992.4800~~
~~Fax: 973.992.9125~~

*Attorneys for Plaintiff Happy Products, Inc.*

Dated: February 28, 2025

/s/ Jordan B. Kaplan
Jordan B. Kaplan
jbkaplan@foxrosthschild.com
**FOX ROTHSCHILD, LLP**
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

*Attorney for Plaintiff Happy Products, Inc.*