## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAPPY PRODUCTS, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ONTEL PRODUCTS CORPORATION;<br>BOSCOV'S DEPARTMENT STORE,<br>LLC; BJ'S WHOLESALE CLUB, INC.;<br>AND UNBEATABLESALE.COM, INC.,<br><br>　　　　　Defendants. | Civil Action No. 2:24-cv-09819-EP-JRA<br><br>**Motion Date: April 21, 2025**<br><br>**Oral Argument Requested**<br><br>*Document Filed Electronically* |

### DEFENDANTS' BRIEF IN SUPPORT OF
### MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)
### AND MOTION TO STRIKE PURSUANT TO RULE 12(f)

Katherine A. Escanlar
**Saiber LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932
Tel: (973) 845-7720
kescanlar@saiber.com


Michelle Mancino Marsh
michelle.marsh@afslaw.com
Ariel S. Peikes
ariel.peikes@afslaw.com
**ArentFox Schiff LLP**
1301 Avenue of the Americas,
42nd Floor
New York, NY 10019
Tel: (212) 484-3900
Fax: (212) 484-3990

Janine A. Carlan (*phv forthcoming*)
janine.carlan@afslaw.com
**ArentFox Schiff LLP**
1717 K St NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395


Julie A. Vernon (*phv forthcoming*)
julie.vernon@afslaw.com
**ArentFox Schiff LLP**
233 South Wacker Drive,
Suite 7100
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-5600

*Attorneys for Defendants Ontel Prods. Corp., Boscov's Department Store, LLC, BJ's Wholesale Club, Inc., and Unbeatablesale.com, Inc.*

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  RELEVANT PROCEDURAL HISTORY ................................................................... 3

III. LEGAL ARGUMENT ............................................................................................... 5

   A.   STANDARD OF REVIEW ................................................................................... 5

   B.   HPI'S TRADE DRESS INFRINGEMENT CLAIM FAILS DUE TO MULTIPLE
   PLEADING DEFECTS.................................................................................................... 6

      i.    HPI Improperly Claims Functional Design Elements As Constituting Its Trade Dress. 8

      ii.   The Flippy's "Rounded Ledges" are Functional and, therefore, are Ineligible for Trade
      Dress Protection................................................................................................... 12

      iii.  The Flippy's "Soft Fabric Cover" is Functional and, therefore, is Ineligible for Trade
      Dress Protection................................................................................................... 15

      iv.   HPI's Trade Dress Description #2 is Indefinite and Must Be Dismissed for the Failure
      to Provide a Full List of the Trade Dress Elements and to Plead Non-Functionality .......... 17

   C.   THE UNFAIR COMPETITION CLAIMS (COUNTS VIII AND IX) MUST ALSO BE
   DISMISSED..................................................................................................................... 18

   D.   HPI FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH
   PROSPECTIVE ECONOMIC ADVANTAGE .......................................................... 18

   E.   PLAINTIFF'S IMPERTINENT ALLEGATIONS ABOUT DEFENDANT ONTEL AND
   FORMER-DEFENDANT TELEBRANDS SHOULD BE STRICKEN PURSUANT TO
   FEDERAL RULE OF CIVIL PROCEDURE 12(f)................................................... 22

IV.  CONCLUSION ......................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Oral Techs., L.L.C. v. Nutrex Rsch., Inc.*,
No. 10-5303(DRD), 2011 WL 1080204 (D.N.J. Mar. 21, 2011) ...........................................22

*Arro-Mark Co. LLC. v. Warren*,
No. 2:22-cv-6663-JKS-MAH, 2024 WL 4053027 (D.N.J. Sept. 5, 2024) (Semper, J.)............6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................5

*Azurous, Inc. v. Kennedy Int'l, Inc.*,
No. 23-04770 (ZNQ) (JBD), 2024 WL 3219663 (D.N.J. June 28, 2024) ...................... *passim*

*Baraka v. McGreevey*,
481 F.3d 187 (3d Cir. 2007)..............................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................5, 6

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016).............................................................................................5

*DeFazio v. Leading Edge Recovery Sols., LLC*,
No. 2:10-cv-02945-WJM-MF, 2010 WL 5146765 (D.N.J. Dec. 13, 2010) ...........................6

*Ewing v. Freedom Forever, LLC*,
No. 23-cv-1240 JLS (AHG), 2024 WL 221777 (S.D. Cal. Jan. 19, 2024)............................25

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
986 F.3d 250 (3d Cir. 2021)........................................................................................8, 9, 18

*Fair Wind Sailing, Inc. v. Dempster*,
764 F.3d 303 (3d Cir. 2014)..........................................................................................7, 17

*Interlink Prod. Int'l, Inc. v. HDS Trading Corp., Inc.*,
No. 3:15-cv-1642 (PGS)(TJB), 2015 WL 12840378 (D.N.J. Oct. 14, 2015)...................15, 17

*Intervet, Inc. v. Mileutis, Ltd.*,
No. 15-1371 (FLW)(TJB), 2016 WL 740267 (D.N.J. Feb. 24, 2016)....................................19

*Malleus v. George*,
641 F.3d 560 (3d Cir. 2011)..............................................................................................6

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
    511 F.3d 350 (3d Cir. 2007)...........................................................................6, 7

*Mu Sigma, Inc. v. Affine, Inc.*,
    No. 12-1323(FLW), 2013 WL 3772724 (D.N.J. July 17, 2023) ..................................... *passim*

*Mylan Pharm., Inc. v. Teva Pharms. Indus. Ltd. et al*,
    No. 21-13087 (JXN) (JSA), 2025 WL 756793 (D.N.J. Feb. 27, 2025)...........................22, 23

*New Jersey Physicians United Reciprocal Exch. v. Privilege Underwriters, Inc.*,
    No. 15-6911 (FLW), 2016 WL 6126914 (D.N.J. Oct. 18, 2016) ...............................11, 19, 22

*PIM Brands Inc. v. Haribo of Am. Inc.*,
    81 F.4th 317 (3d Cir. 2023) .........................................................................9, 10

*Qualitex Co. v. Jacobson Prod. Co., Inc.*,
    514 U.S. 159 (1995)........................................................................................9

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001)......................................................................................9, 11

*Tristar Prods., Inc. v. E. Mishan & Sons, Inc.*,
    No. 17-1204 (RMB/JS), 2017 WL 1404315 (D.N.J. Apr. 19, 2017) .......................................7

*Wal-Mart Stores, Inc. v. Samara Bros.*,
    529 U.S. 205 (2000).................................................................................7, 9, 15

## Statutes

15 U.S.C. § 1052(e)(5)..........................................................................................8

## I.    INTRODUCTION

Defendant Ontel Products Corporation ("Ontel"), joined by the other Defendants, moves to dismiss several legal claims from Plaintiff's Amended Complaint (D.I. 34) pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a legal claim. These Amended Complaint claims are:

- o   Trade Dress Infringement under the Lanham Act (Count IV);

- o   Unfair Competition under N.J.S.A. § 56:4-1 (Count VIII);

- o   Unfair Competition Under New Jersey Common Law (Count IX); and

- o   Tortious Interference with Prospective Economic Advantage under New Jersey Common Law (Count X).

Also, Ontel moves to strike impertinent allegations from the Amended Complaint pursuant to Fed. R. Civ. P. 12(f), in particular, "facts" that have been included in order to falsely conflate and confuse Defendant Ontel with former-Defendant Telebrands Corporation ("Telebrands").

Defendants Boscov's Department Store, LLC ("Boscov's"), BJ's Wholesale Club, Inc. ("BJ's"), and Unbeatablesale.com, Inc. ("Unbeatable") join Ontel's Motion, as to the proposed dismissal of Counts IV, VIII and IX. Plaintiff's claims for "Tortious Interference with Prospective Economic Advantage" (Count X) is only against Defendant Ontel. Boscov's, BJ's and Unbeatable also join the Rule 12(f) Motion to Strike impertinent and scandalous allegations from the Amended Complaint.

This Motion will show that Plaintiff's alleged trade dress is not protectable because it comprises the <u>functional</u> design elements of Plaintiff's product design, which is not permitted under the law. The patent and trade dress laws are clear that functional design elements cannot be protected as part of a trade dress. Moreover, Plaintiff provides two different, alternative statements of what constitutes its alleged, unregistered trade dress, which is a second basis for dismissing the

trade dress claims because Plaintiff must provide a clear statement of all of the elements that constitute its unregistered trade dress.

Plaintiff's unfair competition claims (Counts VIII and IX) are dependent upon Plaintiff's faulty trade dress pleading. Therefore, the Court must also dismiss the unfair competition claims.

Next, Plaintiff's Tortious Interference with Prospective Economic Advantage claim (Count X) is overbroad, vague, and indefinite, thereby lacking the requisite specificity. Plaintiff fails to plead the existence of a reasonable expectation of economic advantage; that absent Ontel's alleged interference there was a reasonable probability that Plaintiff would have received the anticipated economic benefits; and that Ontel's acts caused the alleged damages identified by Plaintiff. *See Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323(FLW), 2013 WL 3772724, at *3 (D.N.J. July 17, 2023). Rather than identify specific relationships that Defendant Ontel allegedly 'tortiously interfered with' and specific damages that Plaintiff allegedly suffered because of Ontel's conduct, Plaintiff instead alleges that Ontel interfered with all of Plaintiff's existing business relationships and all of Plaintiff's prospective business relationships in the future, including with distributors, retailers, consumers, and even with potential investors and acquisition suitors. The Amended Complaint asserts, without factual basis, that any customer of Ontel would have been Plaintiff's customer but for Ontel's products competing with Plaintiff's products. These are conclusory allegations, which seek vague and indefinite damages, and that cannot be adjudicated by any Court pursuant to the New Jersey common law that allows for recovery under a legal theory of tortious interference with a prospective economic advantage.

In addition, Defendants request that the Court strike impertinent "fact" allegations regarding Telebrands, a former Defendant in this lawsuit that Plaintiff voluntarily dismissed. *See* D.I. 22. Despite having already dismissed Telebrands from this lawsuit, the Amended Complaint

mentions "Telebrands" more than sixty (60) times. Plaintiff's intention is clear: to conflate and confuse Telebrands with Defendant Ontel. However, Plaintiff knows that Telebrands and Ontel are separate and distinct companies, do not share any common ownership, compete with each other in the As Seen On TV industry, and that Telebrands was not involved with the development, marketing, or sale of the Ontel products that are at issue in this lawsuit. Plaintiff knows these facts because it received and relied upon a sworn Declaration from Telebrands' Chief Operating Officer, Ajit Khubani (the "Khubani Declaration"). The Khubani Declaration is attached as **Ex. D** to the Declaration of Ariel Peikes ("**Peikes Decl.**"), which is submitted herewith. The Khubani Declaration led Plaintiff to dismiss Telebrands from this lawsuit voluntarily. Furthermore, the Amended Complaint references other legal disputes that have nothing to do with Plaintiff or with Plaintiff's purported intellectual property rights that are asserted in this lawsuit. These "fact" allegations, which are further enumerated herein, are included in the Amended Complaint only to try to tarnish Defendant Ontel with impertinent and scandalous claims.

## II.     RELEVANT PROCEDURAL HISTORY

On October 15, 2024, Plaintiff Happy Products, Inc. ("HPI") filed a Complaint (D.I. 1) in the District of New Jersey against Defendants Ontel and Telebrands Corporation, whom HPI accused of developing, manufacturing and selling products that allegedly infringe upon HPI's patent and trade dress rights (the "Accused Products"). HPI also sued retailers, namely, Defendants Boscov's, BJ's, and Unbeatable, all of whom are accused of offering and selling the Accused Products. *Id.*[1]

One day earlier, on October 14, 2024, HPI filed a lawsuit in the Eastern District of Texas, *Happy Products, Inc. v. Ace Hardware Corp. et al*, 4:24-cv-00915, asserting the same patents and

---

[1] The Am. Compl. defines the "Accused Products" as Defendant Ontel's "Pillow Pad and equivalent products." D.I. 34 at ¶ 304.

unregistered trade dress rights against nine (9) other retailers who are alleged to also have offered and sold the Accused Products.

HPI's original Complaints were defective *inter alia* in that they asserted a legally "surrendered" patent, U.S. Patent No. 9,642,454 ("the '454 patent"). D.I. 1, at ¶ 98, 100-104. This patent became a legal nullity on March 23, 2021, when HPI secured a reissue of the '454 Patent, which issued as U.S. Patent No. RE48,479 ("the '479 patent"). *See id*. Additionally, HPI's DNJ Complaint was defective in that it: (1) improperly asserted that HPI possesses unregistered trade dress rights in its "Flippy" product design; and (2) improperly pled tortious interference with a prospective economic advantage.

On December 4, 2024, Defendant Ontel requested a pre-motion conference with the Court in advance of Ontel's proposed Partial Motion to Dismiss the Complaint. D.I. 16. Afterwards, Ontel and HPI had a meet-and-confer to discuss HPI's improper assertion of the '454 Patent, which is legally a 'dead' patent.

On December 13, 2024, HPI received the Khubani Declaration (*see* **Peikes Decl., at Ex. D**) stating *inter alia* that Telebrands and Ontel are independent and competing companies, and that Telebrands was not involved with the Accused Products, HPI voluntarily dismissed Telebrands from this lawsuit. D.I. 22.

On January 29, 2025, the Court held a pre-motion conference on Ontel's proposed Partial Motion to Dismiss the Complaint. *See* D.I. 31 and 33. At the pre-motion conference, the Court instructed, and HPI agreed, to file an amended complaint that would: (1) drop all of the patent claims based upon the '454 Patent; (2) replead HPI's tortious interference claim; and (3) not mention Telebrands because Telebrands was not involved with the Accused Products and had been

voluntarily dismissed from the lawsuit pursuant to the Khubani Declaration (which was described to the Court by Ontel's counsel during the pre-motion conference).

In the EDTX, on February 18, 2025, HPI and the Defendants there filed a Joint Motion to Stay the Complaint and Litigation Against All Defendants, in favor of the DNJ lawsuit. And, on February 21, 2025, Hon. Judge Sean D. Jordan granted the parties' motion, in part. The Judge administratively closed the EDTX lawsuit "pending the final resolution" of the DNJ lawsuit, which presents many of the same patent and trade dress issues. *See* **Peikes Decl., Ex. G**.

On February 28, 2025, HPI filed its Amended Complaint. D.I. 34. Although the Amended Complaint does not include claims based upon the '454 Patent, the Amended Complaint still has a faulty tortious interference claim and still mentions *ad nauseum* former-Defendant Telebrands. Additionally, the Amended Complaint still contains the defective trade dress pleading that Ontel raised in its pre-motion letter. D.I. 16.

## III.    LEGAL ARGUMENT

### A.    STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotations and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, the court "must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (alteration in original) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). However, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff, a court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). "If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears that no relief could be granted 'under any set of facts consistent with the allegations,' a court may dismiss the complaint for failure to state a claim." *DeFazio v. Leading Edge Recovery Sols., LLC*, No. 2:10-cv-02945-WJM-MF, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

## B.  HPI'S TRADE DRESS INFRINGEMENT CLAIM FAILS DUE TO MULTIPLE PLEADING DEFECTS

Trade dress "is the overall look of a product or business[]" and can include a product's design, such as its "size, shape, color or color combinations, texture [and] graphics[.]" *Arro-Mark Co. LLC. v. Warren*, No. 2:22-cv-6663-JKS-MAH, 2024 WL 4053027, at *17 (D.N.J. Sept. 5, 2024) (Semper, J.) (citing *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000)). "The purpose of trade dress protection is to 'secure [for] the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007).

In order to plead trade dress infringement, a complaint must set forth facts stating that: "(1) the allegedly infringing design is <u>non-functional</u>; (2) the design is inherently distinctive or has

acquired secondary meaning[2]; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *Id.* at 357 (Emphasis added) (citing *Shire US Inc. v. Barr Lab'ys Inc.*, 329 F.3d 348, 353 (3d. Cir. 2003)).

The Third Circuit notes that "before [the Court] reaches the question of protectability ... a district court should scrutinize a plaintiff's description of its trade dress to ensure itself that the plaintiff seeks protection of visual," i.e., ornamental, "elements of its business," and not for functional elements of its product design. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014). Consequently, a trade dress claimant has the "duty to articulat[e] the specific elements which comprise its distinct dress." *Id.* This is to ensure, in part, that protection for a purported trade dress does not usurp the patent laws, which is the sole intellectual property law branch for protecting products' utility. Moreover, patent protection for an invention is for a limited period of time, whereas trade dress rights can exist indefinitely – for as long as the trade dress is used in commerce.

In order for a plaintiff to meet the pleading requirements for trade dress, "the discrete elements which make up the [trade dress claim] should be separated out and identified in a list." *Id.* (*quoting* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:3 (4th ed. 2014)). "[M]erely includ[ing] images" of a product is insufficient. *Tristar Prods., Inc. v. E. Mishan & Sons, Inc.*, No. 17-1204 (RMB/JS), 2017 WL 1404315, at *7 (D.N.J. Apr. 19, 2017) (*citing Fair Wind*, 764 F.3d at 309).

---

[2] A product's design (as opposed to a product's packaging) can never be inherently distinctive as a matter of law. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212-13 (2000). Consumers are aware rather that product designs are intended to render the goods more useful or more appealing rather than to identify their source. *Id.* Therefore, a party claiming trade dress rights in a product's design must plead that the product design has achieved secondary meaning amongst consumers. *Id.* at 216.

Here, HPI fails to specify the discrete non-functional design elements that constitute its purported "trade dress." Rather than offer a clear statement, with a list of non-functional design elements as is required in this Circuit, HPI offers two (2) <u>different</u> and <u>competing</u> descriptions of its alleged trade dress, both of which are comprised of functional design elements:

**Trade Dress Description #1**: The Flippy trade dress is comprised solely of its "signature rounded ledges." *See* Am. Compl.'s *Prayer for Relief*, at ¶ G (requesting that this Court find that the Flippy's "<u>signature rounded ledges</u> constitute distinctive trade dress.") (Emphasis added). *See also id.* at ¶ 335 (alleging that the rounded ledges, "<u>at specific levels of roundedness</u>, are distinctive of the Flippy.") (Emphasis added). Thus, Description #1 involves only a single design element, the rounded ledges.[3]

**Trade Dress Description #2**: The Flippy trade dress is comprised of design features "<u>including in particular</u> its soft fabric cover and the rounded ledges between each support and the next edge support." (Emphasis added) *Id.* at ¶ 333. Thus, Description #2 involves an <u>unknown</u> number of design elements because of the inclusion of the indefinite language, "including in particular"; but, HPI discloses that two (2) of those design elements are the Flippy's (a) soft fabric cover, and (b) rounded ledges between each back support and the next edge support.

### i. HPI Improperly Claims Functional Design Elements As Constituting Its Trade Dress

In order to prevent trade dress protection from "usurping the place of patents" and to "keep trademark law in its lane," a trade dress cannot protect the functionality of a product. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 256 (3d Cir. 2021), as amended (Mar. 10, 2021). This maxim is reflected in the Lanham Act itself, which provides that registration shall be refused if it "comprises any matter that, as a whole, is functional." 15 U.S.C. § 1052(e)(5). "Trade

---

[3] The Amended Complaint provides no additional explanation for what "specific levels of roundedness" means. It is indeed not specific at all and contains no measurement or range of measurements that supposedly are covered by the Flippy trade dress, and which consumers have allegedly come to know as designating HPI as the source of the Flippy product design.

dress is limited to designs that identify a product's source," and trade dress cannot "safeguard designs that are functional—that is, useful." *Ezaki Glico*, 986 F.3d at 253. *See also PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023) (holding that trade dress is only meant to protect "distinctive choices" that are "arbitrary, ornamental, or the like").

In *Qualitex Co. v. Jacobson Prod. Co., Inc.*, 514 U.S. 159, 164 (1995), the Supreme Court described the functionality doctrine as protecting competition by keeping a producer from perpetually controlling a useful product feature. In *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34 (2001), the Court described functionality as depending on whether "the feature in question is shown as a useful part of the invention." The *TrafFix Devices* opinion contrasted functional features disclosed in a utility patent with "arbitrary, incidental, or ornamental aspects" that "do not serve a purpose within the terms of the utility patent." *Id.* And, in *Wal-Mart Stores,* the Court contrasted designs that "render the product itself more useful or more appealing" with designs that only "identify the source" of the product. 529 U.S. 205, 213 (2000).

Consequently, federal courts must evaluate whether the design element "affects the cost or quality of the article," i.e., makes the product "more useful or more appealing" to consumers, rather than evaluate whether that particular design element is "essential" to providing the utility. *See TrafFix Devices*, 532 U.S. at 24 (explaining that the Court has expanded the meaning of "functional," observing that a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage, but that language does not mean that <u>competitive necessity</u> is a necessary test for functionality; in other words, where the design is functional, there is no need to proceed further to consider competitive necessity). In *PIM Brands,* the Third Circuit explained that "[t]rade dress is limited to design choices that serve only to brand

a product[,]" and if the design feature "makes a product work better" or "improves cost, quality, or the like" then the design feature is functional and not protectable as trade dress. 81 F.4th at 321.

In a recent and analogous patent and trade dress case, *Azurous, Inc. v. Kennedy Int'l, Inc.*, No. 23-04770 (ZNQ) (JBD), 2024 WL 3219663, at *10 (D.N.J. June 28, 2024), Hon. Judge Qurashi dismissed plaintiff's claim of unregistered trade dress rights in the design of its <u>travel pillow</u>. In granting defendant's partial motion to dismiss, the Court determined that the asserted 'trade dress' design elements were functional and, therefore, the design elements were not creditable as arbitrary and ornamental design elements. An image of the *Azurous* plaintiff's travel pillow product is shown below:



The plaintiff in that case had pled that the features that make up its product design trade dress are: "the **distinctive shape**, **outer material**, attached media pouch and adjustable clasps[.]" *Id.* at *9. Judge Qurashi determined that, despite plaintiff's pleading that such elements are non-functional:

> the Complaint and supporting documents indicate that the very features Plaintiff contends are non-functional are not only useful, but also give the EVOLUTION Pillow an advantage over its competitors—they do more than just brand the product. The Complaint alone suggests that the EVOLUTION Pillow's **"U-shaped design" and configuration** and its **"soft, velvety" texture serve the function of consumer comfort**.

*Id.* (Emphasis added). Finally, the Court determined that: "All of the claimed features, taken together, are not 'arbitrary' or 'ornamental,' but instead appear to be design choices that serve to

bolster the quality of the design and maintain the product's popularity with consumers over other brands." *Id.* (citing *PIM Brands*, 81 F.4th at 321).

The Court may also consider HPI's utility patent that it alleges to cover the Flippy product design because "[a] utility patent is strong evidence that the features therein claimed are functional." *TrafFix Devices*, 532 U.S. at 29-30. Putting aside the validity of HPI's utility patent, which is contested, HPI purports that its utility patent covers the same subject matter. That patent, the '479 Patent, is simultaneously being asserted against the Defendants. A copy of HPI's '479 Patent is attached to the Amended Complaint, as **Ex. B**. (D.I. 34-1). Amended Complaint Counts I, II and III allege infringement of the '479 Patent, a utility patent.

In fact, when HPI attempted to register its alleged "trade dress" with the United States Patent and Trademark Office ("USPTO") in 2019, it was denied protection because  the claimed design was determined to be "functional,"  especially due to the existence of the patent issued to HPI for (allegedly) the same design. **Peikes Decl., Ex. B.** The USPTO's Trademark Examiner noted that HPI's "utility patent claiming the design features…is strong evidence that those features are functional" and not protectable as trade dress. *Id.* HPI failed to respond to the USPTO's Office Action, thereby allowing its trade dress application to go abandoned. *Id*. at **Ex. C**.

This Court is allowed to consider the determination of the USPTO that HPI's purported "trade dress" is actually "functional" and therefore not protectable as trade dress. *See New Jersey Physicians United Reciprocal Exch. v. Privilege Underwriters, Inc.*, No. 15-6911 (FLW), 2016 WL 6126914, at *3 (D.N.J. Oct. 18, 2016) (determining that the court could take judicial notice of USPTO records).

Now, nearly five years after the USPTO refused to grant trade dress rights to HPI and HPI abandoned its application, HPI requests that this Court grant it valid and protectable trade dress

rights. However, the Amended Complaint fails to identify even a single non-functional, ornamental design element that can qualify for trade dress protection. Therefore, this Court must conclude that HPI's trade dress pleading is legally deficient and fails to state a legal claim.

### ii. The Flippy's "Rounded Ledges" are Functional and, therefore, are Ineligible for Trade Dress Protection

Here, as in *Azurous*, HPI's Amended Complaint and the '479 Patent inform us that the "rounded ledges" in HPI's Flippy product design were intended to supposedly bolster the quality of HPI's design and to contribute to the Flippy's overall usefulness. In *Azurous*, *supra*, Judge Qurashi determined that the purported "distinctive shape" of plaintiff's travel pillow was nothing more than a utilitarian-driven design choice. The shape of the pillow, and all of the rest of plaintiff's design choices, "serve[d] the function of consumer comfort." 2024 WL 3219663, at *9. The same conclusion is required as to the Flippy's inclusion of the rounded ledges in the product design.

The "rounded ledges" are functional features that facilitate vertical rotation between the design's three viewing angles, including while the user is lying down. These functional features are intended to contribute to the consumer's comfort while using the product.

HPI's Amended Complaint states that:

> 87. Claim 12 of the '479 patent, for example, is directed to a "media support apparatus comprising: a body having a first support back, a second support back, and a third support back disposed about a central axis" where each support edge is "disposed between" two support backs, wherein "the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions …" and provides three "viewing angles" that are different from one another.

D.I. 34, at ¶ 87. (Emphasis added). Further, the Amended Complaint alleges that "one primary use" for the product's design is "for when the viewer is lying down (e.g., in bed or on the couch)." *Id.* at ¶ 98. Thus, the "horizontal support" (*see* ¶ 87) that is often under the product design is the user's body (the user's chest or stomach area), especially while the user is lying down on his or her back "in bed or on the couch."

Elsewhere in the Amended Complaint, HPI provides an illustration that helps to show how the "apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support," often a user's body, "in any one of three positions." The illustration from the Amended Complaint, at ¶ 2, is shown here:



The illustration highlights the three different viewing angles offered by HPI's purported invention. What is implied in these drawing is that the user can "rotate" the structure "about the central axis," along the rounded ledges of the design. The rounded ledges facilitate the rotation between the three differing viewing angles.

Furthermore, the alleged utilitarian advantages of the rounded ledges are disclosed by HPI in its '479 Patent. Specifically, the Patent touts how the design can be rotated from one viewing angle to another, including while the design is against the user's body, when the user is lying down. The '479 Patent states that:

a. "[While lying down], [t]he user may further rotate the media support to select a back support with a comfortable viewing angle" ('479 Patent at 3:19-21); and

b. "[w]hen the user changes position, the media support may be quickly rotated to provide a different viewing angle. As a result, the media support is quickly deployed to provide the appropriate viewing angle." (*Id*. at 4:28-29).

13

Thus, the '479 Patent reveals that the "rounded ledges" of the Flippy merely facilitate rotation of the product, enabling the user to comfortably select one of the three viewing angles offered by the product design.

HPI disingenuously states in the Amended Complaint that without the "rounded ledges," the Flippy would "appear weapon-like[,] [s]pecifically, it would *look like* a 'ninja star' or shuriken when viewed from the side." D.I. 34, at ¶ 104 (emphasis added). However, it is clear that not only would the Flippy <u>appear</u> to be less comfortable without the rounded ledges, in fact, it would be less comfortable against a user's body, especially while the user is lying down, if the design choice by HPI had been to include jagged, pointy edges. The Complaint provides an illustration of the design differences, included below:



*Id.* at ¶ 103. In particular, the pointed ledges shown on the right side would contact the user's body while the user is lying down and, therefore, the user would be less comfortable. Furthermore, the Flippy is intended to be rotated from one side to another in order to pick a comfortable viewing angle.  Consumers would identify that "rotating" the product design vertically, i.e., around the jagged edges (to the extent that *rotating around a jagged edge* is even possible) is not as comfortable as rotating along a "rounded ledge," especially when the product is against the user's body. Thus, the Amended Complaint's illustration shows that the curved ledges are not merely for the good feeling, "ii kanji" as HPI alleges, they are for utilitarian purpose of helping to rotate the

product vertically and also for providing comfort to the consumer, when the object is against the user's body, and especially when the user is lying down.

Consequently, this Court should determine that the "rounded ledges" of the product design provide utility and, therefore, are ineligible for trade dress protection.

### iii.   The Flippy's "Soft Fabric Cover" is Functional and, therefore, is Ineligible for Trade Dress Protection

HPI's Amended Complaint fails to plead that the Flippy's "soft fabric cover," which it alleges to be a part of the Flippy trade dress, is non-functional. *See Interlink Prod. Int'l, Inc. v. HDS Trading Corp., Inc.,* No. 3:15-cv-1642 (PGS)(TJB), 2015 WL 12840378 at *4 (D.N.J. Oct. 14, 2015) (dismissing trade dress claim for failure to properly plead non-functionality). HPI only mentions the "soft fabric cover" one time in its Amended Complaint – almost as an afterthought. D.I. 34, at ¶ 333. Nowhere in that Paragraph does HPI meet its obligation to state that this design element is non-functional.

As in *Azurous, supra*, it is clear that HPI elected a "soft, velvety texture" or "soft fabric cover" for the exterior of its product design in order to provide consumers with comfort when using the product. Comfort is an important product design feature for HPI, especially when the user is lying down, and the product is against the user's body. *See Wal-Mart Stores*, 529 U.S. at 212-13 (Consumers are aware that product designs are intended to render the goods more useful or more appealing rather than to identify their source). *Azurous* and HPI both designed products that would contact the consumer's body while the consumer is reclining and relaxing ("e.g., while in bed or on the couch" *See* D.I. 34, at ¶ 98); and, unsurprisingly, both incorporated soft, pillowy and "velvety" covers on their products, as a means of providing increased comfort for their consumers.

HPI's '479 Patent tells us that the "soft fabric cover" is utilitarian and not decorative:

A user may place the media support on a table, in the user's lap, or **on the user while lying down**. **The semi-rigid pillow feel of the media support comfortably contacts the user while providing firm support for the media**.

(*Id.* at 3:16-19) (Emphasis added). Thus, the Flippy's "soft fabric cover" was a design choice made by HPI to provide a "pillow feel." This enables the product to "comfortably contact[] the user," including while the user is "lying down." The <u>interior</u> of the product makes it "semi-rigid," whereas the <u>exterior</u> provides the comfortable "pillow feel." The Amended Complaint does not even offer any explanation to the contrary, i.e., that the "soft fabric cover" was incorporated into the Flippy design for the purpose of ornamentation or decoration. The only possible conclusion is that the "soft fabric cover" is for utility (namely, consumer comfort) and cannot be deemed a non-functional, trade dress element.

HPI's online advertising for the Flippy also confirms that the "soft fabric cover" provides utility. On Amazon, at the Flippy Store, HPI refers to the Flippy as a "Tablet Pillow Stand – Cushion Tablet Stand & Holder." **Peikes Decl., Ex. E**. HPI advertises that the Flippy can be used for "[c]ozy [r]eading." *Id.* Also, HPI advertises that the Flippy is "covered in ultra-suede" so that "it's soft yet sturdy." *Id.* On HPI's website, getflippy.com, HPI states:

> "Looking for a **super functional stand** that is **more like a comfortable pillow** than a piece of hardware? Flippy Cubby is the answer!"

**Peikes Decl., Ex. F** (Emphasis added). Notably, HPI refers to the Flippy as a "super functional stand" that is "like a comfortable pillow." *Id.* The Flippy's soft fabric cover contributes to this utility by providing comfort, "like a comfortable pillow." *Id.* Furthermore, the website page advertises that the Flippy is "SOFT, STURDY, LIGHTWEIGHT…The plush polyester exterior is **extra soft** and can be wiped off with a damp cloth." *Id.* (Emphasis added). Therefore, Plaintiff's own advertising emphasizes that the Flippy's exterior is "extra soft" thereby providing the utility of comfort to Plaintiff's customers.

Consequently, it is clear that the Flippy's "soft fabric cover" design element provides utility, not decoration, and it cannot be part of a trade dress.

> **iv.    HPI's Trade Dress Description #2 is Indefinite and Must Be Dismissed for the Failure to Provide a Full List of the Trade Dress Elements and to Plead Non-Functionality**

As described above, the Third Circuit requires that a party alleging trade dress rights must "articulat[e] the specific elements which comprise" the "distinct dress." *Fair Wind*, 764 F.3d at 309. Here, it is clear that HPI has failed to do so with the following non-limiting trade dress description: The Flippy trade dress is comprised of design features "**including in particular** its soft fabric cover and the rounded ledges between each back support and the next edge support[.]" D.I., at ¶ 333 (emphasis added). Defendants are not informed of what other design elements are included in this purported trade dress. Defendants have received only a partial list of this purported trade dress and, moreover, this list contradicts Trade Dress Description #1, which included only a single design element, the "rounded ledges." *See* p. 8, herein.

Moreover, a party alleging unregistered trade dress rights is required to plead that the purported trade dress is non-functional. *See Interlink Prod. Int'l*, 2015 WL 12840378 at *4 (dismissing trade dress claim for failure to properly plead non-functionality). HPI does not even identify the design elements that comprise the trade dress and, therefore, it blatantly fails to assert that the unidentified trade dress design elements are non-functional.

Therefore, HPI's non-disclosure of all the trade dress elements and its failure to assert each of them as being non-functional are fatal to HPI's trade dress claim.

In sum, HPI's Trade Dress Descriptions #1 and #2 both fail because HPI identifies only functional design elements as constituting its "trade dress," and fails to adequately plead non-functionality.

## C.  THE UNFAIR COMPETITION CLAIMS (COUNTS VIII AND IX) MUST ALSO BE DISMISSED

Plaintiff's New Jersey statutory and common law unfair competition claims (Counts VIII and IX) cite "duplicat[ion]" and "infringement" of the "Flippy Trade Dress." D.I. 34, at ¶¶ 370, 379, and 382. Accordingly, these Counts must also be dismissed because Plaintiff has failed to articulate a valid, non-functional trade dress. *See Ezaki Glico*, 986 F.3d at 255 (ruling that because plaintiff's federal trade dress infringement claim had failed, the state unfair competition claim must also be dismissed, since New Jersey's unfair-competition and trademark laws are not significantly different from federal law). Likewise, in *Azurous, supra*, the District Court ruled that, "[g]iven the overlap in the analysis for trade dress infringement and for common law unfair competition, the Court finds that Plaintiff's common law claims for unfair competition also cannot proceed for the same reasons." 2024 WL 3219663, at *10.

## D.  HPI FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE

Plaintiff's Count X for Tortious Interference With Prospective Economic Advantage must be dismissed for failure to state a claim for relief.

To state a claim for tortious interference with prospective economic advantage, a plaintiff must adequately allege: "(1) the existence of a reasonable expectation of economic advantage; (2) the interference was done intentionally and with malice; (3) absent the interference there was a reasonable probability that the plaintiff would have received the anticipated economic benefits; and (4) the injury caused the damage." *Mu Sigma*, 2013 WL 3772724, at *3. Plaintiff's Amended Complaint fails to adequately plead the first, third, and fourth elements of the claim.

To allege a "reasonable expectation of economic advantage," "mere hope that a plaintiff would have entered into some future arraignment is not sufficient." *Intervet, Inc. v. Mileutis, Ltd.*, No. 15-1371 (FLW)(TJB), 2016 WL 740267, at *8 (D.N.J. Feb. 24, 2016); *Mu Sigma*, 2013 WL

3772724, at *3. Plaintiff must "at least allege specific prospective contracts that were interfered with" by the defendant. *New Jersey Physicians*, 141 F. Supp. 3d at 309. However, rather than be specific, the Amended Complaint does the exact opposite, and Plaintiff alleges tortious interference with countless *prospective* and *unnamed* retailers and consumers. D.I. 34 at ¶¶ 385 and 394. HPI states its legal theory as follows:

> On information and belief, every customer (whether retailer, distributor, or end-user) who purchased a knock-off Pillow Pad from Ontel or via an Ontel-controlled sales channel, or who purchased a Pillow Pad product that was the subject of Ontel's false advertising, was a customer who would have potentially purchased Plaintiff's innovative Flippy instead—but for Ontel's intentional actions.

*Id.* at ¶ 394; *see also id.* at ¶¶ 388-90. But, the Amended Complaint acknowledges that Ontel is an established, "big player" company in the As Seen On TV industry (*Id*. at ¶ 29; *See also* ¶¶ 32 and 38), whereas Plaintiff is smaller and newer businesses entity, having only been founded recently, in 2018 (*Id*. at ¶ 115) and therefore does not have equivalent retailer and customer relationships to the more established Ontel. Plaintiff's statement is therefore conclusory and one of "mere hope," similar to the complaint allegations refused as insufficient in *Intervet, Inc.*

Likewise, without pleading any facts that HPI was in discussions with any party to be infused with investment capital or to be acquired, HPI improperly seeks damages for loss of "opportunities to develop relationships leading to potentially profitable business arrangements such as investment and/or acquisition." *Id.* at ¶ 386. HPI pleads no facts showing that Ontel tortiously interfered with HPI receiving any investment or being acquired by some unnamed individual and/or company. These are mere conclusory allegations by HPI.

Plaintiff fails to plead that there was a "reasonable probability" that it would have secured particular retailers as its customers, but for Ontel's "tortious" acts. Thus, the Amended Complaint fails the third prong of the pleading requirement.

19

For example, the Amended Complaint specifically mentions "Kroger," among others,[4] as a potential client that Ontel "interfered" with but the Amended Complaint also acknowledges that, in September 2019, HPI's Principal "found" the Ontel product "for sale at her local Kroger store, Fred Meyer." *Id.* at ¶ 209. Only <u>after</u> seeing the Ontel product being sold at Kroger did HPI contact "Kroger principals" and offer to present to them HPI's product. *Id.* at ¶¶ 212-13. Thus, the Amended Complaint tells the opposite story of HPI's claim, that HPI sought to replace Ontel as the wholesaler of the plush stand products to Kroger. The Amended Complaint acknowledges that, at the time Ontel started to sell the Accused Products to Kroger, HPI had not yet presented the Flippy to Kroger, and had not made an offer to Kroger to carry the HPI product. Therefore, HPI never had a reasonable expectation that it would sell any product to Kroger, and it never had any business relationship with Kroger.

The Amended Complaint also references HPI's attempts to sell to Ollie's Discount Outlets ("Ollie's"). *Id.* at ¶¶ 244-48 and 395. However, the Amended Complaint admits that HPI could not meet Ollie's price point. *Id.* at ¶¶ 244-47. According to the Amended Complaint, Ollie's even offered to purchase HPI's product at "double what we paid [Ontel]." *Id.* at ¶ 245. Nevertheless, HPI was unable or unwilling to meet Ollie's proposed price, and the Amended Complaint alleges that Ollie's preferred to continue to buy Ontel's products instead. See *Id.* at ¶¶ 246-48. Again, Ollie's was already purchasing from Ontel before it was even approached by HPI, according to the Amended Complaint. Moreover, none of HPI's factual pleadings support, for example, that Ontel secured Ollie's or any other retailer's business by advertising that it was the "innovator" of the Pillow Pad or that it "told any retailer[] that it would provide them with all necessary rights for the

---

[4] The Amended Complaint alleges that "Ontel specifically and intentionally interfered with Plaintiff's economic opportunities with retailers, including at least BBB [Bed Bath and Beyond], Ollie's, and Kroger." *Id.* at ¶ 395.

importation, distribution, and sale of the knock-off Pillow Pad." *See Id.* at ¶ 389. These are mere conclusory statements by HPI, and the name-dropping of retailers such as "BBB [Bed Bath and Beyond], Ollie's, and Kroger" (*Id.* at ¶ 389) is for the sole purpose of distracting from Plaintiff's actual and explicitly stated theory of its tortious interference claim, that: "**every customer** (whether retailer, distributor, or end-user) **who purchased a knock-off Pillow Pad from Ontel or via an Ontel-controlled sales channe**l, or who purchased a Pillow Pad product that was the subject of Ontel's false advertising, **was a customer who would have potentially purchased Plaintiff's innovative Flippy instead**." *Id.* at ¶ 394. (Emphasis added). Therefore, it is clear that HPI's tortious interference claim is not based on any specific relationship, or nearly consummated relationship, with "BBB [Bed Bath and Beyond], Ollie's, and Kroger." Rather, HPI alleges that Ontel interfered with HPI's potential relationships with <u>all</u> retailers, <u>all</u> distributors, and <u>all</u> consumers that might, sometime in the future, purchase the Flippy from HPI. This is not a legitimate claim for tortious interference with prospective economic advantage.

Similarly, in *Mu Sigma v. Affine*, Plaintiff failed to identify any specific prospective business client, which was fatal to its tortious interference claim. *Mu Sigma*, 2013 WL 3772724, at *4 (failing to meet the first and third prongs of the test). Having not explained beyond a "mere hope" that the plaintiff would have entered a future arrangement, plaintiff's pleading tortious interference claim must be dismissed. *Id*. Here, Plaintiff does nothing more than express a "mere hope" that it would have sold to Kroger, Ollies, Walmart, among others.

Plaintiff's pleading also fails the fourth prong because damages are a "substantive element" of the claim and "must be identified with a certain degree of specificity." *See New Jersey Physicians*, 141 F. Supp. 3d at 310. "[C]laimed loss of ... unknown customers is insufficient," and plaintiff "must allege an injury that is more concrete than lost business of unknown, unsolicited,

or hypothetical customers." *Id. See also Advanced Oral Techs., L.L.C. v. Nutrex Rsch., Inc.*, No. 10-5303(DRD), 2011 WL 1080204, at *4 (D.N.J. Mar. 21, 2011); *Mu Sigma*, 2013 WL 3772724, at *3-4. The Amended Complaint refers only generally to any alleged benefit such as a "continued and increased sales to consumers" (D.I. 34, at ¶ 386) and "opportunities to increase sales" (*id.* at ¶ 387) and, generally, "lost sales, lost profits, lost business opportunities, tarnished reputation, and loss of good will" (*id.* at ¶ 396). These conclusory allegations do not satisfy the requirement that the pleading of purported damages from the defendant's conduct be alleged with specificity.

Consequently, Plaintiff has failed to state a claim for tortious interference with a prospective economic advantage.

### E.  PLAINTIFF'S IMPERTINENT ALLEGATIONS ABOUT DEFENDANT ONTEL AND FORMER-DEFENDANT TELEBRANDS SHOULD BE STRICKEN PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(f)

The Amended Complaint is replete with immaterial allegations regarding Ontel and Telebrands, including statements obviously intended to conflate and confuse Telebrands with Ontel. The Amended Complaint indulges in immaterial diatribes about former-Defendant Telebrands and Defendant Ontel, including regarding unrelated disputes, unrelated parties, and unrelated alleged intellectual property rights.

Under Rule 12(f), the Court may "strike from a pleading . . . any . . . impertinent or scandalous matter." Fed. R. Civ. Proc. 12(f). An impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. *Mylan Pharm., Inc. v. Teva Pharms. Indus. Ltd. et al*, No. 21-13087 (JXN) (JSA), 2025 WL 756793, at *44 (D.N.J. Feb. 27, 2025). The party seeking to strike portions of a pleading must show that the matter sought to be stricken is outside the issues in the case and is prejudicial. *Id.*

The Amended Complaint's obsessing over non-party, former-Defendant Telebrands – mentioning Telebrands more than sixty (60) times – is impertinent, in particular, because it is

obvious that HPI seeks to present Telebrands and Ontel as affiliated or cooperating companies, when they are not. HPI attempts to implicate Ontel by raising Telebrands' disputes with third-parties. However, HPI <u>knows</u> that Telebrands and Ontel are independent and competing companies. For this very reason, HPI voluntarily <u>dismissed</u> Telebrands from this lawsuit on December 13, 2024 (D.I. 22 and 23), whereas Ontel remains a Defendant.

On December 13, 2024, Telebrands' Chief Executive Officer, Ajit Khubani provided to Plaintiff a sworn declaration that explicitly states: "I submit this Declaration to address certain inaccurate statements related to Telebrands made in the Complaint [D.I. 1] filed by Plaintiff Happy Products, Inc. ("HPI"), and to confirm, for the record, that Telebrands had nothing, whatsoever, to do with defendant Ontel Products Corporation's ("Ontel") decision to develop, or Ontel's development, marketing and/or sale of Ontel's Pillow Pad product (which is the subject of HPI's Complaint)." **Peikes Decl., Ex. D**. The Khubani Declaration also states that: "[t]here is no common ownership between Telebrands and Ontel;" "[t]hey are completely separate, independent entities owned by different parties[,]" and; "Telebrands and Ontel are direct competitors." *Id.* at ¶¶ 5-6. And, to resolve any doubt that Telebrands was not involved with the facts of this lawsuit, Khubani states that: "[i]n short, Telebrands had nothing, whatsoever, to do with Ontel's decision to develop the Pillow Pad product, nor Ontel's decision to actually develop, market and/or sell that product[, and that] Ontel did those things completely on its own, without any communication…with Telebrands." *Id.* at ¶ 13.

Further, on January 29, 2025, during the pre-motion conference on Ontel's proposed Partial Motion to Dismiss, held by Hon. Judge Padin, HPI represented to the Court that HPI would not mention Telebrands in its Amended Complaint. Nevertheless, on February 28, 2025, more than two months after receiving the Khubani Declaration and dismissing Telebrands voluntarily from

this lawsuit, and one month after representing to Hon. Judge Padin that the Amended Complaint would not mention Telebrands, Plaintiff filed its Amended Complaint that mentions Telebrands <u>sixty-four (64)</u> times, and has an entire section (of 20 Paragraphs in the Amended Complaint), from ¶¶ 60-79, dedicated to discussing a single legal dispute that involved Telebrands, but did not involve Ontel or any of the other Defendants in this lawsuit.[5] The Amended Complaint even contains a section entitled "ONTEL AND TELEBRANDS PERSONNEL ORDER MULTIPLE FLIPPY PRODUCTS; TELEBRANDS DECLINES TO COPY FLIPPY WHILE UNDER THE SPOTLIGHT." *Id.* at p. 21 and ¶¶ 124-157. The implication is clear, that Ontel and Telebrands conferred and determined that only Ontel would offer the Accused Products because Telebrands was already "under the spotlight." Regardless, the references to Telebrands are impertinent to this lawsuit because it was not involved with the development or sale of the Accused Products.

Most offensively, the Amended Complaint repeatedly references familial connections between the two, independent and competing companies. For example, the Amended Complaint states that "Chuck Khubani [of Ontel] is the brother of AJ Khubani, the CEO of Telebrands, another family-owned 'As Seen On TV' direct response company," and "Amar Khubani is Chuck Khubani's son and AJ Khubani's nephew." *Id.* at ¶¶ 10, 13; s*ee also* ¶ 31 (stating that Telebrands is "run by A.J. Khubani–the brother of Ontel CEO Chuck Khubani…[and] A.J. Khubani [of Telebrands], is known as the infamous 'Knock Off King' of the infomercial industry."). Yet, Plaintiff knows that none of these purported "facts" have anything to do with the instant lawsuit because Telebrands was not involved with Ontel's development, marketing or sale of the Accused Products.

---

[5] HPI discusses Telebrands in the Amended Complaint (D.I. 34), at ¶¶ 10, 31-32, 35-37, 56-57, 59-62, 65-67, 70-79, 134-136, 138, 141-154, 202, 214, and 278, as well as at footnotes nos. 1-3.

HPI's motive for including more than sixty (60) references to Telebrands in the Amended Complaint is clear. HPI is convinced that it can create a false affiliation between Ontel and Telebrands. This is inappropriate because HPI knows that Ontel and Telebrands are "completely separate, independent entities owned by different parties[,]" are "direct competitors," and that Telebrands "had nothing, whatsoever, to do with Ontel's decision to develop the Pillow Pad product…[and that] Ontel did those things completely on its own, without any communication, whatsoever, about the product or concept, with Telebrands." Peikes, Decl., Ex. D., Khubani Decl. at ¶¶ 5-6 and 13.

Consequently, all of the Amended Complaint paragraphs mentioning Telebrands should be stricken for being impertinent. Furthermore, the following paragraphs, in particular, must be stricken for being both impertinent and scandalous[6]: ¶¶ 31-37; 56-60[7]; 61-79 (regarding Telebrands and "Bunch O Balloons"); and 142-154 (suggesting that Telebrands and Ontel together evaluated launching a competing product to HPI's Flippy).

The Court should strike numerous Amended Complaint paragraphs discussing unrelated lawsuits, including involving Ontel. These lawsuits have nothing to do with HPI, the purported intellectual property rights that are asserted by HPI, and have no relationship to the Accused Products. The following paragraphs reference impertinent disputes allegedly involving Ontel: ¶¶ 53, 54 (alleging infringement of numerous products that are unrelated to this lawsuit); 55

---

[6] *See Ewing v. Freedom Forever, LLC*, No. 23-cv-1240 JLS (AHG), 2024 WL 221777, at *12 (S.D. Cal. Jan. 19, 2024) (defining scandalous as allegations which "improperly cast[] a derogatory light on someone, most typically on a party to the action" (internal quotations omitted)).

[7] For example, ¶ 56 again conflates Ontel and Telebrands, stating that: "Ontel, like Telebrands, employs aggressive bullying tactics in response to the potential of adverse litigation when these smaller companies attempt to assert their intellectual property rights against the respective Ontel and Telebrands knock-offs that saturate the market."

(referencing a complaint's allegations against Ontel, in a third-party lawsuit, as if those allegations are established facts); 57 (stating that "Ontel and Telebrands have <u>collectively faced over 100 lawsuits</u> for intellectual property infringement" but *inter alia* failing to distinguish between the lawsuits filed against Ontel and the lawsuits filed against Telebrands). (Emphasis added).

Therefore, it is appropriate for this Court to strike Plaintiff's impertinent and scandalous allegations regarding Ontel and former-Defendant Telebrands from the Amended Complaint.


## IV.    CONCLUSION

For the aforementioned reasons, the Defendants submit that Counts IV, VIII, IX, and X of the Amended Complaint must be dismissed, with prejudice. Plaintiff should not be granted leave to amend, for a second time, to replead its legal claims. Defendant Ontel previously put Plaintiff on notice of its failure to state legal claims. *See*, e.g., D.I. 16. In addition, the identified impertinent and scandalous allegations should be stricken from the Amended Complaint.

Dated: March 28, 2025

/s/ *Katherine A. Escanlar*
Katherine A. Escanlar
**Saiber LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932
Tel: (973) 845-7720
kescanlar@saiber.com

Michelle M. Marsh
michelle.marsh@afslaw.com
Ariel S. Peikes
ariel.peikes@afslaw.com
**ArentFox Schiff LLP**
1301 Avenue of the Americas,
42nd Floor
New York, NY 10019
Tel: (212) 484-3900
Fax: (212) 484-3990

Janine A. Carlan (*phv forthcoming*)

janine.carlan@afslaw.com
**ArentFox Schiff LLP**
1717 K St NW
Washington, DC 20006
Tel: (202) 857-6000
Fax: (202) 857-6395

Julie A. Vernon (*phv forthcoming*)
julie.vernon@afslaw.com
**ArentFox Schiff LLP**
233 South Wacker Drive,
Suite 7100
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-5600

*Attorneys for Defendants Ontel Prods. Corp., Boscov's Department Store, LLC, BJ's Wholesale Club, Inc., and Unbeatablesale.com, Inc.*